UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.  9:23-cv-81291-XXXX

MOLEKULE GROUP, INC.,
a Delaware corporation,

      Plaintiff,

vs.

AURA SMART AIR, LTD., an Israeli
corporation

      Defendant.

_____/

## COMPLAINT FOR SPECIFIC PERFORMANCE AND INJUNCTIVE RELIEF

Plaintiff, Molekule Group, Inc. ("Plaintiff" or "Molekule") sues Defendant, Aura Smart Air, Ltd. ("Defendant" or "ASA Ltd."), and alleges as follows:

### INTRODUCTION

1.     This action concerns Defendant ASA Ltd.'s unjustified failure to comply with its written agreement to: (a) deliver to Molekule all technology and information needed to deploy and operate a software dashboard application program Molekule licensed from ASA Ltd.; and (b) deposit all of its source code into an escrow established for the sole benefit of Molekule to secure its rights in and to the intellectual property.

2.     Molekule produces, distributes, and sells air quality management devices and systems to consumers and to businesses.  For well over two years, Molekule developed and executed on a business plan to market and sell products and services specifically designed for the crucially important business-to-business ("B2B") market.

3.     Businesses often maintain centralized offices that support various field offices. Molekule's products and services, the Molekule 360 and Molekule 360 HUB (collectively,

"Molekule 360"), would feature not only Molekule's state of the art air purification technologies, but also a dashboard software application enabling a central office location to remotely monitor and operate a fleet of air purification devices installed in field office locations.

4.      In late 2022, Molekule identified a potential partner, ASA Ltd., that possessed proprietary technology more mature than the Molekule 360 dashboard application then under development.  After testing and reviewing ASA Ltd.'s technology, Molekule, for substantial consideration, secured a perpetual and world-wide license to, among other things, ASA Ltd.'s dashboard application software. Accordingly, Molekule shelved its own dashboard development program.

5.      ASA Ltd.'s dashboard application software operated on a cloud computing platform.  Between March and June 2023, Molekule and ASA Ltd. collaborated to integrate the Molekule 360 into the licensed cloud-based dashboard application.  On or about July 18, 2023, Molekule announced the Molekule 360 product launch. The launch initially met with great success. Two of Molekule's B2B customers included a Fortune 50 banking company and one of the largest telecommunication companies in the United States.

6.       Under the parties' agreements, ASA Ltd. agreed to deliver all technology and information needed to deploy and operate the dashboard application on any cloud computing platform Molekule may choose.  To protect Molekule's rights and interests under the ASA Ltd. license, ASA Ltd. also agreed to deposit into escrow all of ASA Ltd.'s source code to be released to Molekule only on certain conditions, such as ASA Ltd.'s insolvency.

7.      After the Molekule 360 product launch, ASA Ltd. failed and refused to deliver the technology and information needed to deploy or operate the dashboard application on a cloud computing platform of Molekule's choosing.  Thus, Molekule was left with no choice but to

continue to operate the Molekule 360 dashboard application on ASA Ltd.'s cloud computing platform. ASA Ltd. further failed and refused to deposit into escrow its source code, thus denying Molekule its bargained for protections.

8.      ASA Ltd. failed to pay certain key creditors and vendors, including its cloud computing platform vendors. Ultimately, the cloud computing vendors suspended ASA Ltd.'s accounts. The suspension rendered the Molekule 360's dashboard application inoperative. Molekule's customers who already purchased and paid for the Molekule 360 cannot utilize the essential dashboard application feature. Molekule was also forced to suspend its product launch, ceasing all sales of Molekule 360 product and services.

9.      On or about August 25, 2023, ASA Ltd. commenced a foreign bankruptcy filing in Israel in the Tel Aviv-Jaffa District Court. A trustee has been appointed to manage ASA Ltd.'s business affairs. However, as of the date of the filing of this Complaint, neither ASA Ltd. nor its foreign representatives have filed an ancillary proceeding under chapter 15 of the United States Bankruptcy Code.

10.     Molekule has suffered and will continue to suffer immediate and irreparable harm unless ASA Ltd. is restrained and enjoined from persisting in its violation of the parties' agreement. Absent timely injunctive relief, Molekule's reputation and goodwill with its customers will be tarnished, its launch of the new B2B products and services will likely fail, and Molekule's customers will continue to be denied the benefit of a key feature of Molekule's products and services.

## THE PARTIES, JURISDICTION AND VENUE

11.     Plaintiff is a Delaware corporation with its principal place of business located in Palm Beach County, Florida.

12.     Plaintiff is informed and believes that Defendant is a corporation formed and registered in Israel, with its principal place of business in Tel Aviv, Israel.

13.     This Court has original jurisdiction based upon diversity of citizenship under 28 U.S.C. § 1332(a)(2).  The amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and this civil action is between citizens of a State and citizens or subjects of a foreign state.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of Florida or, alternately, under § 1391(b)(3), because there is no district in which an action may be brought under subsections (1) or (2), and this is a judicial district in which Defendant is subject to the Court's personal jurisdiction with respect to such action.

15.     Venue is independently also proper in this Court.  Except as provided in § 9.06 of the TCA (as such term is defined below),  the TCA generally states that disputes arising thereunder must be brought in Delaware.  Section 9.06 specifically provides that Plaintiff Molekule may apply to any court of competent jurisdiction for an injunction or equitable relief against Defendant. Molekule specifically bargained for this provision of the TCA in order to protect its rights thereunder.

16.     Defendant is subject to the personal jurisdiction of this Court under the United States Constitution and Fla. Stat. § 48.193(1)(a)(1) because Defendant operates, conducts, engages in and carries on a business or business venture in the State of Florida.  In fact, Defendant's General Manager attended various meetings and performed services in Palm Beach County, Florida, pursuant to the parties' written agreements.

17.     Defendant is also subject to the personal jurisdiction of this Court under the United States Constitution and Fla. Stat. § 48.193(1)(a)(7) because Defendant entered into and breached a contract to be performed in the State of Florida.  Defendant has substantially performed under the contracts described hereinbelow in Palm Beach County, Florida, including attending multiple integration meetings, training meetings and sales meetings in the Palm Beach County, Florida office of Plaintiff.  Defendant has also breached a contract in the State of Florida by refusing to enter into an escrow agreement and deposit source code with a Florida escrow agent selected by Plaintiff.

## **GENERAL ALLEGATIONS**

18.     Molekule manufactures, distributes, and sells products and services for indoor air quality management, monitoring, filtering, and disinfection. Molekule's revolutionary technology includes PECO™ air filters, air filters scientifically shown to drastically reduce airborne organic pathogens.

19.     Molekule and its predecessor had developed a business plan for a first-of-its-kind indoor air quality ("IAQ") management solution (i.e., Molekule 360) to secure a competitive edge in the B2B marketplace.  Penetration into the B2B marketplace is essential to the success of Molekule 360.

20.     Businesses often maintain various different locations.  For purposes of efficiency, businesses often perform certain administrative or property management functions in a centralized location that supports remote office locations.  Accordingly, Molekule identified a need in the B2B market for enterprise IAQ management for a fleet of devices that could be remotely monitored and controlled through a dashboard software application deployed through the internet cloud.

21.     Timing, however, was critical.  Molekule correctly anticipated that businesses would need Molekule 360 as they endeavored to re-open their workplaces to employees, which now is occurring across the United States.  If Molekule 360 did not enter the marketplace expeditiously, the window of opportunity likely would close.

22.     Molekule invested significant resources to deploy Molekule 360 including retaining technical personnel to develop and implement the needed dashboard software solution. Molekule was developing its own dashboard software application.  The application, however, was not yet robust and did not feature all of the functionality Molekule believed the B2B marketplace desired.

23.     In late 2022, Molekule identified a potential business partner, ASA Ltd., to accelerate the development of the Molekule 360's remote monitoring and operation capability. ASA Ltd. possessed a proprietary dashboard software that was more mature and robust than the technology Molekule had developed.  After testing and reviewing ASA Ltd.'s technology and many technical and business discussions, Molekule and ASA Ltd. decided to collaborate on their respective technologies and potentially merge.  As a result, Molekule shelved its development efforts for its own dashboard application as the hub for Molekule 360 and elected to proceed using ASA Ltd.'s proprietary dashboard.

24.     On or about February 26, 2023, Molekule and ASA Ltd. entered into a merger agreement, intending to combine their business operations, subject to conditions subsequent. Because the completion of the merger could not be assured as some of the conditions subsequent were outside of Molekule's control, Molekule and ASA Ltd. also entered into a Technology Collaboration Agreement (the "TCA"), a true and correct copy of which is attached hereto as **EXHIBIT "A"**.  At about that time, Plaintiff and ASA Ltd. also entered into a written distribution

agreement whereby Molekule became, and currently serves as, the exclusive distributor of ASA Ltd.'s products in North and South America.

25.    Pursuant to §§ 3.01 and 4.05 of the TCA, Molekule paid ASA Ltd. $250,000.00 for a perpetual, worldwide license to, among other things, use and sell products that incorporate ASA Ltd.'s intellectual property, defined in the TCA as "Background IP." Under Section 2.01(a) of the TCA, ASA Ltd. was required to deliver to Molekule all documentation of the ASA Ltd. Background IP.

26.    At the same time, the parties entered into the Statement of Work No. 1 ("SOW-1") pursuant to the TCA. Under SOW-1, Molekule also agreed to pay ASA Ltd. nearly $70,000 per month for services rendered in connection with integrating ASA Ltd.'s Background IP with that of Molekule. The TCA and SOW-1 define this work as "Integration Activities." The Integration Activities included all the work necessary to establish a functional "bridge" between the Molekule 360 devices and ASA Ltd.'s dashboard application, which was then hosted on ASA Ltd.'s cloud computing platform.

