UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:

MKUL, Inc. (f/k/a Molekule Group, Inc.),                    Case No. 23–18094–EPK

                                                            Chapter 11
        Debtors.                                            (Jointly Administered)
_____/

MKUL, Inc. (f/k/a Molekule Group, Inc.),
a Delaware corporation,

        Plaintiff,

vs.                                                         Adv. Proc. No. 24–01004–EPK

AURA SMART AIR, LTD., an Israeli
corporation,

        Defendant.
_____/

## MOTION TO STAY DISCOVERY PENDING
## RESOLUTION OF SUMMARY JUDGMENT MOTION

        Plaintiff, MKUL, Inc. ("Molekule" or "Molekule Group"), pursuant to Fed. R.

Civ. P. 26(c), respectfully requests that the Court stay discovery pending the

resolution of a dispositive summary judgment motion.

### PROCEDURAL HISTORY

**A.    The TCA and Fundamental Representation.**

        1.    This adversary proceeding is based on a Technology Collaboration

Agreement (the "TCA") between the parties.  In essence, the parties entered into the

TCA because Defendant, Aura Smart Air, Ltd. ("Aura"), owned a mature web-based

platform and dashboard application technology that could be used to control and evaluate Molekule air purification devices remotely.  Exhibit "A" to the TCA consists of a Statement of Work ("SOW-1") pursuant to which Aura agreed to link: (a) Molekule devices to (b) the Aura cloud computing platform and dashboard application, such that the former could interoperate with the latter.

2.    A copy of the TCA is attached as **EXHIBIT "1"**.

3.    The parties recognized that certain Aura technology may be subject to Israeli law such that its export from Israel is restricted.  The TCA defines this technology as "Excluded Know-How" and the applicable law as the "R&D Law."  *See* TCA § 1.01 (definitions).  Aura therefore made a fundamental representation in the TCA "that, notwithstanding anything contrary contained herein, <u>none of the technology set forth on SOW-1 constitutes Excluded Know-How</u>…Aura further represented and warranted to Molekule that the restrictions and step-in rights that the IIA has under the IIA Approved Programs do <u>not apply to any of the technology set forth on SOW-1</u>." TCA § 4.02 (emphases supplied).

4.    The phrases "Aura Air platform" and "Aura web platform" appear eleven times on SOW-1.  *See* TCA, Ex. A.  By any reasonable metric this technology, i.e. the Aura platform, is "set forth" on SOW-1 and subject to the fundamental representations in § 4.02.

**B.    The Escrow Requirement.**

5.    Under the TCA, Molekule devices relied on the Aura cloud computing platform and dashboard application to operate.  If Aura e.g. filed for bankruptcy or

otherwise failed to pay its creditors, access to its cloud computing platform would be lost and Molekule devices would not function as intended.  As protection against this possibility, TCA § 2.07 provides for Aura to deposit all source code relating to its intellectual property (the "Deposit Materials") with a third-party agent, to be released to Molekule upon the occurrence of various conditions.  Should any of these conditions occur, the escrow agent shall release the Deposit Materials to Molekule, "but with respect to any Excluded Know-How, solely to the extent permitted pursuant to the R&D Law."  TCA § 2.07.

6.    Given the representations made by Aura in TCA § 4.02, the Aura cloud computing platform is <u>not</u> Excluded Know-How and can be released by the escrow agent. *See* § A, *supra*.

7.    The parties do not dispute that: (a) Aura has not entered into an escrow agreement, and (b) Aura has filed for bankruptcy relief in Israel.  Through this proceeding, Molekule requests specific performance of the TCA such that all applicable Deposit Materials—including source code to the Aura Air platform—are escrowed and subsequently released to it.

**C.    Molekule Has Assumed the TCA.**

8.    Without more, Molekule has established a clearcut case for specific performance.

9.    Additionally, however, on December 1, 2023, Molekule filed a list of contracts that it intended to assume under § 365 of the Bankruptcy Code (the

"Assumption List").  M.C. 241.[1]  The TCA is listed therein.  Assumption List 2.  On February 5, 2024, the Court entered an order confirming Molekule's chapter 11 plan (the "Confirmation Order").  M.C. 405.  The Confirmation Order states that all executory contracts and leases set forth on the Assumption list—which again includes the TCA—are assumed.  *Id.* at ¶ 13.

10.    Given this, arguments regarding enforceability of the TCA are barred by res judicata.  *See, e.g.*, *Off the Grill Franchising, LLC v. Hickory Partners, LLC*, 2006 WL 1454744 (M.D. Tenn. May 24, 2006) (fraudulent inducement defense to enforceability of assumed contract subject to res judicata); *In re Ali Prop., Inc.*, 334 B.R. 455, 461 (Bankr. D. Kan. 2005) ("Where the nonbankrupt party has knowledge of facts sufficient to place the party on notice that a potential pre-confirmation breach has occurred, res judicata bars the party from later asserting a claim based upon the prepetition breach.") (cleaned up); *In re Lykes Bros. Steamship Co.*, 221 B.R. 881, 883 (Bankr. M.D. Fla. 1997) ("If prior to the assumption of any executory contract there is no allegation of any existing default, the order approving the contract determines that no default exists.") (citation omitted).

### D.    Molekule Has Moved for Summary Judgment and Aura Has Not Sought Relief Under Rule 56(d).

11.    Given the strength of its claims, Molekule filed a motion for summary judgment on March 27, 2024.  ECF No. 100.  The motion has been fully briefed.  ECF Nos. 100, 101, 129, 130, 137 and 138.

---

[1]    "M.C." refers to items docketed in the main bankruptcy case, Lead Case No. 23–18094–EPK.

{2471/001/00580562}

12.     Notably, although it contests summary judgment, <u>Aura has not alleged that any facts are unavailable to it under Fed. R. Civ. P. 56(d)</u>.  *See* Fed. R. Civ. P. 56(d) (nonmovant must show by affidavit or declaration specified reasons that it cannot be present facts essential to oppose summary judgment); ECF Nos. 129–30 (Aura response brief and statement of material facts).  Given the nature of this litigation, the lack of a Rule 56(d) request is unsurprising.  This is a contractual dispute that will be decided on the plain language of the TCA.

**E.     The Merger Agreement.**

13.     Perhaps realizing the weakness of its position under the TCA, Aura insists that the focus of this proceeding should be on an entirely separate contract, the "Merger Agreement" or "MA."  Aura argues, for example, that the Merger Agreement and TCA "comprise one contemporaneous transaction," and that the termination of the former resulted in the termination of the latter as well.  *See* ECF No. 129 at 2–3 (Aura response brief).

14.     Molekule does not dispute that the parties entered into the Merger Agreement, and that the MA was terminated in August 2023.  *See* ECF No. 128 at ¶ 60 (Aura statement of material facts).  However, arguments regarding the MA are meritless and addressed extensively in Molekule's reply brief filed at ECF No. 138. For purposes of brevity, those arguments include:

- Molekule assumed the TCA following the termination of the MA. Arguments that the TCA had terminated are thus barred by res judicata.

- Section 8.02 of the MA provides that "this Agreement"—i.e. the MA itself—is null and void upon termination, but does not apply

this result to other "Ancillary Agreements," including the TCA, despite those agreements being defined and discussed elsewhere in the Merger Agreement.  This reflects a deliberate choice by the contract drafters that only the MA would become null and void upon its termination, and not the Ancillary Agreements.

- Section 5.01 of the TCA provides that the term of the contract shall run through the earlier of (a) the closing of the proposed merger in the MA or (b) the date at which no outstanding Statement of Work remains in effect.  In other words, the TCA recognizes a scenario where the merger does not occur but the TCA remains in force.

- Section 4.05 of the TCA grants Molekule "a fully paid-up, worldwide…nonterminable, perpetual, irrevocable…license under all of Aura"s Background IP and any other Intellectual Property owned or controlled by Aura at any time during the Term…" This phrase only has effect if it survives the termination of the MA.

*See* ECF No. 138 at 2–5 (Molekule reply brief).

### F.    Aura Seeks Burdensome, Irrelevant and Unnecessary Discovery.

15.    Although it has not sought relief under Rule 56(d), Aura has issued document requests (the "Requests") and a deposition *duces tecum* notice (the "Notice") to Molekule.  Copies of the Requests and Notice (together, the "Discovery") are attached hereto as **EXHIBITS "2"** and **"3"**, respectively.

16.    The Discovery is notable for its focus on topics <u>other</u> than the TCA.  For example, of the 27 categories of documents set forth in the Requests:

- Fifteen (55.5%) concern the Merger Agreement.  *See* Requests 1–5, 11–14, 20–24 and 26.

- Six (22.2%) concern the Ancillary Agreements, which term again includes not only the TCA but various other contracts.  *See* Requests 3, 5–6, 22, 25 and 27; *see also* Requests ¶ 9 (defining "Ancillary Agreements").

- Two (7.4%) concern Molekule's motivations for filing bankruptcy. *See* Requests 18–19.