27.    Section 2.04(i) of the TCA set forth the "Deliverables" to be provided to Molekule by ASA Ltd. Section 2.04(i) describes the work product and intellectual property jointly developed in connection with the Integration Activities, i.e., the information necessary to establish the "bridge" between the Molekule 360 device and ASA Ltd.'s cloud-based dashboard application. Separate and apart from the Deliverables, § 2.04(ii) additionally requires ASA Ltd. to deliver all "tangible embodiments" of the ASA Ltd. Background IP in a form and manner reasonably requested by Molekule.

28.    In the field of computer software technology, "tangible embodiments" refers to and means all of the software, directions and instructions needed to deploy and operate a software

program on a computer or a cloud computing platform.  To illustrate, when a consumer purchases a software program for a home computer, like a word processing program, the consumer downloads the software source code from either a DVD ROM or from the internet.  The manufacturer typically provides written instructions to the consumer concerning where and how to download and operate the software program.  The downloaded software and the written instructions constitute the "tangible embodiments" of the software program.

29.     In this circumstance, the "tangible embodiments" consist of the following:

a.     Molekule 360 Platform fully deployed and compiled source code components including, but not limited to, functions, modules, dataflows, the Application Programming Interface's front-end applications, *etc*.

b.     Fully restored Molekule 360 databases in the newly built Google Cloud Platform ("GCP") environment with detailed instructions on restoration processes and steps.

c.     Molekule 360 Platform user access to the newly built GCP environment with all role/permission levels.

d.     Molekule 360 Platform testing scripts, documentation, and testing artifacts to validate operation of the newly built GCP environment.

e.     Molekule 360 GCP Hosting Environment Documentation including, but not limited to, component/resource setup and configuration, account and project setup, permissions, user configuration setup, *etc*.

f.     Source Code Build and Deployment Documentation for all source code components to compile and deploy to GCP infrastructure including, but not

limited to, any automated scripts, manual processes and procedures, and any other handbooks regarding deployment architecture for Molekule 360.

g.    Access to compiled code deployment and GCP environment setup and configuration processes.

h.    Third party dependencies and documentation (*e.g.*, Particle Industries, Inc. ("Particle"), Tomorrow.io, *etc*.) that make all functionality of Molekule 360 fully operational including, but not limited to, additional tools, platforms, license dependencies and connectivity.

30.    The dashboard software component of the tangible embodiments contains "compiled" software code and, where necessary, "uncompiled" software code.   "Compiled" software code is the format a computer can read, but human beings cannot.    In contrast, "uncompiled" software code refers to software code written in language and symbols human beings can read.   When a software program exhibits a bug or experiences a security breach, a software engineer often must refer to the uncompiled software code to analyze and remedy the problem with the program.

31.    If the transactions with ASA Ltd. proceeded as initially anticipated, Molekule would either merge with ASA Ltd. or continue as "collaboration partners."   If the merger proceeded, the combined company would have the knowledge base necessary to remedy any potential bug or security breach.   If the parties proceeded as "collaboration partners," Molekule could seek assistance from ASA Ltd. to remedy the problem.   An obvious concern, however, would be what would happen should ASA Ltd. fail as a going concern or become unreliable.

32.    Accordingly, ASA Ltd. was obligated to deposit all its source code that relates to or is used in connection with its Background IP (including uncompiled code) into an escrow.   On

specified conditions, such as ASA Ltd. becoming subject to bankruptcy proceedings, the source code would be released to Molekule. Section 2.07 of the TCA provides, in pertinent part:

> As soon as reasonably practicable, and in any event within five (5) Business Days of the Effective Date, the Parties shall enter into a source code escrow agreement (the "Escrow Agreement") with a third-party escrow agent determined by Molekule (the "Escrow Agent"), under which Escrow Agreement: (a) ASA Ltd. shall deposit into escrow all ASA Ltd. source code existing as of the date of the Escrow Agreement that relates to or is used in connection with ASA Ltd.'s Background IP (the "Deposit Materials") and (b) the Escrow Agent shall release the Deposit Materials . . . to Molekule upon the occurrence of any of the following during the Term: ASA Ltd. (i) is dissolved or liquidated or takes any corporate action for such purpose; (ii) <u>becomes insolvent or is generally unable to pay, or fails to pay, its debts as they become due; (iii) files or has filed against it a petition for voluntary or involuntary bankruptcy or otherwise becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law;</u> (iv) makes or seeks to make a general assignment for the benefit of its creditors; or (v) applies for or has appointed a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

(emphases supplied.)

33.     Soon after the TCA was signed, ASA Ltd. and Molekule began their efforts to integrate Molekule's technology with ASA Ltd.'s dashboard application then hosted on ASA Ltd.'s cloud computing platform. This work included multiple collaboration office visits in Molekule's headquarters in Palm Beach County, Florida, as well as its offices in Lakeland, Florida, and San Francisco, California.

34.     By June 2023, the Integration Activities were largely complete. On July 18, 2023, Molekule formally announced the launch of Molekule 360. As predicted, it was a smashing success. Eager customers included a Fortune 50 financial institution and one of the leading telecommunication companies in the United States.

35.     As the Integration Activities began to wind down, Molekule's technical team turned its focus to obtaining from ASA Ltd. the "Deliverables" under § 2.04 of the TCA to migrate the now licensed ASA Ltd. dashboard application to a cloud computing platform account under Molekule's name.

36.     At first, ASA Ltd. from outward appearances intended to comply with its obligations to enable Molekule to operate the licensed dashboard application on Molekule's own cloud account.  ASA Ltd. actively participated in a series of meetings to assist in explanation of the source code build, deployment processes and documentation, and transfer of the Deliverables onto Molekule's independent cloud computing platform.

37.     ASA Ltd. also commenced preparations for the other required Deliverables.  ASA Ltd. advised Molekule that ASA Ltd.'s intellectual property was stored at Atlassian Corporation ("Atlassian") in a cloud storage "workspace" in several virtual repositories using a software program termed "BitBucket".  Molekule also maintains storage accounts at Atlassian for its own source code using Atlassian's BitBucket program.  Atlassian's BitBucket cloud is located within the United States.  Molekule opened a new repository in its existing "workspace" at Atlassian for the storage of the ASA Ltd. Background IP and jointly developed IP.

38.     On or about July 25, 2023, ASA Ltd. began to transfer the "Deliverables" under § 2.04(i) of the TCA.  This consisted of the jointly developed intellectual property generated during the Integration Activities, i.e., the "bridge" between the Molekule 360 devices and the licensed dashboard application hosted on a cloud computing platform.  At about that time, ASA Ltd. also began to deliver to Molekule's workspace at Atlassian the same intellectual property.  ASA Ltd., however, became evasive when Molekule asked ASA Ltd. for the required tangible embodiments

(per § 2.04(ii) of the TCA) needed to deploy and operate the licensed dashboard application on Molekule's own cloud computing platform account.

39.     At times, ASA Ltd. blamed its delay in transferring the § 2.04(ii) tangible embodiments on alleged concerns that information restricted by Israel's Research & Development Law ("R&D Law") may be included in the dashboard application software.  Molekule is informed and believes, and based thereon alleges, that the R&D Law restricts the exportation of technology from Israel if developed under an Israeli Innovation Authority ("IAA") approved program, until the IAA has been repaid any financial assistance it provided in the program.

40.     Molekule knew, however, and both ASA Ltd. and Atlassian later confirmed, that ASA Ltd.'s Background IP utilized for its dashboard application had already been exported to and was present in the United States. ASA Ltd. runs its cloud operations on cloud computing platform (e.g., Particle and GCP) locations in the United States.  Further, prior to entering into the TCA, ASA Ltd. repeatedly assured Molekule that none of the ASA Ltd. dashboard application software was developed in or in connection with an IAA approved program.

41.     On or about August 5, 2023, Molekule's CEO made a specific request to ASA Ltd. for the tangible embodiments, item by item.  ASA Ltd.'s initial response was to suggest it would cooperate.  ASA Ltd. also asked for a draft of the escrow agreement for the source code deposit required under the TCA.

42.     Pursuant to Section 2.07 of the TCA, Molekule selected Philip J. von Kahle of Michael Moecker & Associates ("Mr. von Kahle") as the Escrow Agent.  Mr. von Kahle is a resident of Florida with business offices located in Broward County, Florida.  On or about August 6, 2023, Plaintiff forwarded the Escrow Agreement to Defendant for signature, a true and correct copy of which is attached as **EXHIBIT "B"** (the "Escrow Agreement").

43.     On or about August 8, 2023, the parties and their counsel participated in an early morning teleconference.  After discussion, ASA Ltd. and its counsel agreed that ASA Ltd. needed to provide the § 2.04(ii) tangible embodiments, the § 2.01(a) documentation for the ASA Ltd. Background IP, any remaining Deliverables under § 2.04(i), and deposit all required source code into escrow.  Accordingly, the parties scheduled a technical call for later that day to arrange for such data transfer.

44.     In the subsequent call, however, ASA Ltd. reversed course.  Despite the clear and unambiguous promises in the TCA, and its representations made that very morning, ASA Ltd. again refused to provide the tangible embodiments, the documentation for the ASA Ltd. Background IP, any remaining Deliverables, and/or to deposit all required source code into escrow.