Similarly, of the 28 categories of deposition topics listed in the Notice:

- Nine (33.3%) concern the Merger Agreement. *See* Notice Topics 4–6, 11, 14, 17, 20, 23 and 26.

- Two (7.1%) concern Molekule's motivations for filing for bankruptcy. *See* Notice Topics 12 and 25.

- Two concern a separate contract, the Co-Distribution Agreement. *See* Notice Topics 18 and 21.

17.   In light of the foregoing, Molekule anticipates expending substantial resources responding to the Requests, preparing a representative for deposition, and being deposed, regarding facts that: (a) are not relevant to this adversary proceeding and (b) with respect to which Aura has not sought Rule 56(d) relief.

## RELIEF REQUESTED

Rule 26(c) governs protective orders.  The rule states in relevant part that the Court may "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" relating to a discovery request.

Molekule respectfully requests that the Court issue a protective order staying the Discovery pending its summary judgment ruling.  This request is based on five factors:

<u>First</u>, the summary judgment motion is potentially case dispositive.  Molekule asserts two straightforward counts, specific performance and injunctive relief, and seeks summary judgment as to both.  *See* ECF No. 100 (summary judgment motion).

<u>Second</u>, Aura is not relying on any discovery to oppose summary judgment, and has not requested additional time to take discovery under Rule 56(d).  *See* ECF No. 129 (Aura response brief).

<u>Third</u>, this is a straightforward case.  Molekule is seeking to enforce the plain language of the TCA.  As such, there is no need to consider extrinsic or parol evidence—indeed such evidence would be inadmissible at trial.  *See* Fed. R. Civ. P. 56(c)(4) (summary judgment declarations must set forth evidence that would be admissible at trial); *Cohen v. Formula Plus, Inc.*, 750 F.Supp.2d 495, 502 (D. Del. 2010) (extrinsic evidence may not be used to interpret unambiguous contract).  Moreover, the assumption of the TCA and res judicata preclude any arguments Aura may wish to raise concerning breaches or enforceability.

<u>Fourth</u>, a substantial portion of the Discovery concerns arguments that are not relevant to his proceeding or precluded under res judicata, e.g. the Merger Agreement and motivations for Molekule filing for bankruptcy relief.

<u>Fifth</u>, Molekule anticipates spending substantial resources: (a) providing written responses to the Requests, (b) producing and reviewing responsive documents, (c) preparing a corporate representative for deposition, (d) being deposed, and (e) likely engaging in discovery litigation over e.g. the applicability of the Merger Agreement.  These issues will all be rendered moot if the Court grants summary judgment.

In light of the foregoing, Molekule submits that a stay of the Discovery is warranted.  *See Principle Solutions Group, LLC v. Ironshore Indemnity, Inc.*, 2016

WL 9049187, at *1 (N.D. Ga., Mar. 22, 2016) ("A court has broad discretion to stay discovery pending resolution of a motion for summary judgment. A court may grant a motion to stay discovery upon a showing of good cause and reasonableness. When determining whether to grant a stay of discovery, a court should balance the prejudice occasioned by the delay against the burden of proceeding with the discovery.") (cleaned up); *see also Moore v. Potter*, 141 Fed.Appx. 803, 807–08 (11th Cir. 2005) (trial court has "broad discretion" over pretrial matters, including discovery stays).

## GOOD FAITH CERTIFICATION

The undersigned certifies, pursuant to Fed. R. Civ. P. 26(c) and Local Rule 7026-1, that he has conferred with counsel for ASA Ltd. in a good faith effort to resolve by agreement the issues raised herein without Court intervention, but has been unable to do so.

[Remainder of Page Intentionally Left Blank]

**WHEREFORE**, Molekule Group respectfully requests the entry of an order (1) staying the Discovery for 30 days; and (2) granting Molekule Group such further relief as the Court deems just and proper.

## ATTORNEY CERTIFICATION

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished via Notice of Electronic Filing to those parties registered to receive electronic noticing in this case on May 14, 2024.

**SHRAIBERG PAGE P.A.**
Attorneys for Molekule Group
2385 NW Executive Center Drive, #300
Boca Raton, Florida 33431
Telephone: 561-443-0800
Facsimile: 561-998-0047
pdorsey@slp.law

By: ___/s/ Patrick Dorsey_____
          Patrick Dorsey, Esq.
          Florida Bar. No. 0085841

# EXHIBIT 1

## TECHNOLOGY COLLABORATION AGREEMENT

This Technology Collaboration Agreement ("Agreement") is made effective as of February 26, 2023 (the "Effective Date") by and between Molekule Group, Inc. ("Molekule") and Aura Smart Air Ltd. ("Aura", and together with Molekule, each individually referred to as a "Party" and collectively as the "Parties").

## RECITALS

WHEREAS, Molekule and Aura have certain experience in and have developed technologies and devices relating to air purification systems;

WHEREAS, the Parties desire to participate in a technology collaboration to integrate the Molekule technology and the Aura technology and to engage in certain joint development activities in accordance with the terms and conditions set forth herein and under SOWs to be entered into between the Parties.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

SECTION 1.01 Definitions. For the purposes of this Agreement, capitalized terms used but not defined elsewhere shall have the following meanings. Capitalized terms used by not defined in this Agreement shall have the meanings given in the Merger Agreement, by and among Aura, Molekule and the other Parties thereto, entered into as of the date hereof.

"Background IP" means any Intellectual Property owned or licensed by a Party or its Affiliates, created or developed prior to the Effective Date or after that date but without access to any of the information or materials provided or made available under this Agreement.

"Business Day" means a day other than a Friday, Saturday, Sunday or other day on which commercial banks in New York, New York or in Tel Aviv, Israel are authorized or required by law to close.

"Deliverables" means any and all work product or other results of the Services, in any form or medium and regardless of the state of completion, that is delivered and/or developed by Aura to or for Molekule or its Affiliates as further detailed in the relevant SOW or as set forth in the Integration Activities.

"Excluded Know-How" means Intellectual Property developed in connection with or which arises from any research and development efforts conducted under any of the IIA Approved Programs.

"IIA" means the Israeli Innovation Authority.

"IIA Approved Programs" means the following IIA program numbers and titles: (1) 64715 ("פיילוט מחקרי בבתי ספר ") and (2) 67274 ("מערכת לניהול איכות האוויר בבית").

"Intellectual Property" means any and all of the following: patents and patent applications (including design patents, divisionals, continuations, continuations-in-part, substitutions, reissues, re-examinations, extensions, restorations of any of the foregoing, and other and similar rights), industrial designs, copyrights or works of authorship (including proprietary rights with respect to software and databases, whether or not copyrightable), and all registrations, applications for registration, and renewals of any of the foregoing, mask work rights, rights with respect to trade secrets, know-how, inventions (whether or not patentable), technology, and other confidential or proprietary information, trademark rights, trade dress rights, and similar rights with respect to indicia of source or origin, rights with respect to data and any other intellectual, proprietary or industrial property rights, whether arising under the laws of the United States or any other jurisdiction.

"Marks" means all names, branding, marks, logos, artwork, designs, trade dress, and similar materials used to identify a Party, its Affiliates, or its or their products and services.

"Materials" means any Confidential Information, Intellectual Property, Marks or other materials of any Party or third party, as applicable, in any form or medium (tangible, intangible, oral, written, electronic, observational or other) in which such materials may be communicated or subsist, made available to any other Party under an SOW or otherwise made available (directly or through a Party's Affiliates, or contractors, or licensors, provided the receiving Party is notified at the time of disclosure by such contractors or licensors that such Materials are the disclosing Party's Materials) under this Agreement.

"Merger Agreement" means the Agreement and Plan of Merger by and among Molekule, Aura and Avatar Merger Sub Ltd., dated February 26, 2023.

"Molekule-Compliant Devices" means a Molekule device integrating the Aura technology in compliance with Molekule Specifications.

"R&D Law" means Israeli Encouragement of Research, Development and Technological Innovation in Industry Law, 5744-1984.

"Services" means the design, development, and all other services, tasks, and responsibilities to be performed by Aura under this Agreement, as described in more detail in the applicable SOW or as set forth in the Integration Activities, including all services, tasks, and responsibilities inherent in or required for the proper performance, completion, and delivery of the services, tasks, responsibilities, and Deliverables described in an SOW.

"SOW" means a binding statement of work, as mutually agreed in writing and executed by the Parties in accordance with the terms hereunder.

"Specifications" means the specifications and requirements with respect to a Deliverable as determined by Molekule.

"Subcontractors" means any approved subcontractor as set forth in an SOW.

**ARTICLE II**
**TECHNOLOGY COLLABORATION**

SECTION 2.01 <u>Integration Activities</u>. Concurrently with the execution of this Agreement, the Parties agree to enter into SOW-1, and Aura agrees to promptly:

(a)    deliver to Molekule documentation for the Aura Background IP (excluding the Excluded Know-How); and

(b)    conduct the integration activities as further described in SOW-1 to integrate the Aura technology with the Molekule technology (including, to the extent reasonably requested, integrating the Excluded Know-How with the Molekule technology in a manner permitted under, and in accordance with all restrictions of the R&D Law), in order to develop Molekule-Compliant Devices on the terms set forth herein (the "<u>Integration Activities</u>").