45.     Accordingly, Molekule 360's licensed dashboard application continued to run on ASA Ltd.'s cloud computing platforms.  ASA Ltd., however, was failing to pay key vendors, including its cloud computing platform vendors.  Molekule stepped in and paid some of ASA Ltd.'s overdue invoices.  Ultimately, however, an essential cloud platform vendor (Particle) suspended ASA Ltd.'s account for non-payment of more than $900,000 allegedly owed by ASA Ltd.

46.     The suspension of ASA Ltd.'s vendor resulted in Molekule 360's licensed dashboard application becoming inoperative, and as a result, the remote operation and monitoring capabilities, so essential in the B2B market and Molekule 360, failed.  Customers already accepting delivery of the Molekule 360 platform could not use the products and services as intended. Molekule was forced to suspend the Molekule 360 product launch.

47.     The suspension of the Molekule 360 product launch and the failures of the Molekule 360 already in the field have caused and continue to cause reputational and financial consequences for Molekule.  Molekule suffers severe embarrassment and a tarnished reputation

with its customer base.  Further, business enterprises are now attempting to re-open.  The window of opportunity for Molekule 360, for which Molekule planned and invested significant resources, may close.  Customers will simply adopt other competitors' products, even though they are inferior to Molekule 360.  Once a customer adopts and implements a competitive product, the customer may be lost to Molekule forever.

48.    ASA Ltd. has failed and refused to meet its obligations under the TCA.  Following such failures, ASA Ltd. demanded unjustified concessions from Molekule and engaged in coercive and disingenuous tactics.  Among other things, it was clear that ASA Ltd. was not operating its business according to the ordinary course.  Molekule was left with no reasonable alternative but to terminate the merger.

49.    On or about August 25, 2023, ASA Ltd. commenced a foreign bankruptcy filing in Israel, and a trustee has been appointed to manage ASA Ltd.'s affairs.  As of the date of the filing of this Complaint, neither ASA Ltd. nor its foreign representatives have filed an ancillary proceeding under chapter 15 of the United States Bankruptcy Code.

50.    The severe damage being caused to Molekule and its business reputation is devastating and would be difficult if not impossible to calculate.  Further, ASA Ltd.'s precarious financial position may very well render ASA Ltd. unable to compensate Molekule for the extraordinary damages being suffered.

51.    The TCA expressly authorizes equitable relief in this precise situation, which can be pursued in any court of competent jurisdiction.  Section 9.06 of the TCA provides, in relevant part:

> Each Party further acknowledges that the restrictions and other obligations under this Agreement are reasonable and necessary to protect Molekule's interests and rights in its Materials, the Molekule technology and the Molekule-Compliant Devices.  Accordingly,

> ASA Ltd. agrees that Molekule, in addition to any other available remedies, <u>shall have the right to an immediate injunction and other equitable relief to enforce such restrictions and other obligations, and to enjoin any breach or threatened breach of this Agreement</u>, without the necessity of posting any bond or other security. Molekule may apply to any court of competent jurisdiction for such an injunction or other equitable relief at any time.

(emphasis supplied.)

52.     All conditions precedent in this action have been performed, have occurred, or have been waived.

## COUNT I – SPECIFIC PERFORMANCE
### (Against ASA Ltd.)

53.     Molekule realleges and incorporates paragraphs 1 through 52, inclusive, as though fully set forth herein.

54.     The TCA is a valid and specifically enforceable contract between Molekule and ASA Ltd.

55.     Molekule is ready, willing and able to perform, and has performed, its obligations under the TCA.

56.     Molekule provided good and valuable consideration in exchange for these promises.

57.     ASA Ltd. has a contractual obligation under the TCA to provide the § 2.04(ii) tangible embodiments, the § 2.01(a) documentation for the ASA Ltd. Background IP, any remaining Deliverables under § 2.04(i), and to deposit all required source code into escrow.

58.     ASA Ltd. has breached its contractual obligations by, among other things, failing to provide the tangible embodiments, the documentation for the ASA Ltd. Background IP, any remaining Deliverables, and failing to deposit all required source code into escrow.

59.     Molekule has suffered and continues to suffer immediate and irreparable harm as a direct and proximate result of these breaches of contract.  The contract and its terms are sufficiently definite to be enforced judicially.

60.     The balance of equities favors an order of specific performance.

**WHEREFORE**, Molekule respectfully requests that the Court enter judgment against ASA Ltd. requiring: (1) specific performance of all of its outstanding obligations under the TCA; (2) awarding all reasonable attorneys' fees, costs, and expenses incurred by the Molekule in this instant action; and, (3) granting such other relief the Court deems appropriate.

<u>**COUNT II – INJUNCTIVE RELIEF**</u>
**(Against ASA Ltd.)**

61.     Molekule realleges and incorporates paragraphs 1 through 59, inclusive, as though fully set forth herein.

62.     Molekule shall succeed on the merits of its claims.

63.     Molekule shall suffer irreparable harm if injunctive relief is not granted and ASA Ltd. is not required to perform under the TCA and enter into the Escrow Agreement.

64.     The harm that will result to Molekule from ASA Ltd. not performing under the TCA and entering into the Escrow Agreement outweighs the harm that will befall ASA Ltd. should it perform under the TCA and enter into the Escrow Agreement.

65.     Molekule is entitled to a temporary, preliminary and permanent injunction enjoining ASA Ltd. from further violating its obligations and otherwise preserving Molekule's legal rights and interests.

**WHEREFORE**, Molekule respectfully requests that the Court temporarily, preliminarily and permanently enjoin ASA Ltd. and all those acting in concert with it: (1) from deleting, modifying and/or damaging the ASA Ltd. Background IP stored at Atlassian; (2) denying

Molekule the right to clone and transfer all source code and related documentation from any account in the name of ASA Ltd. and/or its subsidiary ASA Ltd. Smart Air, Inc., a Delaware corporation, at Atlassian Corporation or elsewhere, to an escrow account in the name of the escrow agent (or any other agent) for the sole benefit of Molekule; (3) from persisting in ASA Ltd.'s refusal to enter into the Escrow Agreement and deposit into the escrow the source code existing as of the Court order date that relates to or is used in connection with ASA Ltd.'s Background IP, subject to the release and delivery provisions of the Deposit Materials under the Escrow Agreement if an event listed therein; (4) taking any action to deny access to Molekule of ASA Ltd. Background IP including, without limitation, software code stored with Atlassian Corporation or elsewhere; (5) to deliver all tangible embodiments of the ASA Ltd. Background IP to Molekule; (6) awarding all reasonable attorneys' fees, costs, and expenses incurred by the Molekule in this instant action; and (7) granting such other relief the Court deems appropriate.

<div style="margin-left:40%">

Respectfully Submitted,

**SHRAIBERG PAGE P.A.**
Attorneys for Molekule Group, Inc.
2385 N.W. Executive Center Drive, Suite 300
Boca Raton, Florida 33431
Telephone: 561-443-0800
Facsimile: 561-998-0047
Email:  bss@slp.law

By:  ___/s/ Bradley Shraiberg_____
     Bradley Shraiberg
     Fla Bar No. 121622

</div>

# EXHIBIT A

## TECHNOLOGY COLLABORATION AGREEMENT

This Technology Collaboration Agreement ("Agreement") is made effective as of February 26, 2023 (the "Effective Date") by and between Molekule Group, Inc. ("Molekule") and Aura Smart Air Ltd. ("Aura", and together with Molekule, each individually referred to as a "Party" and collectively as the "Parties").

## RECITALS

WHEREAS, Molekule and Aura have certain experience in and have developed technologies and devices relating to air purification systems;

WHEREAS, the Parties desire to participate in a technology collaboration to integrate the Molekule technology and the Aura technology and to engage in certain joint development activities in accordance with the terms and conditions set forth herein and under SOWs to be entered into between the Parties.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

SECTION 1.01 Definitions. For the purposes of this Agreement, capitalized terms used but not defined elsewhere shall have the following meanings. Capitalized terms used by not defined in this Agreement shall have the meanings given in the Merger Agreement, by and among Aura, Molekule and the other Parties thereto, entered into as of the date hereof.

"Background IP" means any Intellectual Property owned or licensed by a Party or its Affiliates, created or developed prior to the Effective Date or after that date but without access to any of the information or materials provided or made available under this Agreement.

"Business Day" means a day other than a Friday, Saturday, Sunday or other day on which commercial banks in New York, New York or in Tel Aviv, Israel are authorized or required by law to close.

"Deliverables" means any and all work product or other results of the Services, in any form or medium and regardless of the state of completion, that is delivered and/or developed by Aura to or for Molekule or its Affiliates as further detailed in the relevant SOW or as set forth in the Integration Activities.

"Excluded Know-How" means Intellectual Property developed in connection with or which arises from any research and development efforts conducted under any of the IIA Approved Programs.

"IIA" means the Israeli Innovation Authority.

"IIA Approved Programs" means the following IIA program numbers and titles: (1) 64715 ("פיילוט מחקרי בבתי ספר") and (2) 67274 ("מערכת לניהול איכות האוויר בבית").

"Intellectual Property" means any and all of the following: patents and patent applications (including design patents, divisionals, continuations, continuations-in-part, substitutions, reissues, re-examinations, extensions, restorations of any of the foregoing, and other and similar rights), industrial designs, copyrights or works of authorship (including proprietary rights with respect to software and databases, whether or not copyrightable), and all registrations, applications for registration, and renewals of any of the foregoing, mask work rights, rights with respect to trade secrets, know-how, inventions (whether or not patentable), technology, and other confidential or proprietary information, trademark rights, trade dress rights, and similar rights with respect to indicia of source or origin, rights with respect to data and any other intellectual, proprietary or industrial property rights, whether arising under the laws of the United States or any other jurisdiction.