SECTION 2.02 <u>Additional SOWs</u>. In addition to the Integration Activities set forth in SOW-1, Aura further agrees to collaborate with and provide to Molekule additional Services or Deliverables relating to the development and integration of certain sensor and filtration technology on terms to be agreed to in good faith by Aura and Molekule, pursuant to such additional SOWs. Each such SOW shall describe, to the extent applicable: (a) the Services and/or Deliverables to be performed or provided by Aura; (b) Materials to be made available by each Party to the other Party in connection with the Services and/or Deliverables; (c) staffing and personnel requirements; (d) schedule of work to be performed; (e) Specifications, acceptance criteria, and quality control procedures; and (f) Intellectual Property matters, to the extent not addressed in this Agreement. Such additional SOWs shall be consecutively numbered ("<u>SOW-1</u>" for the first SOW, "<u>SOW-2</u>" for the second SOW, etc.). The terms of this Agreement shall be made a part of and incorporated by reference into each SOW, and each SOW shall be incorporated into and made a part of this Agreement. SOW-1 shall be attached to this Agreement as Exhibit A and shall take effect on the Effective Date.

SECTION 2.03 <u>Changes to SOWs</u>. If Molekule determines that a material change is needed to any SOW, including to any Services, Deliverables, Specifications or schedule, then Molekule shall promptly inform Aura in writing under a change order ("<u>Change Order</u>") and discuss with Aura.

SECTION 2.04 <u>Deliverables</u>. Aura shall deliver to Molekule (i) all Deliverables provided for in the applicable SOW, together with related source code, documentation, test results, and related Materials in accordance with the applicable schedule and otherwise as set forth in this Agreement, including the applicable SOW; and (ii) any tangible embodiments of the Background IP in a form and manner reasonably requested by Molekule. Deliverables shall meet applicable requirements and criteria specified in the applicable SOW in all material respects. Aura shall test each Deliverable for such conformance prior to delivery and shall provide all such test results to Molekule upon request.

SECTION 2.05 <u>Evaluation, Testing, Acceptance and Correction</u>. Evaluation, testing, acceptance, and correction criteria and procedures applicable to Aura shall be set forth in the applicable requirements, Specifications and/or engineering design documents that are specified by Molekule in the applicable SOW or otherwise notified to Aura. If a Deliverable fails to meet the

requirements and/or criteria specified in such documents or is not delivered in accordance with the applicable SOW, Aura shall use best efforts to re-perform its obligations as necessary to deliver such Deliverable that meets the applicable requirements and/or criteria and in accordance with the applicable SOW.

SECTION 2.06 <u>Technical Committees</u>. From time to time during the Term, the Parties shall meet to discuss and review the status of the Services and Deliverables and Aura's activities in connection therewith, and any issues arising under this Agreement or any SOW (such meetings, the "<u>Technical Committees</u>"). Technical Committees shall be held at such place or places as are mutually agreed or by teleconference or videoconference. The Parties agree that the costs incurred by each Party in connection with its participation in the Business Reviews shall be borne solely by such Party.

SECTION 2.07 <u>Source Code Escrow</u>. As soon as reasonably practicable, and in any event within five (5) Business Days of the Effective Date, the Parties shall enter into a source code escrow agreement (the "<u>Escrow Agreement</u>") with a third-party escrow agent determined by Molekule (the "<u>Escrow Agent</u>"), under which Escrow Agreement: (a) Aura shall deposit into escrow all Aura source code existing as of the date of the Escrow Agreement that relates to or is used in connection with Aura's Background IP (the "<u>Deposit Materials</u>") and (b) the Escrow Agent shall release the Deposit Materials (but with respect to any Excluded Know-How, solely to the extent permitted pursuant to the R&D Law) to Molekule upon the occurrence of any of the following during the Term: Aura (i) is dissolved or liquidated or takes any corporate action for such purpose; (ii) becomes insolvent or is generally unable to pay, or fails to pay, its debts as they become due; (iii) files or has filed against it a petition for voluntary or involuntary bankruptcy or otherwise becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (iv) makes or seeks to make a general assignment for the benefit of its creditors; or (v) applies for or has appointed a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

## ARTICLE III
## LICENSE AND SERVICE FEES.

SECTION 3.01 <u>License</u>. In consideration of the rights granted to Molekule hereunder and the representations set forth in <u>Section 4.02</u>, pursuant to which Molekule has agreed to enter into this Agreement, Molekule shall pay to Aura a fully paid-up, non-refundable (except at set forth

herein) licensee fee in the amount of $250,000 to be paid within seven (7) Business Days of the Effective Date.

SECTION 3.02 Service Fees. Each SOW shall set forth the service fees, if any, applicable to the Services and Deliverables to be provided by Aura under such SOW. All such service fees shall be due fifteen (15) Business Days after invoice.

SECTION 3.03 Limited Remedy. In addition to any other remedies or recourse Molekule may have under this Agreement, under law or in equity, in the event of a breach of Section 4.02, Molekule shall be entitled to a full and complete refund for any license fees paid hereunder.

SECTION 3.04 Taxes. Any amounts due under Section 3.02  shall be inclusive of any and all taxes.

## ARTICLE IV
## INTELLECTUAL PROPERTY

SECTION 4.01 Background IP. As between Aura and Molekule, each Party shall be the sole and exclusive owner of all right, title and interest in and to its own Background IP. All rights not expressly granted by a Party herein are reserved by such Party.

SECTION 4.02 Fundamental Representation. In consideration of a fundamental element pursuant to which Molekule has agreed to enter into this Agreement, Aura represents that it is the sole and exclusive owner of Aura's Background IP and that, notwithstanding anything contrary contained herein, none of the technology set forth on SOW-1 constitutes Excluded Know-How and such technology has not been developed in connection with or arose from any research and development efforts conducted under the IIA Approved Programs. Aura further represents and warrants to Molekule that the restrictions and step-in rights that the IIA has under the IIA Approved Programs do not apply to any of the technology set forth on SOW-1.

SECTION 4.03 Ownership of Deliverables and Intellectual Property. As between Aura and Molekule, (a) Aura is, and shall be, the sole and exclusive owner of all right, title and interest to Intellectual Property that (i) is made, invented, developed, created, conceived, or reduced to practice solely by Aura and (ii) exclusively relates to Aura's Background IP (such Intellectual Property, the "Aura Developed IP") and (b) Molekule is, and shall be, the sole and exclusive owner of all right, title and interest in and to the Deliverables, including all Intellectual Property rights therein, and all other Intellectual Property made, invented, developed, created, conceived, or reduced to practice as a result of work conducted pursuant to any collaboration between the Parties under this Agreement or any SOW (such Intellectual Property, the "Molekule IP"). To the extent that Molekule is not the owner of any Molekule IP automatically on creation thereof, Aura hereby (and shall procure that its Affiliates and Subcontractors) transfers and assigns to Molekule, without additional consideration, all of its right, title, and interest in and to such Molekule IP.

SECTION 4.04 License to Aura. Subject to Aura's compliance with the terms and conditions of this Agreement and any SOW, Molekule hereby grants Aura a limited royalty-free (unless otherwise provided under an SOW), non-exclusive, non-sublicensable (except in accordance with Section 4.06 below) and non-transferable license to Molekule's Background IP (solely for use in connection with the Services) and the Molekule IP (and have such rights

exercised by Subcontractors) solely to the extent required by Aura to provide the Services and to otherwise meet its obligations under this Agreement or any SOW.

SECTION 4.05 <u>License to Molekule</u>. Aura hereby grants Molekule a fully paid-up, worldwide, royalty-free, non-exclusive, non-terminable, perpetual, irrevocable, sublicensable (including through multiple tiers) and transferable license under all of Aura's Background IP and any other Intellectual Property owned or controlled by Aura at any time during the Term including the Aura Developed IP (but in each case excluding any Excluded Know-How solely to the extent restricted by the R&D Law), whether or not such Intellectual Property is integrated in a Molekule-Compliant Device, to use, reproduce, distribute, publicly perform, publicly display, prepare derivative works based on, make, have made, provide, develop, offer to sell, sell, import, have imported, export, have exported, distribute, otherwise dispose of or otherwise commercially exploit any Molekule products or services.

SECTION 4.06 <u>Sublicensing</u>. Aura may sublicense any licenses granted hereunder to an Affiliate or a third party manufacturing products or components for it, subject to the terms of this Agreement and any relevant SOW; *provided*, that Aura shall remain responsible for its Affiliate's or such third party's compliance with the terms of this Agreement.
**TERM AND TERMINATION**

SECTION 5.01 <u>Term</u>. This Agreement shall be effective from the Effective Date and terminate automatically at the earlier of (i) the date of the Closing, and (ii) the date at which no outstanding SOW remains in effect, unless earlier terminated in accordance with <u>Section 5.042</u> or <u>Section 5.03</u> (the "<u>Term</u>").