"Marks" means all names, branding, marks, logos, artwork, designs, trade dress, and similar materials used to identify a Party, its Affiliates, or its or their products and services.

"Materials" means any Confidential Information, Intellectual Property, Marks or other materials of any Party or third party, as applicable, in any form or medium (tangible, intangible, oral, written, electronic, observational or other) in which such materials may be communicated or subsist, made available to any other Party under an SOW or otherwise made available (directly or through a Party's Affiliates, or contractors, or licensors, provided the receiving Party is notified at the time of disclosure by such contractors or licensors that such Materials are the disclosing Party's Materials) under this Agreement.

"Merger Agreement" means the Agreement and Plan of Merger by and among Molekule, Aura and Avatar Merger Sub Ltd., dated February 26, 2023.

"Molekule-Compliant Devices" means a Molekule device integrating the Aura technology in compliance with Molekule Specifications.

"R&D Law" means Israeli Encouragement of Research, Development and Technological Innovation in Industry Law, 5744-1984.

"Services" means the design, development, and all other services, tasks, and responsibilities to be performed by Aura under this Agreement, as described in more detail in the applicable SOW or as set forth in the Integration Activities, including all services, tasks, and responsibilities inherent in or required for the proper performance, completion, and delivery of the services, tasks, responsibilities, and Deliverables described in an SOW.

"SOW" means a binding statement of work, as mutually agreed in writing and executed by the Parties in accordance with the terms hereunder.

"Specifications" means the specifications and requirements with respect to a Deliverable as determined by Molekule.

"Subcontractors" means any approved subcontractor as set forth in an SOW.

## ARTICLE II
## TECHNOLOGY COLLABORATION

SECTION 2.01 <u>Integration Activities</u>. Concurrently with the execution of this Agreement, the Parties agree to enter into SOW-1, and Aura agrees to promptly:

       (a)    deliver to Molekule documentation for the Aura Background IP (excluding the Excluded Know-How); and

       (b)    conduct the integration activities as further described in SOW-1 to integrate the Aura technology with the Molekule technology (including, to the extent reasonably requested, integrating the Excluded Know-How with the Molekule technology in a manner permitted under, and in accordance with all restrictions of the R&D Law), in order to develop Molekule-Compliant Devices on the terms set forth herein (the "<u>Integration Activities</u>").

SECTION 2.02 <u>Additional SOWs</u>. In addition to the Integration Activities set forth in SOW-1, Aura further agrees to collaborate with and provide to Molekule additional Services or Deliverables relating to the development and integration of certain sensor and filtration technology on terms to be agreed to in good faith by Aura and Molekule, pursuant to such additional SOWs. Each such SOW shall describe, to the extent applicable: (a) the Services and/or Deliverables to be performed or provided by Aura; (b) Materials to be made available by each Party to the other Party in connection with the Services and/or Deliverables; (c) staffing and personnel requirements; (d) schedule of work to be performed; (e) Specifications, acceptance criteria, and quality control procedures; and (f) Intellectual Property matters, to the extent not addressed in this Agreement. Such additional SOWs shall be consecutively numbered ("<u>SOW-1</u>" for the first SOW, "<u>SOW-2</u>" for the second SOW, etc.). The terms of this Agreement shall be made a part of and incorporated by reference into each SOW, and each SOW shall be incorporated into and made a part of this Agreement. SOW-1 shall be attached to this Agreement as Exhibit A and shall take effect on the Effective Date.

SECTION 2.03 <u>Changes to SOWs</u>. If Molekule determines that a material change is needed to any SOW, including to any Services, Deliverables, Specifications or schedule, then Molekule shall promptly inform Aura in writing under a change order ("<u>Change Order</u>") and discuss with Aura.

SECTION 2.04 <u>Deliverables</u>. Aura shall deliver to Molekule (i) all Deliverables provided for in the applicable SOW, together with related source code, documentation, test results, and related Materials in accordance with the applicable schedule and otherwise as set forth in this Agreement, including the applicable SOW; and (ii) any tangible embodiments of the Background IP in a form and manner reasonably requested by Molekule. Deliverables shall meet applicable requirements and criteria specified in the applicable SOW in all material respects. Aura shall test each Deliverable for such conformance prior to delivery and shall provide all such test results to Molekule upon request.

SECTION 2.05 <u>Evaluation, Testing, Acceptance and Correction</u>. Evaluation, testing, acceptance, and correction criteria and procedures applicable to Aura shall be set forth in the applicable requirements, Specifications and/or engineering design documents that are specified by Molekule in the applicable SOW or otherwise notified to Aura. If a Deliverable fails to meet the

requirements and/or criteria specified in such documents or is not delivered in accordance with the applicable SOW, Aura shall use best efforts to re-perform its obligations as necessary to deliver such Deliverable that meets the applicable requirements and/or criteria and in accordance with the applicable SOW.

SECTION 2.06 <u>Technical Committees</u>. From time to time during the Term, the Parties shall meet to discuss and review the status of the Services and Deliverables and Aura's activities in connection therewith, and any issues arising under this Agreement or any SOW (such meetings, the "<u>Technical Committees</u>"). Technical Committees shall be held at such place or places as are mutually agreed or by teleconference or videoconference. The Parties agree that the costs incurred by each Party in connection with its participation in the Business Reviews shall be borne solely by such Party.

SECTION 2.07 <u>Source Code Escrow</u>. As soon as reasonably practicable, and in any event within five (5) Business Days of the Effective Date, the Parties shall enter into a source code escrow agreement (the "<u>Escrow Agreement</u>") with a third-party escrow agent determined by Molekule (the "<u>Escrow Agent</u>"), under which Escrow Agreement: (a) Aura shall deposit into escrow all Aura source code existing as of the date of the Escrow Agreement that relates to or is used in connection with Aura's Background IP (the "<u>Deposit Materials</u>") and (b) the Escrow Agent shall release the Deposit Materials (but with respect to any Excluded Know-How, solely to the extent permitted pursuant to the R&D Law) to Molekule upon the occurrence of any of the following during the Term: Aura (i) is dissolved or liquidated or takes any corporate action for such purpose; (ii) becomes insolvent or is generally unable to pay, or fails to pay, its debts as they become due; (iii) files or has filed against it a petition for voluntary or involuntary bankruptcy or otherwise becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (iv) makes or seeks to make a general assignment for the benefit of its creditors; or (v) applies for or has appointed a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

<div align="center">

**ARTICLE III**
**LICENSE AND SERVICE FEES.**

</div>

SECTION 3.01 <u>License</u>. In consideration of the rights granted to Molekule hereunder and the representations set forth in <u>Section 4.02</u>, pursuant to which Molekule has agreed to enter into this Agreement, Molekule shall pay to Aura a fully paid-up, non-refundable (except at set forth

herein) licensee fee in the amount of $250,000 to be paid within seven (7) Business Days of the Effective Date.

SECTION 3.02 <u>Service Fees</u>. Each SOW shall set forth the service fees, if any, applicable to the Services and Deliverables to be provided by Aura under such SOW. All such service fees shall be due fifteen (15) Business Days after invoice.

SECTION 3.03 <u>Limited Remedy</u>. In addition to any other remedies or recourse Molekule may have under this Agreement, under law or in equity, in the event of a breach of <u>Section 4.02</u>, Molekule shall be entitled to a full and complete refund for any license fees paid hereunder.

SECTION 3.04 <u>Taxes</u>. Any amounts due under <u>Section 3.02</u>  shall be inclusive of any and all taxes.

## ARTICLE IV
## INTELLECTUAL PROPERTY

SECTION 4.01 <u>Background IP</u>. As between Aura and Molekule, each Party shall be the sole and exclusive owner of all right, title and interest in and to its own Background IP. All rights not expressly granted by a Party herein are reserved by such Party.

SECTION 4.02 <u>Fundamental Representation</u>. In consideration of a fundamental element pursuant to which Molekule has agreed to enter into this Agreement, Aura represents that it is the sole and exclusive owner of Aura's Background IP and that, notwithstanding anything contrary contained herein, none of the technology set forth on SOW-1 constitutes Excluded Know-How and such technology has not been developed in connection with or arose from any research and development efforts conducted under the IIA Approved Programs. Aura further represents and warrants to Molekule that the restrictions and step-in rights that the IIA has under the IIA Approved Programs do not apply to any of the technology set forth on SOW-1.

SECTION 4.03 <u>Ownership of Deliverables and Intellectual Property</u>. As between Aura and Molekule, (a) Aura is, and shall be, the sole and exclusive owner of all right, title and interest to Intellectual Property that (i) is made, invented, developed, created, conceived, or reduced to practice solely by Aura and (ii) exclusively relates to Aura's Background IP (such Intellectual Property, the "<u>Aura Developed IP</u>") and (b) Molekule is, and shall be, the sole and exclusive owner of all right, title and interest in and to the Deliverables, including all Intellectual Property rights therein, and all other Intellectual Property made, invented, developed, created, conceived, or reduced to practice as a result of work conducted pursuant to any collaboration between the Parties under this Agreement or any SOW (such Intellectual Property, the "<u>Molekule IP</u>"). To the extent that Molekule is not the owner of any Molekule IP automatically on creation thereof, Aura hereby (and shall procure that its Affiliates and Subcontractors) transfers and assigns to Molekule, without additional consideration, all of its right, title, and interest in and to such Molekule IP.