SECTION 5.02 <u>Termination by Molekule</u>.  Molekule may terminate this Agreement in its entirety and any SOW immediately upon notice to Aura if Aura: (i) is dissolved or liquidated or takes any corporate action for such purpose; (ii) becomes insolvent or is generally unable to pay, or fails to pay, its debts as they become due; (iii) files or has filed against it a petition for voluntary or involuntary bankruptcy or otherwise becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (iv) makes or seeks to make a general assignment for the benefit of creditors; (v) applies for or has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business; (vi) suspends or ceases, or in Molekule's reasonable opinion is likely to suspend or cease, carrying on all or a substantial part of its business relating to the services applicable under any SOW; (vii) assigns or attempts to assign this Agreement to any third-party without Molekule's prior written consent; (viii) undergoes a change of control whereby the ownership of more than 25% of Aura's outstanding debt or equity is transferred or otherwise under the control of a third-party; or (ix) fails (whether due to restrictions under the R&D Law or otherwise) to integrate the Aura technology with the Molekule technology pursuant to this Agreement or SOW-1 in a manner reasonably acceptable to Molekule.

SECTION 5.03 <u>Mutual Termination</u>.  Either Party may terminate this Agreement in its entirety and any SOW for a material breach by the other Party, so long as notice and time to cure of forty-five (45) Business Days are provided and have lapsed; <u>provided</u>, however, that in the event

of a breach by Aura of the representations and warranties in <u>Section 4.02</u>, Molekule may terminate this Agreement in its entirety and any SOW with immediate effect.

SECTION 5.04 <u>Effect of Termination of Agreement</u>.  Notwithstanding anything contained herein, on termination or expiry of this Agreement for any reason (except automatic termination in accordance with <u>Section 5.01(i)</u>): the licenses granted under <u>Section 4.05</u> shall survive such termination;

(b)     Aura shall immediately cease use of and access to Molekule's Materials and immediately return or, if so requested by Molekule, destroy all Materials that Aura possesses or controls belonging to Molekule;

(c)     Aura shall deliver to Molekule all Deliverables (including related documentation) and all work-in-progress related to any ongoing SOW; and

(d)     if Molekule elects to terminate pursuant to <u>Section 5.02</u>, Aura shall cooperate with Molekule to develop and implement a transition plan and provide to Molekule any reasonable termination assistance services requested to facilitate the orderly transfer of the Services and all Deliverables and work-in-progress to Molekule or its designees.

## ARTICLE VI
## CONFIDENTIALITY

SECTION 6.01 <u>Confidential Information</u>. Both Parties shall maintain as confidential and shall not disclose to any third party or copy or use in any manner other than for the performance of its rights or obligations under this Agreement (a) any and all information or materials disclosed by one Party (the "<u>Disclosing Party</u>") to the other Party (the "<u>Receiving Party</u>") that is not generally available to the public and that is designated as confidential by the Disclosing Party and/or its Affiliates or that would reasonably be understood by the Receiving Party to be proprietary or confidential to the Disclosing Party, in any form or medium (tangible, intangible, oral, written, electronic, observational or other) ("<u>Confidential Information</u>"). Each Party agrees to protect the other Party's Confidential Information with the same degree of care it exercises to protect its own Confidential Information (but in no event less than a reasonable standard of care) and to prevent the unauthorized use, disclosure or publication thereof. The Receiving Party may disclose Confidential Information of the Disclosing Party only to its own employees or designated representative having a need to know for purposes of the Receiving Party's performance under this Agreement; *provided* that the individuals receiving the Confidential Information shall be bound by the terms of this provision. Upon any expiration or termination of this Agreement or upon either Parties request, the other Party shall return or destroy all Confidential Information and any copies thereof. The restrictions in this <u>Article VI</u> shall survive termination or expiry of this Agreement.<u>Exceptions</u>. The restrictions on use and disclosure in <u>Section 6.01</u> shall not apply to information that the Disclosing Party can demonstrate (a) is or becomes generally available to the public without the Disclosing Party's breach of this Agreement, (b) was known to the Disclosing Party at the time of its receipt from the Receiving Party without an obligation of confidentiality with respect to such information owed to the Receiving Party, (c) was rightfully disclosed to the Disclosing Party by a third party without an obligation of confidentiality with respect to such information owed to the Receiving Party, or (d) was independently developed by the Disclosing Party without use of or reference to Confidential Information. The Disclosing Party may disclose

Confidential Information to the extent required to comply with binding orders of governmental entities that have jurisdiction over it; *provided*, that the Disclosing Party (x) gives the Receiving Party reasonable notice (to the extent permitted by law) to allow the Receiving Party to seek a protective order or other appropriate remedy and provides reasonable assistance in connection therewith, (y) discloses only such information as is required by the governmental entity, and (z) uses its best efforts to obtain confidential treatment for any Confidential Information so disclosed.
**REPRESENTATIONS, WARRANTIES AND COVENANTS**

SECTION 7.01 <u>General.</u> Each Party represents and warrants that it has the corporate power and authority to enter into this Agreement and to perform its obligations set forth in this Agreement.

SECTION 7.02 <u>Representations and Warranties</u>. Aura represents, warrants and covenants that:it or its Affiliates owns or has an appropriate license to all Intellectual Property provided to provide the Services and Deliverables, including any Intellectual Property owned or controlled by a third party;

(b)     all employees and Subcontractors have properly assigned any right it may have or may have had at any time in or to the Deliverables and any Intellectual Property rights contained therein; and

(c)     it shall comply with applicable laws and regulations, as well as all applicable Molekule policies provided to Aura.

SECTION 7.03 <u>Performance</u>. Aura shall, in relation to the obligations allocated to it in an SOW agreed in accordance with this Agreement: (a) perform such obligations, including by providing the Services and Deliverables in accordance with timeframes or milestones (if any) specified in the SOW; (b) assign employees with suitable qualifications as required to perform any Services to high professional standards; (c) use reasonable care and skill and comply with good industry practice in performing such obligations; (d) comply with all laws applicable to it; (e) obtain and maintain consents, licenses and permissions (statutory, regulatory, contractual or otherwise) that are necessary to enable it to comply with such obligations; and (f) ensure that the inputs it provides conform with descriptions and Specifications (if any) set out in the applicable SOW.

SECTION 7.04 <u>Notification of Security Breach</u>. Aura shall notify Molekule immediately following the discovery of any incident that involves or reasonably may involve the unauthorized access, use, disclosure, or loss of any of Molekule's Materials or any other suspected breach or compromise of the security, confidentiality or integrity of Molekule's Materials and shall not communicate with any third party, including but not limited to the media, vendors, consumers and affected individuals regarding any such security incident without the express written consent and direction of Molekule.

SECTION 7.05 <u>Site and System Access</u>. If Aura (or any employee, contractor, agent, or authorized Subcontractor acting on such Party's behalf in connection with this Agreement or any SOW) (an "<u>Accessing Party</u>") is granted access to any (a) facility or location of Molekule (each a "<u>Site</u>") or (b) Molekule's systems, networks, databases, computers, telecommunications or other information systems owned, controlled or operated by or on the other Party's behalf (collectively,

"Systems"), then such access is subject to the Accessing Party's and that employee's, contractor's, agent's or authorized Subcontractor's compliance with all then-current policies of Molekule. Any access to any Sites or Systems is strictly for the purpose of the Accessing Party's performance of the Services during the Term.

SECTION 7.06 Records. Aura shall regularly test and monitor security procedures and systems required under all applicable SOWs and shall make such reviews available to Molekule upon reasonable request. Aura shall maintain (and shall cause its Subcontractors who are directly involved in performing Deliverables and/or who have access to Molekule's Materials) to maintain, industry standard written records for its business for at least three years after the period to which the records relate.

## ARTICLE VIII
## LIMITATION OF LIABILITY AND INDEMNIFICATION

SECTION 8.01 Limitations on Liability. EXCEPT FOR (I) AURA'S INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS; (II) AURA'S BREACH OF Article VI (CONFIDENTIALITY); OR (III) CLAIMS UNDER THE INDEMNIFICATION OBLIGATIONS IN Section 8.02; (A) NEITHER PARTY SHALL BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES, REGARDLESS OF THE FORM OF ACTION WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

SECTION 8.02 Indemnification by Aura. Aura shall indemnify, defend and hold Molekule and its Affiliates (including their respective directors, officers, employees, and agents) harmless from any and all awards, damages, losses, liabilities, obligations and costs (including attorney's fees) arising from any claim or action by a third party against Molekule, its Affiliates, or their respective employees, officers, directors, contractors, agents, and customers that is based on (a) Aura's breach of any obligation, representation or warranty under this Agreement; (b) any infringement or misappropriation of any Intellectual Property of any third party by Aura's (or its agents') contributions to the Molekule-Compliant Devices or of any Services or Deliverables provided by Aura under this Agreement or any SOW, or their use as contemplated under this Agreement (including the manufacture and supply of the Molekule-Compliant Devices for mass production); (c) product liability attributable to Aura; (d) any claim asserted by Aura's employees or Subcontractors (or former Aura employees or Subcontractors in connection with work performed while employed or engaged by Aura); or (e) gross negligence or wilful misconduct.