SECTION 4.04 <u>License to Aura</u>. Subject to Aura's compliance with the terms and conditions of this Agreement and any SOW, Molekule hereby grants Aura a limited royalty-free (unless otherwise provided under an SOW), non-exclusive, non-sublicensable (except in accordance with <u>Section 4.06</u> below) and non-transferable license to Molekule's Background IP (solely for use in connection with the Services) and the Molekule IP (and have such rights

exercised by Subcontractors) solely to the extent required by Aura to provide the Services and to otherwise meet its obligations under this Agreement or any SOW.

SECTION 4.05 <u>License to Molekule</u>. Aura hereby grants Molekule a fully paid-up, worldwide, royalty-free, non-exclusive, non-terminable, perpetual, irrevocable, sublicensable (including through multiple tiers) and transferable license under all of Aura's Background IP and any other Intellectual Property owned or controlled by Aura at any time during the Term including the Aura Developed IP (but in each case excluding any Excluded Know-How solely to the extent restricted by the R&D Law), whether or not such Intellectual Property is integrated in a Molekule-Compliant Device, to use, reproduce, distribute, publicly perform, publicly display, prepare derivative works based on, make, have made, provide, develop, offer to sell, sell, import, have imported, export, have exported, distribute, otherwise dispose of or otherwise commercially exploit any Molekule products or services.

SECTION 4.06 <u>Sublicensing</u>. Aura may sublicense any licenses granted hereunder to an Affiliate or a third party manufacturing products or components for it, subject to the terms of this Agreement and any relevant SOW; *provided*, that Aura shall remain responsible for its Affiliate's or such third party's compliance with the terms of this Agreement.
**TERM AND TERMINATION**

SECTION 5.01 <u>Term</u>. This Agreement shall be effective from the Effective Date and terminate automatically at the earlier of (i) the date of the Closing, and (ii) the date at which no outstanding SOW remains in effect, unless earlier terminated in accordance with <u>Section 5.042</u> or <u>Section 5.03</u> (the "<u>Term</u>").

SECTION 5.02 <u>Termination by Molekule</u>. Molekule may terminate this Agreement in its entirety and any SOW immediately upon notice to Aura if Aura: (i) is dissolved or liquidated or takes any corporate action for such purpose; (ii) becomes insolvent or is generally unable to pay, or fails to pay, its debts as they become due; (iii) files or has filed against it a petition for voluntary or involuntary bankruptcy or otherwise becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (iv) makes or seeks to make a general assignment for the benefit of creditors; (v) applies for or has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business; (vi) suspends or ceases, or in Molekule's reasonable opinion is likely to suspend or cease, carrying on all or a substantial part of its business relating to the services applicable under any SOW; (vii) assigns or attempts to assign this Agreement to any third-party without Molekule's prior written consent; (viii) undergoes a change of control whereby the ownership of more than 25% of Aura's outstanding debt or equity is transferred or otherwise under the control of a third-party; or (ix) fails (whether due to restrictions under the R&D Law or otherwise) to integrate the Aura technology with the Molekule technology pursuant to this Agreement or SOW-1 in a manner reasonably acceptable to Molekule.

SECTION 5.03 <u>Mutual Termination</u>. Either Party may terminate this Agreement in its entirety and any SOW for a material breach by the other Party, so long as notice and time to cure of forty-five (45) Business Days are provided and have lapsed; <u>provided</u>, however, that in the event

6|17

of a breach by Aura of the representations and warranties in <u>Section 4.02</u>, Molekule may terminate this Agreement in its entirety and any SOW with immediate effect.

SECTION 5.04 <u>Effect of Termination of Agreement</u>.  Notwithstanding anything contained herein, on termination or expiry of this Agreement for any reason (except automatic termination in accordance with <u>Section 5.01(i)</u>): the licenses granted under <u>Section 4.05</u> shall survive such termination;

(b)    Aura shall immediately cease use of and access to Molekule's Materials and immediately return or, if so requested by Molekule, destroy all Materials that Aura possesses or controls belonging to Molekule;

(c)    Aura shall deliver to Molekule all Deliverables (including related documentation) and all work-in-progress related to any ongoing SOW; and

(d)    if Molekule elects to terminate pursuant to <u>Section 5.02</u>, Aura shall cooperate with Molekule to develop and implement a transition plan and provide to Molekule any reasonable termination assistance services requested to facilitate the orderly transfer of the Services and all Deliverables and work-in-progress to Molekule or its designees.

## ARTICLE VI
## CONFIDENTIALITY

SECTION 6.01 <u>Confidential Information</u>. Both Parties shall maintain as confidential and shall not disclose to any third party or copy or use in any manner other than for the performance of its rights or obligations under this Agreement (a) any and all information or materials disclosed by one Party (the "<u>Disclosing Party</u>") to the other Party (the "<u>Receiving Party</u>") that is not generally available to the public and that is designated as confidential by the Disclosing Party and/or its Affiliates or that would reasonably be understood by the Receiving Party to be proprietary or confidential to the Disclosing Party, in any form or medium (tangible, intangible, oral, written, electronic, observational or other) ("<u>Confidential Information</u>"). Each Party agrees to protect the other Party's Confidential Information with the same degree of care it exercises to protect its own Confidential Information (but in no event less than a reasonable standard of care) and to prevent the unauthorized use, disclosure or publication thereof. The Receiving Party may disclose Confidential Information of the Disclosing Party only to its own employees or designated representative having a need to know for purposes of the Receiving Party's performance under this Agreement; *provided* that the individuals receiving the Confidential Information shall be bound by the terms of this provision. Upon any expiration or termination of this Agreement or upon either Parties request, the other Party shall return or destroy all Confidential Information and any copies thereof. The restrictions in this <u>Article VI</u> shall survive termination or expiry of this Agreement.<u>Exceptions</u>. The restrictions on use and disclosure in <u>Section 6.01</u> shall not apply to information that the Disclosing Party can demonstrate (a) is or becomes generally available to the public without the Disclosing Party's breach of this Agreement, (b) was known to the Disclosing Party at the time of its receipt from the Receiving Party without an obligation of confidentiality with respect to such information owed to the Receiving Party, (c) was rightfully disclosed to the Disclosing Party by a third party without an obligation of confidentiality with respect to such information owed to the Receiving Party, or (d) was independently developed by the Disclosing Party without use of or reference to Confidential Information. The Disclosing Party may disclose

Confidential Information to the extent required to comply with binding orders of governmental entities that have jurisdiction over it; *provided*, that the Disclosing Party (x) gives the Receiving Party reasonable notice (to the extent permitted by law) to allow the Receiving Party to seek a protective order or other appropriate remedy and provides reasonable assistance in connection therewith, (y) discloses only such information as is required by the governmental entity, and (z) uses its best efforts to obtain confidential treatment for any Confidential Information so disclosed.

**REPRESENTATIONS, WARRANTIES AND COVENANTS**

SECTION 7.01 <u>General.</u> Each Party represents and warrants that it has the corporate power and authority to enter into this Agreement and to perform its obligations set forth in this Agreement.

SECTION 7.02 <u>Representations and Warranties</u>. Aura represents, warrants and covenants that:it or its Affiliates owns or has an appropriate license to all Intellectual Property provided to provide the Services and Deliverables, including any Intellectual Property owned or controlled by a third party;

(b)    all employees and Subcontractors have properly assigned any right it may have or may have had at any time in or to the Deliverables and any Intellectual Property rights contained therein; and

(c)    it shall comply with applicable laws and regulations, as well as all applicable Molekule policies provided to Aura.

SECTION 7.03 <u>Performance</u>. Aura shall, in relation to the obligations allocated to it in an SOW agreed in accordance with this Agreement: (a) perform such obligations, including by providing the Services and Deliverables in accordance with timeframes or milestones (if any) specified in the SOW; (b) assign employees with suitable qualifications as required to perform any Services to high professional standards; (c) use reasonable care and skill and comply with good industry practice in performing such obligations; (d) comply with all laws applicable to it; (e) obtain and maintain consents, licenses and permissions (statutory, regulatory, contractual or otherwise) that are necessary to enable it to comply with such obligations; and (f) ensure that the inputs it provides conform with descriptions and Specifications (if any) set out in the applicable SOW.

SECTION 7.04 <u>Notification of Security Breach</u>. Aura shall notify Molekule immediately following the discovery of any incident that involves or reasonably may involve the unauthorized access, use, disclosure, or loss of any of Molekule's Materials or any other suspected breach or compromise of the security, confidentiality or integrity of Molekule's Materials and shall not communicate with any third party, including but not limited to the media, vendors, consumers and affected individuals regarding any such security incident without the express written consent and direction of Molekule.

SECTION 7.05 <u>Site and System Access</u>. If Aura (or any employee, contractor, agent, or authorized Subcontractor acting on such Party's behalf in connection with this Agreement or any SOW) (an "<u>Accessing Party</u>") is granted access to any (a) facility or location of Molekule (each a "<u>Site</u>") or (b) Molekule's systems, networks, databases, computers, telecommunications or other information systems owned, controlled or operated by or on the other Party's behalf (collectively,

"Systems"), then such access is subject to the Accessing Party's and that  employee's, contractor's, agent's or authorized Subcontractor's compliance with all then-current policies of Molekule. Any access to any Sites or Systems is strictly for the purpose of the Accessing Party's performance of the Services during the Term.