SECTION 8.03 Claim Assistance; Procedure. Molekule shall timely provide such assistance and information as may reasonably be requested by Aura in connection with its defense against any claim or action by a third party against it, its Affiliates, or their respective employees, officers, directors, contractors, agents, and customers that is based on any claim for which Molekule is entitled to indemnification under Section 8.02 (an "Indemnified Claim"). Molekule shall (a) promptly notify Aura in writing of any allegations that preceded the legal proceeding or claim, and (b) tender sole control of the indemnified portion of the legal proceeding or claim to Aura; *provided*, that the failure by Molekule to perform such actions set out in clauses (a) and (b) of this sentence shall not relieve Aura from any liability hereunder unless such failure materially

prejudices Aura. Aura shall not enter into any settlement of any such claim or legal proceeding without the written consent of Molekule, not to be unreasonably withheld or delayed. If Aura assumes the defense without Molekule's participation in accordance with the preceding sentence, then Aura shall be solely responsible for any costs and expenses of its separate attorneys' fees and expenses, court costs and other litigation expenses.

## ARTICLE IX
## MISCELLANEOUS

SECTION 9.01 Negotiation and Escalation. Without prejudice to Section 9.02, in the event of a dispute under this Agreement or any SOW that the project managers are unable to resolve after good faith discussions, the Parties shall, upon request by either Party, escalate the dispute by requesting that senior management-level representatives of the Parties meet to discuss and attempt to resolve the dispute in good faith for a period of no less than thirty (30) days. If, after thirty (30) days, the Parties remain unable to dissolve such dispute, Section 9.02 below shall apply.

SECTION 9.02 Governing Law and Jurisdiction. This Agreement shall be governed and construed under the laws of the State of Delaware without regard to conflicts of law provisions. Except as otherwise set forth in Section 9.06, the Parties hereby submit to the sole and exclusive jurisdiction of, and waive any venue objections against, federal and state courts in the state of Delaware with respect to all disputes arising under or relating to this Agreement.

SECTION 9.03 Intellectual Property Under Bankruptcy. Each Party agrees, on behalf of itself and its Affiliates, that all rights and licenses granted under or pursuant to this Agreement are, and shall otherwise be deemed to be, for purposes of Section 365(n) of the Bankruptcy Code, licenses for rights to "intellectual property" as defined under the Bankruptcy Code. The Parties agree that the licensee of such rights under this Agreement shall retain and may fully exercise all of its rights and elections under the Bankruptcy Code. The Parties further agree that, in the event of the commencement of bankruptcy proceedings by or against a Party under the Bankruptcy Code, the licensee shall be entitled to retain all of its Intellectual Property Rights under this Agreement. In addition, the Parties understand and agree that this Agreement shall be construed as "supplementary" agreements pursuant to Section 365(n) of the Bankruptcy Code. Neither Party nor any of its Affiliates may (and each Party, on behalf of itself and its Affiliates, hereby irrevocably waives any right to) object to or challenge any assertion of and reliance on the matters described in the preceding sentence by the other Party.

SECTION 9.04 Language; Interpretation; Currency. This Agreement is executed in English only. Any translation of this Agreement into another language shall be for reference only and without legal effect. The Parties have fully negotiated this Agreement, and it shall be interpreted according to the plain meaning of its terms without a presumption that it should be construed for or against either Party. Unless otherwise expressly stated, "including" and "e.g." are not exclusive or limiting; "Section" refers to sections of this Agreement; "days" refers to consecutive calendar days including Saturdays, Sundays and holidays; dollar amounts and the symbol $ refer to U.S. dollars; and "Exhibit" refers to the Exhibits to this Agreement. Section headings are for ease of reference only and are not to be used to interpret the meaning of any provision. Any consent required from Molekule under this Agreement may be granted or withheld by Molekule in its sole and absolute discretion. Notices. Any notice hereunder shall be in writing

to the contacts set forth below and shall be deemed given: (i) upon receipt if by personal delivery; (ii) upon receipt if sent by certified or registered U.S. Mail (return receipt requested); or (iii) one (1) day after it is sent if by next day delivery by a major commercial delivery service or by electronic mail.**Molekule:**

> 10455 Riverside Dr.
> Palm Beach Gardens, Florida 33410
> Attn : Ryan Tyler
> E-mail: ryan.tyler@molekule.com

With a copy (which shall not constitute notice) to:

> Freshfields Bruckhaus Deringer US LLP
> 601 Lexington Ave.
> New York, NY 10022
> Attn: Valerie Jacob; Paul Humphreys; Menachem Kaplan
> Email: valerie.jacob@freshfields.com; paul.humphreys@freshfields.com; mena.kaplan@freshfields.com

**Aura:**

> Aura Smart Air Ltd.
> Yigal Alon St 86
> Tel Aviv-Yafo, Israel
> Attn: Ofer Bluemenfeld
> Email: ofer@auraair.io

With a copy (which shall not constitute notice) to:

> Arnon, Tadmor-Levy
> 132 Begin Road, Azrieli Center
> Tel Aviv, 6702101
> Attn: David Schapiro
> Email: DavidS@ArnonTL.com

SECTION 9.06 Equitable Relief. Aura acknowledges that any unauthorized disclosure or use of Molekule's Materials will cause irreparable harm and significant injury to the other Party, the full extent of which will be difficult to ascertain, for which damages are an inadequate remedy and for which there will be no other adequate remedy at law. Each Party further acknowledges that the restrictions and other obligations under this Agreement are reasonable and necessary to protect Molekule's interests and rights in its Materials, the Molekule technology and the Molekule-Compliant Devices. Accordingly, Aura agrees that Molekule, in addition to any other available remedies, shall have the right to an immediate injunction and other equitable relief to enforce such restrictions and other obligations, and to enjoin any breach or threatened breach of this Agreement, without the necessity of posting any bond or other security. Molekule may apply to any court of competent jurisdiction for such an injunction or other equitable relief at any time.Severability; Modification; Waiver. If any provision of this Agreement is not enforceable, then it shall be deemed modified as necessary to make it enforceable. If the provision cannot be made enforceable,

it shall be deemed severed, and the rest of this Agreement shall remain in full force and effect. This Agreement may be modified only by an agreement written in English and signed in a non-electronic form by the authorized representatives of Aura and Molekule. No waiver of a right under this Agreement shall be effective unless written in English and signed in a nonelectronic form by the duly authorized representative of the waiving Party.<u>Assignment</u>. Aura may not assign, including by change of control, this Agreement without the prior written consent of Molekule and any attempt to do so shall be null and void. Molekule may freely assign this Agreement to any affiliate or any third party in connection with the sale or transfer of any assets to which this Agreement relates without the prior written consent of Aura.<u>Modification; Waiver</u>. This Agreement may be modified only by an agreement written in English and signed in a non-electronic form by the authorized representatives of Aura and Molekule. No waiver of a right under this Agreement shall be effective unless written in English and signed in a nonelectronic form by the duly authorized representative of the waiving Party.<u>Independent Contractors</u>. The Parties are independent contractors. This Agreement shall not create an employment relationship, partnership, joint venture, or other relationship between the Parties. Neither Party has authority to assume or create obligations on behalf of the other Party.<u>Force Majeure</u>. Neither Party shall be in breach of this Agreement nor liable for delay in performing, or failure to perform, any of its obligations under this Agreement if such delay or failure result from events, circumstances or causes beyond its reasonable control. In such circumstances the affected Party shall be entitled to a reasonable extension of the time for performing such obligations. If the period of delay or non-performance continues for 8 weeks, the Party not affected may terminate this Agreement by giving 30 days' written notice to the affected Party.<u>Export Control</u>. Each Party acknowledges that the Deliverables, Other Party Materials and its Materials are subject to export controls under U.S. and other applicable government laws and regulations. Each Party shall comply with all applicable export laws and regulations of all jurisdictions with respect to the Deliverables, Other Party Materials and its Materials or their export, re-export, import, transfer, distribution, use and servicing, and any other similar laws and regulations of any jurisdiction, and obtain, at its own expense, any required permits or export clearances, copies of which such Party shall provide to the other Party upon request. Each Party shall certify that it shall not, directly or indirectly, export, re-export, or transport Deliverables, the Other Party's Materials and its Materials, or any parts or copies thereof, in such manner as to violate such laws and regulations in effect from time to time. Each Party shall not transfer the Deliverables, the Other Party's Materials and Materials to any entity listed on a denial order published by any governmental entity, or a country subject to sanctions, without first obtaining a license or authorization. Each Party shall not use or transfer Deliverables, the Other Party's Materials and its Materials for purposes prohibited by any governmental entity, including, without limitation, the development, design, manufacture, or production of nuclear, missile, chemical or biological weapons, unless authorized by a specific license or authorization.<u>Survival</u>. <u>Article I</u> (Definitions), <u>Section 4.01</u> (Background IP), <u>Section 4.03</u> (Ownership of Deliverables and Intellectual Property), <u>Section 4.05</u> (License to Molekule), Section 5.4 (Effect of Termination of Agreement), <u>Article VI</u> (Confidentiality), <u>Article VII</u> (Representations, Warranties and Covenants); <u>Article VIII</u> (Limitation of Liability and Indemnification), and <u>Article IX</u> (Miscellaneous) shall survive any expiration or termination of this Agreement.<u>Entire Agreement and Counterparts</u>. This Agreement, including any Annexes, Appendices, Exhibits, and SOWs, constitutes the entire agreement between the Parties with respect to the subject matter of this Agreement (superseding any prior or contemporaneous representations, conditions, understandings and other agreements) and may be executed in identical counterparts, each of

which shall constitute an original and all of which together shall constitute one and the same agreement. *[Signature page follows]*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the Effective Date.