SECTION 7.06 Records. Aura shall regularly test and monitor security procedures and systems required under all applicable SOWs and shall make such reviews available to Molekule upon reasonable request. Aura shall maintain (and shall cause its Subcontractors who are directly involved in performing Deliverables and/or who have access to Molekule's Materials) to maintain, industry standard written records for its business for at least three years after the period to which the records relate.

<h1 style="text-align:center">ARTICLE VIII<br>LIMITATION OF LIABILITY AND INDEMNIFICATION</h1>

SECTION 8.01 Limitations on Liability. EXCEPT FOR  (I) AURA'S INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS; (II) AURA'S BREACH OF Article VI (CONFIDENTIALITY);  OR  (III)  CLAIMS  UNDER  THE  INDEMNIFICATION OBLIGATIONS IN Section 8.02; (A) NEITHER PARTY SHALL BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES, REGARDLESS OF THE FORM OF ACTION WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

SECTION 8.02 Indemnification by Aura. Aura shall indemnify, defend and hold Molekule and its Affiliates (including their respective directors, officers, employees, and agents) harmless from any and all awards, damages, losses, liabilities, obligations and costs (including attorney's fees) arising from any claim or action by a third party against Molekule, its Affiliates, or their respective employees, officers, directors, contractors, agents, and customers that is based on (a) Aura's breach of any obligation, representation or warranty under this Agreement; (b) any infringement or misappropriation of any Intellectual Property of any third party by Aura's (or its agents') contributions to the Molekule-Compliant Devices or of any Services or Deliverables provided by Aura under this Agreement or any SOW, or their use as contemplated under this Agreement (including the manufacture and supply of the Molekule-Compliant Devices for mass production); (c) product liability attributable to Aura; (d) any claim asserted by Aura's employees or Subcontractors (or former Aura employees or Subcontractors in connection with work performed while employed or engaged by Aura); or (e) gross negligence or wilful misconduct.

SECTION 8.03 Claim Assistance; Procedure. Molekule shall timely provide such assistance and information as may reasonably be requested by Aura in connection with its defense against any claim or action by a third party against it, its Affiliates, or their respective employees, officers, directors, contractors, agents, and customers that is based on any claim for which Molekule is entitled to indemnification under Section 8.02 (an "Indemnified Claim"). Molekule shall (a) promptly notify Aura in writing of any allegations that preceded the legal proceeding or claim, and (b) tender sole control of the indemnified portion of the legal proceeding or claim to Aura; provided, that the failure by Molekule to perform such actions set out in clauses (a) and (b) of this sentence shall not relieve Aura from any liability hereunder unless such failure materially

prejudices Aura. Aura shall not enter into any settlement of any such claim or legal proceeding without the written consent of Molekule, not to be unreasonably withheld or delayed. If Aura assumes the defense without Molekule's participation in accordance with the preceding sentence, then Aura shall be solely responsible for any costs and expenses of its separate attorneys' fees and expenses, court costs and other litigation expenses.

## ARTICLE IX
## MISCELLANEOUS

SECTION 9.01 <u>Negotiation and Escalation</u>. Without prejudice to <u>Section 9.02</u>, in the event of a dispute under this Agreement or any SOW that the project managers are unable to resolve after good faith discussions, the Parties shall, upon request by either Party, escalate the dispute by requesting that senior management-level representatives of the Parties meet to discuss and attempt to resolve the dispute in good faith for a period of no less than thirty (30) days. If, after thirty (30) days, the Parties remain unable to dissolve such dispute, <u>Section 9.02</u> below shall apply.

SECTION 9.02 <u>Governing Law and Jurisdiction</u>. This Agreement shall be governed and construed under the laws of the State of Delaware without regard to conflicts of law provisions. Except as otherwise set forth in <u>Section 9.06</u>, the Parties hereby submit to the sole and exclusive jurisdiction of, and waive any venue objections against, federal and state courts in the state of Delaware with respect to all disputes arising under or relating to this Agreement.

SECTION 9.03 <u>Intellectual Property Under Bankruptcy</u>. Each Party agrees, on behalf of itself and its Affiliates, that all rights and licenses granted under or pursuant to this Agreement are, and shall otherwise be deemed to be, for purposes of Section 365(n) of the Bankruptcy Code, licenses for rights to "intellectual property" as defined under the Bankruptcy Code. The Parties agree that the licensee of such rights under this Agreement shall retain and may fully exercise all of its rights and elections under the Bankruptcy Code. The Parties further agree that, in the event of the commencement of bankruptcy proceedings by or against a Party under the Bankruptcy Code, the licensee shall be entitled to retain all of its Intellectual Property Rights under this Agreement. In addition, the Parties understand and agree that this Agreement shall be construed as "supplementary" agreements pursuant to Section 365(n) of the Bankruptcy Code. Neither Party nor any of its Affiliates may (and each Party, on behalf of itself and its Affiliates, hereby irrevocably waives any right to) object to or challenge any assertion of and reliance on the matters described in the preceding sentence by the other Party.

SECTION 9.04 <u>Language; Interpretation; Currency</u>. This Agreement is executed in English only. Any translation of this Agreement into another language shall be for reference only and without legal effect. The Parties have fully negotiated this Agreement, and it shall be interpreted according to the plain meaning of its terms without a presumption that it should be construed for or against either Party. Unless otherwise expressly stated, "including" and "e.g." are not exclusive or limiting; "Section" refers to sections of this Agreement; "days" refers to consecutive calendar days including Saturdays, Sundays and holidays; dollar amounts and the symbol $ refer to U.S. dollars; and "Exhibit" refers to the Exhibits to this Agreement. Section headings are for ease of reference only and are not to be used to interpret the meaning of any provision. Any consent required from Molekule under this Agreement may be granted or withheld by Molekule in its sole and absolute discretion.<u>Notices</u>. Any notice hereunder shall be in writing

to the contacts set forth below and shall be deemed given: (i) upon receipt if by personal delivery; (ii) upon receipt if sent by certified or registered U.S. Mail (return receipt requested); or (iii) one (1) day after it is sent if by next day delivery by a major commercial delivery service or by electronic mail.**Molekule:**

    10455 Riverside Dr.
    Palm Beach Gardens, Florida 33410
    Attn : Ryan Tyler
    E-mail: ryan.tyler@molekule.com

With a copy (which shall not constitute notice) to:

    Freshfields Bruckhaus Deringer US LLP
    601 Lexington Ave.
    New York, NY 10022
    Attn: Valerie Jacob; Paul Humphreys; Menachem Kaplan
    Email: valerie.jacob@freshfields.com; paul.humphreys@freshfields.com;
    mena.kaplan@freshfields.com

**Aura:**

    Aura Smart Air Ltd.
    Yigal Alon St 86
    Tel Aviv-Yafo, Israel
    Attn: Ofer Bluemenfeld
    Email: ofer@auraair.io

With a copy (which shall not constitute notice) to:

    Arnon, Tadmor-Levy
    132 Begin Road, Azrieli Center
    Tel Aviv, 6702101
    Attn: David Schapiro
    Email: DavidS@ArnonTL.com

SECTION 9.06 <u>Equitable Relief</u>. Aura acknowledges that any unauthorized disclosure or use of Molekule's Materials will cause irreparable harm and significant injury to the other Party, the full extent of which will be difficult to ascertain, for which damages are an inadequate remedy and for which there will be no other adequate remedy at law. Each Party further acknowledges that the restrictions and other obligations under this Agreement are reasonable and necessary to protect Molekule's interests and rights in its Materials, the Molekule technology and the Molekule-Compliant Devices. Accordingly, Aura agrees that Molekule, in addition to any other available remedies, shall have the right to an immediate injunction and other equitable relief to enforce such restrictions and other obligations, and to enjoin any breach or threatened breach of this Agreement, without the necessity of posting any bond or other security. Molekule may apply to any court of competent jurisdiction for such an injunction or other equitable relief at any time.<u>Severability; Modification; Waiver</u>. If any provision of this Agreement is not enforceable, then it shall be deemed modified as necessary to make it enforceable. If the provision cannot be made enforceable,