**Molekule Group, Inc.**

By: _Ryan Tyler_____
      Name: Ryan Tyler
      Title: Chief Financial Officer

**Aura Smart Air Ltd.**

By: _____
      Name:
      Title:

[Signature Page to Technology Collaboration Agreement]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the Effective Date.

**Molekule Group, Inc.**

By: _____

    Name:

    Title:

**Aura Smart Air Ltd.**

By: *Aviad Shnaiderman*

    Name: Aviad Shnaiderman

    Title: Co-Founder & CEO

*Ofer Bluemenfeld*

Ofer Bluemenfeld

CFO

[Signature Page to Technology Collaboration Agreement]

**Exhibit A**
**SOW-1 to Technology Collaboration Agreement**

1.    **SOW Effective Date.** February 26, 2023

2.    **Project and Objectives.**

(a)    Provide for the ability for Molekule devices to onboard onto the Aura Air platform.

(b)    Provide for the ability for the Aura Air platform to control connected Molekule devices.

(c)    Provide for the ability for Molekule devices to send sensor and diagnostic data to the Aura Air platform.

(d)    Provide for the ability for Aura Air to deliver over the air (OTA) firmware updates to Molekule devices. OTA for Molekule devices will be done through AWS IoT platform while initiated from Aura Air.

3.    **Services.**

3.1    <u>Aura Responsibilities</u>. Aura will be responsible for: Any App, Firmware, Cloud, API changes required for interoperability along with any necessary documentation, testing, and access to pre-production environments. Aura Air will also identify the Project Manager, Dev Leads, Software Developers, and QA needed to complete this work.

3.2    <u>Molekule Responsibilities</u>. Molekule will be responsible for: Any App, Firmware, and Cloud, API changes required for interoperability along with any necessary documentation, testing, and access to pre-production environments with the Aura Air platform. Molekule will also identify the Project Manager, Dev Leads and Software Developers, and QA needed to complete this work.

3.3    <u>Mutual Responsibilities</u>. Aura Air and Molekule will collaborate on making sure that any software changes implemented within their respective areas will integrate seamlessly. This will require joint working sessions within the respective tech teams. Weekly status meeting and reporting will be created by the joint team.

3.4    <u>Service fees</u>. In exchange for the Services set forth in this SOW, Molekule shall make the following payments to Aura: (i) $68,181.81 due on a due date that is one (1) month from the SOW Effective Date and monthly thereafter for a total of ten (10) months; and (ii) $68,181.90 due the twelfth (12th) month from the SOW Effective Date.

3.5    <u>Timing of Payments</u>. Any payments set forth in <u>Section 3.4</u> shall be paid within fifteen (15) Business Days of its respective due date.

4.    **Deliverables.**

4.1    <u>General Description of Deliverables</u>. The purpose of this SOW is to define, at a high level, the features and functionality that need to be implemented or exposed in order to have Molekule devices interoperate with the Aura Air platform. The required functionality has

been broken down into milestones as described in <u>Section 4.4</u> (Milestones and Acceptance Criteria) below.

4.2    <u>Specifications</u>. Detailed specifications will be developed during the analysis phase, to accomplish the business objectives and milestones described herein.

4.3    <u>Quality Control Procedures</u>. Each Deliverable submitted to Molekule for acceptance must meet the following QA process: (i) conforms to all applicable user story acceptance criteria; (ii) meets or exceeds all code quality and other applicable functional or technical requirements; and (iii) passes all applicable QA and related tests; and (iv) has been fully documented on Molekule's designated issue/project tracking platform.

4.4    <u>Milestones and Acceptance Criteria</u>. The relevant milestones associated with this SOW-1 and applicable target completion dates, allocation of responsibility and acceptance criteria are as follows:

| Milestone | Milestone Target(s) | Responsibility | Acceptance Criteria |
|---|---|---|---|
| M0 | Molekule device onboarding to Aura Air platform | Molekule (Firmware and Molekule Cloud updates)<br><br>Aura (specification of Molekule's functions and migration to the Aura Web Platforms) | Demonstrated ability to onboard Molekule Air Mini+ and Air Pro devices to the Aura Web Platform, and define any required metadata within the Aura Web platform. |
| M1 | Aura Air control of Molekule devices | Molekule (Firmware)<br><br>Aura (any necessary updates to cloud APIs) | Demonstrated ability to control Molekule Air Mini+ and Air Pro devices via the Aura Web Platform |
| M2 | Molekule sensor data sent to Aura Air platform | Molekule (Firmware and Molekule Cloud updates)<br><br>Aura (any necessary updates to software and database systems) | Demonstrated ability to send data from Molekule Air Mini+ and Air Pro devices to the Aura Web Platform |
| M3 | Aura Air publishing of firmware update to Molekule devices | Aura | Demonstrated ability to push a firmware update to Molekule Air Mini+ and Air Pro devices from the Aura Web Platform |

4.5    <u>Timeline</u>. The target completion date for the milestones above will be 16 weeks from the SOW Effective Date.

IN WITNESS WHEREOF, the Parties hereto have caused this SOW-1 to be duly executed as of the SOW Effective Date.

**Molekule Group, Inc.**

By: _Ryan Tyler_____
    Name: Ryan Tyler
    Title: Chief Financial Officer

**Aura Smart Air Ltd.**

By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the Parties hereto have caused this SOW-1 to be duly executed as of the SOW Effective Date.

**Molekule Group, Inc.**

By:_____

    Name:

    Title:

**Aura Smart Air Ltd.**

By: *Aviad Shnaiderman*

Name: Aviad Shnaiderman

Title: Co-Founder & CEO

*Ofer Bluemenfeld*

Ofer Bluemenfeld

CFO

[Signature Page to SOW-1]

# EXHIBIT 2

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

| | |
|---|---|
| **In re:** | Chapter 11 |
| | (Consolidated) |
| **MKUL, INC. (f/k/a MOLEKULE GROUP, INC.)** | |
| Debtors. | Case No. 23-18094-EPK |
| | Case No. 23-18093-EPK |

| | |
|---|---|
| **MOLEKULE GROUP, INC.,** | Adv. Proc. No. 24-01004-EPK |
|      Plaintiff, | |
| v. | |
| **AURA SMART AIR, LTD.**, | |
|      Defendant. | |

## DEFENDANT AURA SMART AIR, LTD'S FIRST REQUEST FOR PRODUCTION TO PLAINTIFF MOLEKULE GROUP, INC.

Pursuant to Federal Rule of Bankruptcy Procedure 7034 and Federal Rule of Civil Procedure 34, Defendant Aura Smart Air, Ltd. ("ASA"), hereby serves its First Request for Production to Plaintiff Molekule Group, Inc. ("Molekule"), and request that Molekule produce and provide for inspection and copying documents within its possession, custody, and control that are responsive to the requests contained herein, within thirty (30) days of service. All documents, including ESI, shall be produced in their native form.

[Signature Page and Certificate of Service to Follow]

Dated: April 12, 2024

Respectfully submitted,

**SANCHEZ FISCHER LEVINE, LLP**
1200 Brickell Avenue, Suite 750
Miami, Florida 33131
Tel: (305) 925-9947

By: */s/ Veronica Rabinowitz*
Veronica Rabinowitz, Esq.
Florida Bar No.: 99618
Email: vrabinowitz@sfl-law.com
Secondary: eservice@sfl-law.com
*Counsel for Aura Smith Air, Ltd.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 12, 2024, a true and correct copy of the foregoing document was served on all counsel of record.

By: */s/ Veronica Rabinowitz*
Veronica Rabinowitz, Esq.

## DEFINITIONS AND INSTRUCTIONS

1.       "**You**", "**Your**", or "**Molekule**" refers to Plaintiff Molekule Group, Inc., and its directors, officers, employees, agents, representatives, or other persons acting, or purporting to act, on its behalf.

2.       "**ASA**" refers to Defendant Aura Smart Air, Ltd. including its directors, officers, employees, agents, representatives, or other persons acting, or purporting to act, on its behalf.

3.       "**Action**" refers to the above-styled matter pending in the United States District Court for the Southern District of Florida and bearing case number 24-01004-EPK.

4.       "**Complaint**" refers to the Complaint [ECF No. 4] filed by Molekule in this Action on January 11, 2024.

5.       "**Merger Agreement**" refers to the Agreement and Plan of Merger entered into by and between Molekule, Avatar Merger Sub, Ltd., and ASA on February 26, 2023.