it shall be deemed severed, and the rest of this Agreement shall remain in full force and effect. This Agreement may be modified only by an agreement written in English and signed in a non-electronic form by the authorized representatives of Aura and Molekule. No waiver of a right under this Agreement shall be effective unless written in English and signed in a nonelectronic form by the duly authorized representative of the waiving Party.<u>Assignment</u>. Aura may not assign, including by change of control, this Agreement without the prior written consent of Molekule and any attempt to do so shall be null and void. Molekule may freely assign this Agreement to any affiliate or any third party in connection with the sale or transfer of any assets to which this Agreement relates without the prior written consent of Aura.<u>Modification; Waiver</u>. This Agreement may be modified only by an agreement written in English and signed in a non-electronic form by the authorized representatives of Aura and Molekule. No waiver of a right under this Agreement shall be effective unless written in English and signed in a nonelectronic form by the duly authorized representative of the waiving Party.<u>Independent Contractors</u>. The Parties are independent contractors. This Agreement shall not create an employment relationship, partnership, joint venture, or other relationship between the Parties. Neither Party has authority to assume or create obligations on behalf of the other Party.<u>Force Majeure</u>. Neither Party shall be in breach of this Agreement nor liable for delay in performing, or failure to perform, any of its obligations under this Agreement if such delay or failure result from events, circumstances or causes beyond its reasonable control. In such circumstances the affected Party shall be entitled to a reasonable extension of the time for performing such obligations. If the period of delay or non-performance continues for 8 weeks, the Party not affected may terminate this Agreement by giving 30 days' written notice to the affected Party.<u>Export Control</u>. Each Party acknowledges that the Deliverables, Other Party Materials and its Materials are subject to export controls under U.S. and other applicable government laws and regulations. Each Party shall comply with all applicable export laws and regulations of all jurisdictions with respect to the Deliverables, Other Party Materials and its Materials or their export, re-export, import, transfer, distribution, use and servicing, and any other similar laws and regulations of any jurisdiction, and obtain, at its own expense, any required permits or export clearances, copies of which such Party shall provide to the other Party upon request. Each Party shall certify that it shall not, directly or indirectly, export, re-export, or transport Deliverables, the Other Party's Materials and its Materials, or any parts or copies thereof, in such manner as to violate such laws and regulations in effect from time to time. Each Party shall not transfer the Deliverables, the Other Party's Materials and Materials to any entity listed on a denial order published by any governmental entity, or a country subject to sanctions, without first obtaining a license or authorization. Each Party shall not use or transfer Deliverables, the Other Party's Materials and its Materials for purposes prohibited by any governmental entity, including, without limitation, the development, design, manufacture, or production of nuclear, missile, chemical or biological weapons, unless authorized by a specific license or authorization.<u>Survival</u>. <u>Article I</u> (Definitions), <u>Section 4.01</u> (Background IP), <u>Section 4.03</u> (Ownership of Deliverables and Intellectual Property), <u>Section 4.05</u> (License to Molekule), Section 5.4 (Effect of Termination of Agreement), <u>Article VI</u> (Confidentiality), <u>Article VII</u> (Representations, Warranties and Covenants); <u>Article VIII</u> (Limitation of Liability and Indemnification), and <u>Article IX</u> (Miscellaneous) shall survive any expiration or termination of this Agreement.<u>Entire Agreement and Counterparts</u>. This Agreement, including any Annexes, Appendices, Exhibits, and SOWs, constitutes the entire agreement between the Parties with respect to the subject matter of this Agreement (superseding any prior or contemporaneous representations, conditions, understandings and other agreements) and may be executed in identical counterparts, each of

which shall constitute an original and all of which together shall constitute one and the same agreement.*[Signature page follows]*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the Effective Date.

**Molekule Group, Inc.**

By: _Ryan Tyler_____
     Name: Ryan Tyler
     Title: Chief Financial Officer

**Aura Smart Air Ltd.**

By: _____
     Name:
     Title:

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the Effective Date.

**Molekule Group, Inc.**

By: _____
    Name:
    Title:

**Aura Smart Air Ltd.**

By: *Aviad Shnaiderman*
    89E29467E56941A
Name: Aviad Shnaiderman
Title: Co-Founder & CEO

*Ofer Bluemenfeld*
A83C185162DE497
Ofer Bluemenfeld

CFO

[Signature Page to Technology Collaboration Agreement]

**Exhibit A**
**SOW-1 to Technology Collaboration Agreement**

1.    **SOW Effective Date.** February 26, 2023

2.    **Project and Objectives.**

(a)    Provide for the ability for Molekule devices to onboard onto the Aura Air platform.

(b)    Provide for the ability for the Aura Air platform to control connected Molekule devices.

(c)    Provide for the ability for Molekule devices to send sensor and diagnostic data to the Aura Air platform.

(d)    Provide for the ability for Aura Air to deliver over the air (OTA) firmware updates to Molekule devices. OTA for Molekule devices will be done through AWS IoT platform while initiated from Aura Air.

3.    **Services.**

3.1    <u>Aura Responsibilities</u>. Aura will be responsible for: Any App, Firmware, Cloud, API changes required for interoperability along with any necessary documentation, testing, and access to pre-production environments. Aura Air will also identify the Project Manager, Dev Leads, Software Developers, and QA  needed to complete this work.

3.2    <u>Molekule Responsibilities</u>. Molekule will be responsible for: Any App, Firmware, and Cloud, API changes required for interoperability along with any necessary documentation, testing, and access to pre-production environments with the Aura Air platform.  Molekule will also identify the Project Manager, Dev Leads and Software Developers, and QA needed to complete this work.

3.3    <u>Mutual Responsibilities</u>. Aura Air and Molekule will collaborate on making sure that any software changes implemented within their respective areas will integrate seamlessly. This will require joint working sessions within the respective tech teams. Weekly status meeting and reporting will be created by the joint team.

3.4    <u>Service fees</u>. In exchange for the Services set forth in this SOW, Molekule shall make the following payments to Aura: (i) $68,181.81 due on a due date that is one (1) month from the SOW Effective Date and monthly thereafter for a total of ten (10) months; and (ii) $68,181.90 due the twelfth (12th) month from the SOW Effective Date.

3.5    <u>Timing of Payments</u>. Any payments set forth in <u>Section 3.4</u> shall be paid within fifteen (15) Business Days of its respective due date.

4.    **Deliverables.**

4.1    <u>General Description of Deliverables</u>. The purpose of this SOW is to define, at a high level, the features and functionality that need to be implemented or exposed in order to have Molekule devices interoperate with the Aura Air platform. The required functionality has

been broken down into milestones as described in <u>Section 4.4</u> (Milestones and Acceptance Criteria) below.

4.2    <u>Specifications</u>. Detailed specifications will be developed during the analysis phase, to accomplish the business objectives and milestones described herein.

4.3    <u>Quality Control Procedures</u>. Each Deliverable submitted to Molekule for acceptance must meet the following QA process: (i) conforms to all applicable user story acceptance criteria; (ii) meets or exceeds all code quality and other applicable functional or technical requirements; and (iii) passes all applicable QA and related tests; and (iv) has been fully documented on Molekule's designated issue/project tracking platform.

4.4    <u>Milestones and Acceptance Criteria</u>. The relevant milestones associated with this SOW-1 and applicable target completion dates, allocation of responsibility and acceptance criteria are as follows:

| Milestone | Milestone Target(s) | Responsibility | Acceptance Criteria |
|---|---|---|---|
| M0 | Molekule device onboarding to Aura Air platform | Molekule (Firmware and Molekule Cloud updates)<br><br>Aura (specification of Molekule's functions and migration to the Aura Web Platforms) | Demonstrated ability to onboard Molekule Air Mini+ and Air Pro devices to the Aura Web Platform, and define any required metadata within the Aura Web platform. |
| M1 | Aura Air control of Molekule devices | Molekule (Firmware)<br><br>Aura (any necessary updates to cloud APIs) | Demonstrated ability to control Molekule Air Mini+ and Air Pro devices via the Aura Web Platform |
| M2 | Molekule sensor data sent to Aura Air platform | Molekule (Firmware and Molekule Cloud updates)<br><br>Aura (any necessary updates to software and database systems) | Demonstrated ability to send data from Molekule Air Mini+ and Air Pro devices to the Aura Web Platform |
| M3 | Aura Air publishing of firmware update to Molekule devices | Aura | Demonstrated ability to push a firmware update to Molekule Air Mini+ and Air Pro devices from the Aura Web Platform |

4.5    <u>Timeline</u>. The target completion date for the milestones above will be 16 weeks from the SOW Effective Date.

IN WITNESS WHEREOF, the Parties hereto have caused this SOW-1 to be duly executed as of the SOW Effective Date.

**Molekule Group, Inc.**

By: _Ryan Tyler_____
     Name: Ryan Tyler
     Title: Chief Financial Officer

**Aura Smart Air Ltd.**

By: _____
     Name:
     Title:

IN WITNESS WHEREOF, the Parties hereto have caused this SOW-1 to be duly executed as of the SOW Effective Date.

**Molekule Group, Inc.**

By:_____

    Name:

    Title:

**Aura Smart Air Ltd.**

By: *Aviad Shnaiderman*
    89E29467E56941A...

Name: Aviad Shnaiderman

Title: Co-Founder & CEO

*Ofer Bluemenfeld*
A83C185162DE497...
Ofer Bluemenfeld

CFO

# EXHIBIT B

## Escrow Agreement

Michael Moecker & Asscoiates, Inc., a Florida corporation, with its main corporate office located at 1885 Marina Mile Blvd., Ste 103, Fort Lauderdale, FL 33315 [www.moecker.com] (herein the "**Firm**" or "**Escrow Agent**") agrees to act as escrow agent regarding the respective property interests of (1) Molekule Group, Inc. ("**Molekule**"), on the one hand, and (2) Aura Smart Air Ltd. ("**Aura**"), on the other hand, as set forth and described hereinbelow in this source code escrow agreement (the "**Source Code Escrow Agreement**" or "**Escrow Agreement**") entered into as of August 1, 2023 (herein the "Escrow Agreement Date"). Molekule and Aura are sometimes referred to herein individually as a "Party" and collectively as the "Parties."

## Recitals

WHEREAS, on or about February 26, 2023 (the "Effective Date"), Molekule and Aura entered into a Technology Collaboration Agreement (the "TCA");

WHEREAS, capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the TCA;

WHEREAS, the TCA provides that "**Background IP**" means any Intellectual Property owned or licensed by a Party or its Affiliates, created or developed prior to the Effective Date or after that date but without access to any of the information or materials provided or made available under this Agreement;

WHEREAS, the TCA provides that "**Intellectual Property**" means any and all of the following: patents and patent applications (including design patents, divisional, continuations, continuations-in-part, substitutions, reissues, re-examinations, extensions, restorations of any of the foregoing, and other and similar rights), industrial designs, copyrights or works of authorship (including proprietary rights with respect to software and databases, whether or not copyrightable), and all registrations, applications for registration, and renewals of any of the foregoing, mask work rights, rights with respect to trade secrets, know-how, inventions (whether or not patentable), technology, and other confidential or proprietary information, trademark rights, trade dress rights, and similar rights with respect to indicia of source or origin, rights with respect to data and any other intellectual, proprietary or industrial property rights, whether arising under the laws of the United States or any other jurisdiction;

WHEREAS, the TCA provides that "**Excluded Know-up**" means Intellectual Property developed in connection with or which arises from any research and development efforts conducted under any of the IIA Approved Programs. All deposits of source code that falls within this category shall be referred to as the "**Excluded Know-up Deposit**" and all remaining source code that does not fall within this definition shall be referred to as the "**Primary Deposit**;"

WHEREAS, the TCA provides that "**IIA**" means the Israeli Innovation Authority;

WHEREAS, the TCA provides that "**R&D Law**" means Israeli Encouragement of Research, Development and Technological Innovation in Industry Law, 5744-1984.