6.       "**Technology Collaboration Agreement**" refers to the agreement entered into by and between Molekule and ASA on February 26, 2023 [ECF No. 100-1, at Exhibit B].

7.       "**Escrow Agreement**" refers to the Source Code Escrow Agreement entered into by and between Molekule, ASA, and Michael Moecker & Associates, Inc. on August 1, 2023 [ECF No. 100-1, at Exhibit F].

8.       "**Co-Distribution Agreement**" refers Co-Distribution Agreement entered into by and between Molekule and ASA on February 26, 2023.

9.       "**Ancillary Agreements**" refers to the Lock-Up Agreements, Support Agreements, the Technology Collaboration Agreement, the Distribution Agreement, the Lender Consents, and the Lender Agreements, as defined in Article 1.01 of the Merger Agreement.

10. "**Excluded Know How**" refers to Intellectual Property developed in connection with or which arises from any research and development efforts conducted under any of the Israeli Innovation Authority Approved Programs, as defined in Article I of the Technology Collaboration Agreement.

11. "**R&D Law**" refers to Israeli Encouragement of Research, Development, and Technological Innovation in Industry Law, 5744-1984, as defined in Article I of the Technology Collaboration Agreement.

12. "**Person**" shall mean, without limitation, natural persons, corporations, partnerships, trusts, ventures, associations, and all similar entities, and any director, officer, employee, agent, representative, attorney, or principal thereof.

13. "**Document**" shall mean and include the terms defined in Rule 1001 of the Federal Rules of Evidence, including "writing," "recording," and "photograph," in addition to its common meaning, correspondence, memoranda (including written memoranda of telephone conversations, other oral communications, discussions, agreements, acts, and activities), telegrams, telexes, cables, telephone records, messages, test messages, WhatsApp messages, chats, reports, tests, samples, studies, compilations of data, filings, pamphlets, diaries, records, charts, lists, analyses, graphs, log books, contracts, agreements, financial statements, books of account, journals, ledgers, expense reports and other financial reports, audits, work papers, profit and loss statements, annual reports, state and federal tax returns, notes, economic or statistical studies, minutes, instructions, requests, cancelled checks, calendars, check pads, appointment books, scrap books, notebooks, electronic documents, on-line documents, electronic mail, email, computer disks, hard drive documents, computer databases, and each draft, electronic or non-identical copy of the foregoing, including those which have notations and writings that do not appear on the originals, now or

formerly in the actual or constructive possession, custody or control of Defendant and/or its representatives or agents.

14.    Consistent with the Federal Rules of Civil Procedure, "**document**" or "**documents**" shall also mean and include (a) any tape or audible recording, any photograph or motion picture or videotape and any non-identical copy of any document as previously defined which differs from any other copy thereof either by virtue of other material appearing thereon, such as handwriting or typewriting, or otherwise; and (b) all electronically stored information (ESI), including without limitation, e-mail, voicemail, documents, spreadsheets calendars, and other information existing in any electronic format (e.g., Word, Excel, Outlook, .pdf, HTML, .tif, .jpeg, .wav).

**WARNING: Computer generated or stored documents, including computer files or data, electronic mail, and information on hard disk which has been erased but is retrievable constitute documents within the meaning of this definition. An inspection of your computer system may be necessary to assure compliance with these requests.**

15.    "**Relates to**" or "**relating to**" shall mean pertains to, refers to, contains, concerns, describes, embodies, mentions, constitutes, supports, corroborates, demonstrates, proves, evidences, shows, refutes, disputes, rebuts, controverts, or contradicts.

16.    The use of the singular herein shall include the plural, and vice versa; the use of the word "**any**" shall and encompass the word "**all**," and vice versa; the use of the disjunctive shall include the conjunctive, and vice versa; and, unless the context indicates otherwise, the use of any gender includes all other genders.

17.    The connectives "**and**" and "**or**" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

18.     The term "**all**" and "**each**" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of discovery all responses that might otherwise be construed to be outside of its scope.

19.     With respect to any Document, information, or thing being withheld from production on the basis of the attorney-client privilege, work product immunity, or otherwise, Molekule must provide a privilege log:

   a.  Identifying the nature of the privilege which is being claimed and the rule of law under which the privilege is being asserted; and,

   b.  The following information:

      i.   The type of Document (e.g., letter, memorandum, e-mail, etc.);

      ii.  The subject matter of the Documents;

      iii. The date of the Document;

      iv.  The present location and identity of the Document's custodian; and

      v.   The author, addressee, and all recipients of copies of the Document.

20.     Unless otherwise specified, the time period of this request is January 1, 2023 to the present.

## REQUESTS FOR PRODUCTION

1.      Any and all documents relating to negotiation of the Merger Agreement.

2.      Any and all documents relating to negotiation or intent of paragraph 8.03 of the Merger Agreement, included but not limited to the following clauses: (1) in subparagraph (b) relating to "the failure of the Transactions to be consummated for a breach or failure to perform hereunder or otherwise, and (2) in subparagraph (c) referring to the "Termination Fee" as "liquidated damages in a reasonable amount that will compensate Parent and Merger Sub for the efforts and resources expended and opportunities foregone while negotiating this Agreement and on the expectation of the consummation of the Transactions."

3.      Any and all documents relating to negotiation or intent of paragraph 9.09 of the Merger Agreement, including, but not limited to, the clause that "[]this Agreement and the Ancillary Agreements constitute the entire agreement with respect to the subject matter contained herein."

4.      Any and all documents relating to negotiation or intent regarding whether the Technology Collaboration Agreement  was intended to impose any obligations upon the parties thereto following a termination of the Merger Agreement (whether or not such termination was one permitted by the Merger Agreement).

5.      Any and all documents relating to negotiation or intent regarding whether the Ancillary Agreements were intended to impose any obligations upon the parties thereto following a termination of the Merger Agreement (whether or not such termination was one permitted by the Merger Agreement).

6.      Any and all documents relating to negotiation of the Ancillary Agreements.

7.      Any and all documents relating to negotiation of the Escrow Agreement.

8.      Any and all documents relating to what software was or is to be deposited pursuant to the Escrow Agreement.

9.      Any and all documents relating to negotiations and understandings of paragraph 8 of the Escrow Agreement, including but not limited to: (a) what materials would or do constitute Excluded Know How, and (b) the reasons for the inclusion of subparagraphs (i) - (v) in paragraph 8 of the Escrow Agreement.

10.     Any and all documents relating to your understanding of what materials would or do constitute Excluded Know How.

11.     Any and all documents relating to negotiations and understandings of paragraph 7.04 of the Merger Agreement.

12.     Any and all documents relating to the reasons why Avatar Merger Sub, Ltd. was organized under the laws of the State of Israel

13.     Any and all documents relating to whether organization of Avatar Merger Sub, Ltd. under the laws of the State of Israel was motivated in whole or part by any portion of the software code constituting or incorporating Excluded Know How.

14.     Any and all documents relating to whether organization of Avatar Merger Sub, Ltd. under the laws of the State of Israel was motivated in whole or part by the R&D Law as that term is defined in the Technology Collaboration Agreement.

15.     Any and all documents relied upon or considered in preparing the Declaration of Joe Lesters dated September 18, 2023 [ECF No. 100-1, at Exhibit C].

16.     Any and all documents relied upon or considered in preparing the Supplemental Declaration of Joe Lesters dated March 12, 2024 [ECF No. 100-1, at Exhibit I].

17.     Any and all documents relied upon or considered in preparing the Declaration of Ryan Tyler dated September 18, 2023 [ECF No. 100-1, at Exhibit D].

18.     Any and all documents relating to your consideration whether to file for protection under the bankruptcy laws of the United States.

19.     Any and all documents relating to why you filed for protection under the bankruptcy laws of the United States.

20.     Any and all documents relating to the reasons why you terminated the Merger Agreement.

21.     Any and all documents relating to your consideration whether the Technology Consulting Agreement or Escrow Agreement would be enforceable following termination of the Merger Agreement (whether or not such termination was one permitted or contemplated by the Merger Agreement)

22.     Any and all documents relating to your failure to make any payments under the Merger Agreement or any of the Ancillary Agreements, including the reasons therefor.

23.     Any and all documents relating to whether any of your actions or inactions constituted a "breach of a covenant or agreement of this Agreement."

24.     Any and all communications relating to the termination of the Merger Agreement.

25.     Any and all communications relating to the termination of the Ancillary Agreements.

26.     All notices of termination of the Merger Agreement you provided.

27.     All notices of termination of the Ancillary Agreements you provided.

# EXHIBIT 3

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

**In re:**

**MKUL, INC. (f/k/a MOLEKULE GROUP, INC.)**

Debtors.

Chapter 11
(Consolidated)

Case No. 23-18094-EPK
Case No. 23-18093-EPK

---

**MOLEKULE GROUP, INC.,**

    Plaintiff,

v.

**AURA SMART AIR, LTD.,**

    Defendant.