WHEREAS, the TCA provides that Molekule and Aura shall enter into a Source Code Escrow Agreement with a third-party escrow agent, as determined by Molekule, within five (5) business days of the Effective Date;

WHEREAS, among other things, the TCA provides that Aura shall promptly deposit into the Source Code Escrow Agreement all Aura source code existing as of the Escrow Agreement Date that relates to or is used in connection with Aura's **Background IP** (the "Deposit Materials");

WHEREAS, for purposes of this Escrow Agreement and for the avoidance of doubt, Molekule and Aura agree that the **Deposit Materials** deposited pursuant to the Escrow Agreement shall include all Aura source code existing as of the date of the Escrow Agreement that relates to or is used in connection with Aura's Background IP.

WHEREAS, in order to implement the terms of the TCA between Molekule and Aura, the Parties have agreed that the Firm shall serve in a fiduciary capacity as escrow agent with respect to the Deposit Materials.

NOW, THEREFORE, the Firm, Molekule and the Aura agree as follows:

## Terms and Conditions

1.    <u>Recitals</u>.  The foregoing recitals are regarded by the Firm and the Parties as true and correct, are expressly incorporated by reference into this Source Code Escrow Agreement and shall be considered a material term and condition of such agreement.

2.    <u>Conflicts With TCA</u>.  Certain terms of the TCA are summarized in this Escrow Agreement for purposes of brevity and convenience.  To any extent a term of this Escrow Agreement is deemed to conflict with a term of the TCA, the Source Code escrow Agreement shall control.

3.    The Firm is serving as an escrow agent with respect to the Deposit Materials and will disburse the Deposit Materials in accordance with the terms of the TCA and this Source Code Escrow Agreement.

4.    Aura shall commence deposit of the Deposit Materials to Escrow Agent within 1 day following the date of the Source Escrow Agreement.  Aura shall upload the Deposit Materials in two categories, the Primary Deposit and Excluded Know-up Deposit.  Escrow Agent shall, upon execution of the Source Code Escrow Agreement and the Retainer Letter (as defined *supra*) by the Parties and Firm, provide access to Aura to upload the Deposit Materials to the Escrow Agent secure portal.

5.    All property received by the Firm as escrow agent shall be held in trust, received in a fiduciary capacity by the Firm, and shall be the property of the person or persons entitled thereto.

6.    Property required to be maintained in the escrow trust account(s) or otherwise held pursuant to this Escrow Agreement shall not be subject to any debts of the Firm and shall be used only in accordance with the terms of the TCA and this Escrow Agreement. In addition, the Escrow

2

Agent shall not combine any other accounts with the escrowed property at any time during the period of this Escrow Agreement.

7.      The Firm shall maintain separate records of all receipts and disbursements of Deposit Materials. The Firm shall, upon written request made by Molekule or Aura, provide an accounting of all receipts and disbursements regarding the Deposit Materials.

8.      The Firm will release and deliver the Deposit Materials solely in accordance with the following procedures: the Escrow Agent shall release the Primary Deposit Deposit Materials (but with respect to any Excluded Know-How, solely to the extent permitted pursuant to the R&D Law) to Molekule upon the occurrence of any of the following during the Term: Aura (i) is dissolved or liquidated or takes any corporate action for such purpose; (ii) becomes insolvent or is generally unable to pay, or fails to pay, its debts as they become due; (iii) files or has filed against it a petition for voluntary or involuntary bankruptcy or otherwise becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (iv) makes or seeks to make a general assignment for the benefit of its creditors; or (v) applies for or has appointed a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

9.      The Firm's duties are determined by the TCA and this Escrow Agreement.  If the Firm's conduct in connection with this Escrow Agreement or the terms of this Escrow Agreement are the subject of any threatened or actual litigation, the Firm shall file an interpleader action between the parties in a court of competent jurisdiction.  In the event such an interpleader action is filed: (i) Aura agrees and stipulates that Molekule has no adequate remedy at law and is entitled to interim possession of the Deposit Materials pending the final adjudication of the interpleader action, and (ii) Aura further agrees and stipulates that Molekule may obtain interim possession of the Deposit Materials, pending final adjudication of the interpleader action, by filing an ex parte application with the court.  Aura shall not object to or otherwise oppose the ex parte application referenced in the preceding sentence.

10.     Upon delivery of the Deposit Materials pursuant to this Escrow Agreement, or the filing of an interpleader action and deposit of the Deposit Materials with a court of competent jurisdiction, the Firm is fully discharged from all obligations relating to or arising out of this Escrow Agreement. Neither this Escrow Agreement nor any of the events it describes prevents the Firm from continuing to represent a party hereto, if such representation exists, with respect to any matter.

11.     This Firm is serving as escrow agent as an accommodation to the parties.  This Firm is not liable for any mistake of fact or error of judgment or any acts or omissions of any kind (excluding gross negligence and willful misconduct). The Firm shall have no liability for any conduct of the Molekule or the Aura, or any third party, who interferes with the Deposit Materials, its delivery, or the failure of the Firm to be able to exercise any rights or duties hereunder, arising out of such interference. The Firm may rely on any instrument or signature it believes to be genuine and may assume that any person purporting to give any writing, notice, or instruction in connection with this escrow arrangement is duly authorized to do so by the person on whose behalf such writing, notice, or instruction is given.

3

12.    All notices, requests, demands, consents and other communications required or permitted under this agreement shall be in writing and shall be (as elected by the person giving such notice) hand delivered by messenger or courier service, emailed, or mailed (airmail if international) by registered or certified mail (postage prepaid), return receipt requested, to the parties at the following respective addresses:

      (a)    <u>If to Molekule</u>:
             <u>Molekule, Inc</u>.
             <u>10455 Riverside Drive, Suite 100</u>
             <u>Palm Beach Gardens, Florida 33410</u>
             <u>Attn: Ryan Patch and Azhar Zuberi</u>
             <u>Email: ryan.patch@molekule.com; azhar.zuberi@molekule.com</u>

      (b)    <u>If to Aura</u>:
             <u>Aura Smart Air Ltd</u>.
             Yigal Alon St 86
             Tel Aviv-Yafo, Israel
             Attn: Ofer Blumenfeld
             Email: ofer@auraair.io

13.    The parties irrevocably and unconditionally: (a) agree that any suit, action or legal proceeding arising out of or relating to this Escrow Agreement must be brought only in Palm Beach County; (b) consent to the jurisdiction of each such court in any suit, action or proceeding; (c) waive any objection which he, she or it may have to the laying of venue of any such suit, action or proceeding in any of such court; and (d) agree that service of any court paper may be effected on such party by mail, as provided in this Escrow Agreement, or in such other manner as may be provided under applicable laws or court rules in the State of Florida.

14.    This Escrow Agreement and all transactions contemplated by this Escrow Agreement are to be governed by, and construed and enforced in accordance with, the internal laws of the State Florida without regard to principles of conflicts of laws. All rights and obligations under this Escrow Agreement (except to the extent this Escrow Agreement expressly releases the Firm) shall continue in full force and effect subsequent to and notwithstanding the release of the Deposit Materials until they are satisfied or by their nature expire.

15.    Time is of the essence for all time periods which this Escrow Agreement specifies. This Escrow Agreement may be executed in one or more counterparts, each of which is considered an original, but all of which together constitute one and the same instrument.  Confirmation of execution by facsimile or scanned and emailed signature page is binding upon any party so confirming.

16.    All attorneys' fees and costs incurred by the Firm as Escrow Agent are to be equally shared by Molekule and Aura. Prior to the Escrow Agent accepting the Deposit Materials, Molekule and Aura shall execute a separate retainer letter with the Escrow Agent (the "**Retainer Letter**"). The Retainer Letter will contain a provision setting the term of the Escrow Agreement at six (6) months which shall automatically renew if not cancelled within one (1) week of the

expiration of any 6 month period.  In addition, through this Source Code Escrow Agreement and the Retainer Letter, both Molekule and Aura expressly grant the Escrow Agent a possessory lien on the Deposit Materials for any amounts owed.

By signing below where indicated, each of the Firm and the Parties evidence its,  his, her, agreement to be bound by and to comply with the terms, conditions, and obligations set forth in this Source Code Escrow Agreement.

**Molekule Group, Inc.**

By: Jason DiBona (Aug 6, 2023 16:28 EDT)
Name: Jason DiBona
Title: President


**Aura Smart Air Ltd.**


By:
Name: Ofer Blumenfeld
Title: Chief Financial Officer

**Aura Smart Air Ltd.**


By:
Name: Aviad Shnaiderman
Title: Chief Executive Officer


**Michael Moecker & Associates, Inc.**


By:
Name: Phil Von Kahle
Title: President

5