Adv. Proc. No. 24-01004-EPK

---

## DEFENDANT AURA SMART AIR, LTD'S NOTICE OF TAKING VIDEOTAPPED DEPOSITION OF PLAINTIFF MOLEKULE GROUP, INC.'S <u>CORPORATE REPRESENTATIVE</u>

Defendant Aura Smart Air, Ltd. ("ASA"), pursuant to Rule 7030 of the Federal Rules of Bankruptcy Procedure and Rule 30(b)(6) of the Federal Rules of Civil Procedure, hereby provides notice of the following deposition:

| DEPONENT | DATE & TIME | LOCATION |
|---|---|---|
| Corporate Representative of Molekule Group, Inc. | May 22, 2024 at 10:00 a.m., EST | Via Zoom[1] |

---

[1] Zoom information will be provided prior to the deposition.

The deposition will be taken before an officer authorized by law to administer oaths and will be videotaped and recorded stenographically.

ASA reserves the right to use any information produced through the deposition process for the purposes of discovery, post-judgment discovery, for use at trial, or for such other purposes as may be permitted under the Federal Rules of Bankruptcy Procedures, corresponding Federal Rules of Civil Procedure, and the Federal Rules of Evidence. Counsel for Defendant Molekule Group, Inc. is invited to attend and to cross-examine.  The deposition will cover all topics identified in **Schedule A** attached hereto.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on  May 8, 2024 a true and correct copy of the foregoing document was served on all counsel of record.

By: *<u>/s/ Michael De Simone</u>*
Michael De Simone, Esq.

## SCHEDULE "A"

## DEFINITIONS AND INSTRUCTIONS

1.      "**You**", "**Your**", or "**Molekule**" refers to Plaintiff Molekule Group, Inc., and its directors, officers, employees, agents, representatives, or other persons acting, or purporting to act, on its behalf.

2.      "**ASA**" refers to Defendant Aura Smart Air, Ltd. including its directors, officers, employees, agents, representatives, or other persons acting, or purporting to act, on its behalf.

3.      "**Action**" refers to the above-styled matter pending in the United States District Court for the Southern District of Florida and bearing case number 24-01004-EPK.

4.      "**Complaint**" refers to the Complaint [ECF No. 4] filed by Molekule in this Action on January 11, 2024.

5.      "**Merger Agreement**" refers to the Agreement and Plan of Merger entered into by and between Molekule, Avatar Merger Sub, Ltd. and ASA on February 26, 2023.

6.      "**Technology Collaboration Agreement**" refers to the agreement entered into by and between Molekule and ASA on February 26, 2023 [ECF No. 100-1, at Exhibit B].

7.      "**Escrow Agreement**" refers to the Source Code Escrow Agreement entered into by and between Molekule, ASA, and Michael Moecker & Associates, Inc. on August 1, 2023 [ECF No. 100-1, at Exhibit F].

8.      "**Co-Distribution Agreement**" refers to the Co-Distribution Agreement entered into by and between Molekule and ASA on February 26, 2023.

9.      "**Ancillary Agreements**" refers to the Lock-Up Agreements, Support Agreements, the Technology Collaboration Agreement, the Distribution Agreement, the Lender Consents, and the Lender Agreements, as defined in Article 1.01 of the Merger Agreement.

10.    "**Excluded Know How**" refers to Intellectual Property developed in connection with or which arises from any research and development efforts conducted under any of the Israeli Innovation Authority Approved Programs, as defined in Article I of the Technology Collaboration Agreement.

11.    "**R&D Law**" refers to Israeli Encouragement of Research, Development, and Technological Innovation in Industry Law, 5744-1984, as defined in Article I of the Technology Collaboration Agreement.

12.    "**Person**" shall mean, without limitation, natural persons, corporations, partnerships, trusts, ventures, associations, and all similar entities, and any director, officer, employee, agent, representative, attorney, or principal thereof.

13.    "**Document**" shall mean and include the terms defined in Rule 1001 of the Federal Rules of Evidence, including "writing," "recording," and "photograph," in addition to its common meaning, correspondence, memoranda (including written memoranda of telephone conversations, other oral communications, discussions, agreements, acts, and activities), telegrams, telexes, cables, telephone records, messages, test messages, WhatsApp messages, chats, reports, tests, samples, studies, compilations of data, filings, pamphlets, diaries, records, charts, lists, analyses, graphs, log books, contracts, agreements, financial statements, books of account, journals, ledgers, expense reports and other financial reports, audits, work papers, profit and loss statements, annual reports, state and federal tax returns, notes, economic or statistical studies, minutes, instructions, requests, cancelled checks, calendars, check pads, appointment books, scrap books, notebooks, electronic documents, on-line documents, electronic mail, email, computer disks, hard drive documents, computer databases, and each draft, electronic or non-identical copy of the foregoing, including those which have notations and writings that do not appear on the originals, now or

formerly in the actual or constructive possession, custody or control of Defendant and/or its representatives or agents.

14.     Consistent with the Federal Rules of Civil Procedure, "**document**" or "**documents**" shall also mean and include (a) any tape or audible recording, any photograph or motion picture or videotape and any non-identical copy of any document as previously defined which differs from any other copy thereof either by virtue of other material appearing thereon, such as handwriting or typewriting, or otherwise; and (b) all electronically stored information (ESI), including without limitation, e-mail, voicemail, documents, spreadsheets calendars, and other information existing in any electronic format (e.g., Word, Excel, Outlook, .pdf, HTML, .tif, .jpeg, .wav).

**WARNING: Computer generated or stored documents, including computer files or data, electronic mail, and information on hard disk which has been erased but is retrievable constitute documents within the meaning of this definition. An inspection of your computer system may be necessary to assure compliance with these requests.**

15.     "**Relates to**" or "**relating to**" shall mean pertains to, refers to, contains, concerns, describes, embodies, mentions, constitutes, supports, corroborates, demonstrates, proves, evidences, shows, refutes, disputes, rebuts, controverts, or contradicts.

16.     The use of the singular herein shall include the plural, and vice versa; the use of the word "**any**" shall and encompass the word "**all**," and vice versa; the use of the disjunctive shall include the conjunctive, and vice versa; and, unless the context indicates otherwise, the use of any gender includes all other genders.

17.     The connectives "**and**" and "**or**" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

18.     The term "**all**" and "**each**" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of discovery all responses that might otherwise be construed to be outside of its scope.

## <u>DEPOSITION TOPICS</u>

The deponent(s) or person(s) will be examined orally as to the following topics:

1.      The facts and circumstances surrounding the matters addressed in the Declaration of Joseph Lesters dated September 18, 2023. [ECF No. 100-1, at Exhibit C].

2.      The facts and circumstances surrounding the matters addressed in the Declaration of Joseph Lesters dated March 12, 2024. [ECF No. 100-1, at Exhibit I].

3.      The facts and circumstances surrounding the matters addressed in the Declaration of Ryan Tyler dated September 18, 2023. [ECF No. 100-1, at Exhibit D].

4.      The facts and circumstances surrounding the negotiation of the Merger Agreement.

5.      The facts and circumstances surrounding the performance and / or satisfaction of the covenants in Article 7 of the Merger Agreement.

6.      The facts and circumstances surrounding the termination of the Merger Agreement.

7.      The facts and circumstances surrounding the negotiation of the Technology Collaboration Agreement.

8.      The facts and circumstances surrounding the negotiation of the Escrow Agreement.

9.      The facts and circumstances surrounding your interpretation of the terms of the Escrow Agreement.

10.     The facts and circumstances surrounding the request(s) to sign the Escrow Agreement.

11.     The facts and circumstances surrounding your decision to terminate the Merger Agreement.

12.     The facts and circumstances surrounding your decision to file for bankruptcy.

13.     The facts and circumstances surrounding the Excluded Know How.

14.     The facts and circumstances surrounding the organization of Avatar Merger Sub, Ltd.

15.     The facts and circumstances surrounding your compliance with R&D Law.

16.     The facts and circumstances surrounding your compliance with requirements the Israeli Innovation Authority.

17.     The facts and circumstances surrounding all amounts paid under the Merger Agreement.

18.     The facts and circumstances surrounding all amounts paid under the Co-Distribution Agreement.

19.     The facts and circumstances surrounding all amounts paid under the Technology Consulting Agreement.

20.     The facts and circumstances surrounding all amounts not paid under the Merger Agreement.

21.     The facts and circumstances surrounding all amounts not paid under the Co-Distribution Agreement.

22.     The facts and circumstances surrounding all amounts not paid under the Technology Consulting Agreement.

23.     The impact of your conduct upon the ability of ASA to satisfy the covenants in Article 7 of the Merger Agreement.

24.     Molekule Group, Inc.'s consideration of the potential for bankruptcy or insolvency of ASA.

25.     Molekule Group, Inc's consideration of whether and when to file for bankruptcy.

26.     Your consideration of how terminating the Merger Agreement might affect your

access to the Aura Air Platform (as that term is used in Exhibit A SOW-1 to Technology Collaboration Agreement) and/or the ability to control Molekule devices

27.    The consideration you have given to re-opening your dashboard program.

28.    Your current B2B market opportunity.