## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

**In re:**

**MKUL, INC. (f/k/a MOLEKULE GROUP, INC.)**

Debtors.

Case No. 23-18094-EPK

Chapter 11
(Jointly Administered)

_____

**MKUL, INC. (f/k/a MOLEKULE GROUP, INC.),** a Delaware corporation,

     Plaintiff,

v.

**AURA SMART AIR, LTD.**, an Israeli corporation,

     Defendant.

Adv. Proc. No. 24-01004-EPK

_____

## DEFENDANT AURA SMART AIR, LTD.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant Aura Smart Air, Ltd. ("ASA") and pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure hereby requests this Court to enter judgment in its favor against Plaintiff, MKUL, Inc. (f/k/a Molekule Group Inc.) ("Molekule").

## INTRODUCTION

ASA is entitled to summary judgment. Molekule is not entitled to source code for the Aura Air Platform. The uncontradicted testimony of Aviad Shnaiderman is that the Aura Air Platform was developed with grants received from the IIA and that the source code, accordingly, is not to

1

be delivered to Molekule pursuant to the parties' contracts.  Molekule, moreover, has no license to install and run that software. Molekule has no rights to the Aura Air Platform.

## FACTS

This action arises from an aborted merger transaction between ASA and Molekule. ASA had been in discussions with a predecessor entity to Molekule about a possible business combination. ASA developed software that enabled business customers to control ASA's smart air filtration products remotely. Declaration of Aviad Shnaiderman dated May 22, 2024, at ¶ 7 (the "Shnaiderman Decl."). This software is the Aura Air Platform. *Id*. Molekule sought a transaction with ASA that would result in Molekule being able to offer business customers the ability to control Molekule air filtration devices using the Aura Air Platform. Shnaiderman Decl.¶ 12.

ASA informed Molekule that the Aura Air Platform had been developed with the benefit of Israel Innovation Authority (the "IIA") funding and, accordingly, was subject to restrictions on transfer. ASA provided access to a data room folder devoted to IIA funding. Shnaiderman Decl. ¶¶ 13-14; Declaration of Ryan Tyler, dated September 18, 2023, at ¶ 13-14 [ECF No. 100-1, the "Tyler Decl."]. ASA and Molekule elected not to proceed with a transaction that would have allowed Molekule to obtain source code of the Aura Air Platform because they would have been required to obtain additional IIA approvals and pay millions of dollars to the IIA. Shnaiderman Decl. ¶ 18.

ASA and Molekule negotiated a merger transaction. Shnaiderman Decl. ¶¶ 11-19. ASA instructed its attorneys to structure a transaction that would comply with Israeli law. Shnaiderman Decl. ¶ 16. The parties agreed to a reverse triangular merger in which ASA would merge with a wholly-owned subsidiary of Molekule that was organized under Israeli law. ASA would have been the surviving company holding all of the rights and interests of pre-merger ASA.  Shnaiderman Decl. ¶¶ 16-17. This structure was adopted, in part, to ensure compliance with Israeli law regarding

the Aura Air Platform. In fact, ASA sought and obtained approval of the IIIA for the merger

transaction (subject to conditions to be satisfied). Shnaiderman Decl. ¶ 17 & Exh. B.

The Merger Agreement demonstrates that Molekule and ASA intended to comply with the

R&D Law. Merger Agreement Art. 6.22 provides: "IIAMatters. Each of the Company and Parent

shall use its reasonable best efforts to obtain as promptly as practicable the IIA Approval. Parent

shall execute and deliver to the IIA an undertaking in customary form to comply with the

provisions of the R&D Law."[1] Shnaiderman Decl. Exh. A, the Merger Agreement. It was a

condition of Molekule's obligation to close that Molekule and ASA obtain IIA Approval. Merger

Agreement Art. 7.02(j). The approval for the merger that ASA obtained as required by Article 6.22

imposed the following requirements:

> Approval is subject to the submission of a letter of commitment signed by Molekule
> Group Inc.
> It is clarified that depositing the source code that was developed as a result of the
> Authority's support in escrow requires the approval of the Committee.

Shnaiderman Decl. Exh. B. The letter of commitment or undertaking required by the IIA and found

on its web site (in the English language) includes the following promises to be made by Molekule:

> 1.      To observe strictly all the requirements of the Innovation Law and the
> provisions of the applicable regulations, rules, procedures and benefit plans, as
> applied to the Company and as directed by the Research Committee, in particular
> those requirements relating to the prohibitions on the transfer of know-how and/or
> production rights.
>
> 2.      As a shareholder of the Company, to make all reasonable efforts that the
> Company shall observe strictly all the requirements of the Innovation Law and the
> provisions of the applicable regulations, rules, procedures and benefit plans, as
> applied to the Company and as directed by the Research Committee, in particular

---

[1] Defined terms in the Merger Agreement include: (a)  "'IIA Approval' means the approval of the IIA required in
accordance with the R&D Law with respect to the Transactions," and (b) "'IIA Notice' shall mean the written notice
to the IIA regarding the change in ownership of the Company effected as a result of the Merger, required to be
submitted to the IIA in connection with the Merger in accordance with the R&D Law, which shall be submitted by
the Company at any time following the date hereof but not later than the Closing."

those requirements relating to the prohibitions on the transfer of know-how and/or production rights.

Shnaiderman Decl. Exhibit F.

Evidencing Molekule's intent to comply with the R&D Law, Molekule required as a condition of its obligation to close that no sums be due to the IIA in excess of those in a schedule provided to it and that consummation of the Transactions contemplated by the Merger Agreement and Ancillary Agreements would not, among other things, cause ASA to be liable to the IIA for any additional sums. Merger Agreement Art. 4.10(m),(n); *see also id*. at Art. 7.02 (representations and warranties in Article 4 required to be true and correct as of the Closing Date).

The reason the IIA approval of the IIA was required is because ASA developed the Aura Air Platform with more than $900,000.00 in IIA grants. Shnaiderman Decl. ¶ 8. The agreements between Molekule and ASA refer at times to Aura's Background IP; the entirety of Aura's Background IP was funded by grants from the IIA. *Id*.

Due to the IIA funding of the development of the Aura Air Platform, Israeli law imposes restrictions. Shnaiderman Decl. ¶ 9. *The source code for the Aura Air Platform may not be transferred to Molekule; were such a transfer to occur criminal and financial penalties could apply.* Shnaiderman Decl. ¶ 10. One reason the IIA had to approve the merger itself was to ensure that the merger was not structured to achieve indirectly a transfer of the source code to the Aura Air Platform. Shnaiderman Decl. ¶ 38.

## A.  The Merger Agreement and TCA were One Integrated Agreement.

On February 26, 2023, Molekule, its subsidiary Avatar Merger Sub, Ltd., and ASA entered into a "Merger Agreement." AS ¶ 12 & Exh. A; Tyler Decl. ¶ 16. They also entered into the Ancillary Agreements, one of which is the Technology Consulting Agreement ("TCA"). Merger Agreement Art. 1.10 (Definitions). Shnaiderman Decl. ¶ 16 & Exh. A; Tyler Decl. ¶ 21. The

Merger Agreement and the Ancillary Agreements, collectively, contemplated completion of several Transactions ("'Transactions' means the transactions contemplated by this [Merger] Agreement and the Ancillary Agreements, including the Merger.'"). Merger Agreement, Definitions. The Merger Agreement and the Ancillary Agreements were drafted to work together as one agreement with respect to the Transactions. Shnaiderman Decl. ¶¶ 20-21 & Exh. A. The Merger Agreement itself provides:

> Entire Agreement. ***This Agreement and the Ancillary Agreements constitute the entire agreement with respect to the subject matter contained herein and therein***, and supersede all prior agreements and understandings, both written and oral, with respect to such subject matter. ***In the event of any inconsistency*** between the statements in the body of this Agreement and those in the Ancillary Agreements and the Schedules (other than an exception expressly set forth as such in the Schedules), ***the statements in the body of this Agreement shall control***.

Merger Agreement, Art. 9.09 (emphasis added). The emphasized first clause indicates that the Merger Agreement and the Ancillary Agreements comprise one agreement covering one subject matter – the Merger and the subsequent relationships of the parties going forward. The final emphasized clause dictates that the Merger Agreement controls in the event of any inconsistency between the Merger Agreement and any Ancillary Agreement – including the TCA. Moreover, the TCA was to expire by no later than when ASA and the Merger Sub merged, leaving ASA the Surviving Company. TCA § 5.01. Reading the Merger Agreement and the TCA together, the TCA's purpose was to give Molekule a head start in preparing for its business customers being able (post-merger) to control Molekule devices via the Aura Air Platform.

The Merger Agreement could be terminated. A concession that Molekule obtained from Aura in the event that *Aura* terminated the Merger Agreement demonstrates the parties' understanding of the consequences of termination. First, the Merger Agreement thereby would be *null and void*. Merger Agreement Art. 8.02. Second, the parties understood and intended that

5

termination of the Merger Agreement would result in the Transactions (the Merger and the transactions under the Ancillary Agreements, including the TCA) *being abandoned*. Merger Agreement Art. 8.03(b) (termination would result in the "failure of the Transactions to be consummated."). The parties agreed in Article 8.03 that certain fees to be paid upon certain terminations of the Merger Agreement were reasonable due to the resulting frustration of the "expectation of the consummation of the Transactions." Merger Agreement Art. 8.03(c).

The point of this discussion of termination is not to argue that any party terminated pursuant to Article 8.03 or that article applies. The provision demonstrates the parties' expectations regarding their future relationship if the Merger Agreement were terminated. *Molekule did not expect the Transactions (including under the TCA) to proceed if the Merger failed*.

### B. The TCA Conveyed No Rights to the Aura Air Platform: Excluded Know How.

Molekule spins a tale regarding its entitlement to the Aura Air Platform that finds no support in the TCA. Molekule partly paid for ASA to build a bridge between Molekule's devices and the Aura Air Platform so that Molekule devices could be controlled remotely. Shnaiderman Decl. ¶ 22. Molekule received the right to use that bridge to integrate between Molekule's devices and ASA's existing platform as well as the right to utilize that software bridge in order to commercialize Molekule devices. Shnaiderman Decl. ¶¶ 22-23. The TCA did not require ASA to deliver any software source code to Molekule other than the source code for the "bridge" between Molekule's internet-connected products and the Aura Air Platform. Shnaiderman Decl. ¶ 24. Neither the TCA nor any other document gives Molekule a license of the Aura Air Platform, any right to run any products in the Aura Air Platform, or any right to install and run the Aura Air Platform on any computer. Shnaiderman Decl. ¶¶ 25-27.

*Molekule seeks specific performance of contract terms that are not found within the TCA.*

The parties agreed numerous times that "Excluded Know How" would not be delivered to Molekule. Excluded Know How is defined in the TCA:

> "Excluded Know-How" means Intellectual Property developed in connection with or which arises from any research and development efforts conducted under any of the IIA Approved Programs.

> "IIA" means the Israeli Innovation Authority.

"IIA Approved Programs" means the following IIA program numbers and titles: (1) 64715 ("פיילוט מחקרי בבתי ספר") and (2) 67274 ("מערכת לניהול איכות האוויר בבית").

TCA Definitions. These two program numbers and titles relate specifically to ASA, with program 64715 relating to "A system for managing air quality in the home" and 67274 relating to a "Research pilot in a school." The TCA also defines the parties' obligations, in part, with reference to the R&D Law:

> "R&D Law" means the Israeli Encouragement of Research, Development and Technological Innovation in Industry Law, 5744-1984 and all of the regulations, rules and internal policies promulgated thereunder by the IIA.

> TCA Section 2.01 is the core of that agreement, requiring ASA to:

> **A.**    deliver to Molekule documentation for the Aura Background IP (excluding the Excluded Know-How); and

> **B.**    conduct the integration activities as further described in SOW-1 to integrate the Aura technology with the Molekule technology (including, to the extent reasonably requested, integrating the Excluded Know-How with the Molekule technology in a manner permitted under, and in accordance with all restrictions of the R&D Law), in order to develop Molekule-Compliant Devices on the terms set forth herein (the "Integration Activities").

Background IP is all software developed by each party prior to the date of the TCA or developed thereafter without access to the information of the other party. TCA Definitions. The undisputed testimony of Aviad Shnaiderman is that the Aura Air Platform/Aura Background IP is Excluded Know-How because funded by IIA grants.

The plain language of these provisions means that Aura was to deliver documentation (but only documentation) relating to its IP developed prior to February 26, 2023, or developed independently after that date. Provided however, that no such documentation was to relate to the Excluded Know How.

TCA § 2.01(b) describes the work under the TCA: ASA was to "conduct the integration activities as further described in SOW-1 to integrate the Aura technology . . . with the Molekule technology in order to develop Molekule-Compliant Devices on the terms set forth herein." The preceding clause directs the parties to the attached SOW-1 for specification of the "integration activities."[2] The parenthetical in TCA § 2.01(b) (corresponding to the ellipsis in the preceding quote) further specifies that it is the obligation of ASA, "to the extent reasonably requested," to "integrat[e] the Excluded Know-How with the Molekule technology in a manner permitted under, and in accordance with all restrictions of the R&D Law." Thus, the obligation to integrate the Excluded Know with Molekule technology is limited by R&D Law Restrictions.

The escrow provision reinforces the conclusion that Excluded Know How was not to be delivered. Although TCA § 2.07 required delivery into escrow all source code that relates to or is used in connection with Aura's Background IP,[3] the potential release to Molekule was limited, permitting release of "Excluded Know-How … solely to the extent permitted pursuant to the R&D Law." TCA § 2.07(b). As Mr. Shnaiderman explains, this precludes release of the Excluded Know How (unless the parties obtained IIA approval for such release, which under the R&D Law would

---

[2] The Statement of Work that is attached to the TCA establishes what was required under TCA § 2.01(b). The Objectives are in Section 2 of SOW-1, ASA's and Molekules' responsibilities are in Section 3 of SOW-1, and the Deliverables (*i.e.*, "the features and functionality . . . in order to have Molekule devices interoperate with the Aura Air platform") are found in Section 4 of SOW-1.
[3] When ASA sought and obtained approval of the Israeli Innovation Authority for the Merger one of the conditions to the IIA's approval was that no source code be released into escrow without prior approval of the IIA: " ** It is clarified that depositing the source code that was developed as a result of the Authority's support in escrow requires the approval of the Committee.". Shnaiderman Decl., Exhibit B. Molekule failed to seek this approval.

have required at least the payment of millions of dollars to the IIA and perhaps satisfaction of other conditions).[4] Shnaiderman Decl. ¶¶ 14, 18.

TCA § 4.05 grants a license "under all of Aura's Background IP" and other Intellectual Property, excluding Excluded Know-How solely to the extent restricted by the R&D Law. The TCA, accordingly, provided for ASA to build a bridge between Molekule devices and the Aura Air Platform. ASA represented that the software comprising this bridge (as specified in SOW-1) would not constitute Excluded Know-How that ASA could not deliver under the R&D Law. TCA § 4.02.

Molekule claims that TCA § 4.02 constitutes a representation that the Aura Background IP is not Excluded Know-How because the Aura Background IP is referenced "on" SOW-1. This is reading is not supported by the language of the TCA because: (a) in that same section ASA "represents that it is the sole and exclusive owner of Aura's Background IP," and one would expect that if ASA were representing that Aura's Background IP were not Excluded Know-How, that would have been expressed in that same clause, making that hypothetical clause read: "ASA "represents that it is the sole and exclusive owner of Aura's Background IP, ***and that Aura's Background IP is not Excluded Know How;***"[5] it is clear that the representation upon which Molekule relies relates to the SOW-1 technologies, and (b) there are repeated carve-outs relating to Aura's Background IP for Excluded Know-How. TCA §§ 2.01(a) ("deliver to Molekule documentation for the Aura Background IP (excluding the Excluded Know-How);"), 2.07 (obligation to deposit source code relating to or used in connection with Aura's Background IP,

---

[4] To expand upon this point, Molekule may be expected to argue in opposition that reading the escrow agreement to not require deliver any source code due to all source code being Excluded Know-How would render TCA § 2.07(b) surplusage. This isn't so, however, due to the parties having had the option to comply fully with the obligations of the Israeli R&D Law to ensure that none of the source code deposited would be "Excluded Know-How." Had Molekule (and ASA) sought approval for transfer of the source code and satisfied the conditions necessary for such transfer, then there would not have been any Excluded Know-How. The fact that the parties did not take these steps does not render the provision surplusage.

[5] Put differently, there was a precise definition for Aura's Background IP, making it nonsensical to specify obligations with respect that Background IP by with reference to technology on an exhibit.

but excluding from release to Molekule Excluded Know-How), 4.05 (exclusion from license). Had the parties understood TCA § 4.02 to represent that Aura's Background IP did not constitute or include "Excluded Know-How," the parties would have had no reason to stipulate repeatedly that delivery of Aura Background IP was subject to exception for Excluded Know-How. Those carve-outs clearly contemplate that at least some part of the Aura Background IP consisted of Excluded Know-How. The TCA, in addition, granted certain rights relating to ASA's software, but in each case carefully carved out all Excluded Know-How as required by the Israeli R&D Law.

As Mr. Shnaiderman explains, the Background IP of ASA consists of what the TCA refers to as the Aura Air Platform. The Aura Air Platform consists of the software that has the capability to connect to and control the essential functions of individual smart air filtration systems.  That Aura Air Platform (*i.e.*, software) was developed with the benefit of grants from Israeli Innovation Authority pursuant to the IIA Approved Programs (as defined). That Aura Air Platform, accordingly, constitutes in its entirety Excluded Know-How that ASA and Molekule agreed would not be transferred from ASA to Molekule.

### C.    The R&D Law and Implications.

ASA, in ECF No. 129 (its opposition to Molekule's motion for summary judgment) explained the Israeli R&D Law in a section written by Yael Baratz of the Israeli law firm Pearl Cohen.[6] ASA incorporates that discussion as if set forth fully herein and the undersigned counsel condenses that discussion.

The R&D Law was enacted to benefit Israel by encouraging research and innovation. Preference is afforded to grant recipients who own the **Funded Technology** and commit to

---

[6] https://www.pearlcohen.com/team-member/yael-baratz/

manufacture a **Funded Product** in Israel. Recipients must not deviate from commitments without permission of the **Research Committee**.

The IIA's Track 1 Rules apply to the grants extended to ASA. Section 14.1 generally requires that the grant recipient own Funded Technology and commit not to transfer the Funded Technology and related rights outside of Israel. Under Section 47A of the R&D Law, violations of certain terms of a grant, including, *inter alia,* transfer of Funded Technology, exposes the offender to penalties and a prison sentence of 3 years. Source code may not be released in a way that allows a third party the potential to further develop the software. It is *illegal* to transfer the source code to a third party without the prior consent of the Research Committee.

IIA grants are repayable via royalties pursuant to Appendix D of the Track 1 Rules. The amount to be repaid is the **Base Royalty Cap**; however, reaching the Base Royalty Cap does not lift the restrictions on transferability of the Funded Technology under the R&D Law. The Track 1 Rules require the Research Committee's prior written approval for *transfer* of Funded Technology outside of Israel as set forth in Section 4 of Appendix B to the Track 1 Rules. If the approval of the Research Committee is obtained for the sale of the Funded Technology to a foreign entity, it is necessary to repay the grants, accrued interest, and an onerous penalty.

An IIA funded company must notify the IIA of a merger or acquisition of such company by a foreign entity. Any foreign person or entity who acquires control must execute an undertaking to observe the provisions of the R&D Law and to make all reasonable efforts to cause the company to adhere to the R&D Law, and in particular to the prohibitions upon the transfer of technology and/or manufacturing rights (the "Undertaking"). Shnaiderman Decl. Exhibit F.

On May 24, 2023, the IIA approved the merger transaction, subject to the requirements that Molekule sign the undertaking and the source code developed with IIA support may not be

deposited into escrow without the IIA's prior consent. Consent for transfer into escrow was never sought or obtained, so that the transfer of the source code from ASA to an escrow agent or to Molekule itself, would be in contravention of the R&D Law. Shnaiderman Decl. Exhibit B.

## ARGUMENT

### A. The Summary Judgment Standard.

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).[7] The moving party bears the burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)*.* A material fact is one which "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Summary judgment is appropriate on a breach of contract claim when the issue is one of contract interpretation. In such a case, summary judgment may be granted if the contract is clear and unambiguous. Summary judgment is appropriate for a moving party who can demonstrate that its construction of the contract "is the only reasonable interpretation." *Bean v. Fursa Capital Partners, LP*, C.A. No. 7566-VCP (Del. Ch. Feb 28, 2013); *GB Biosciences Corp. v. Ishihara Sangyo Kaisha, Ltd.*, 270 F.Supp.2d 476 (D. Del. 2003).

As the Delaware Supreme Court explained in *Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.*, 616 A.2d 1192 (Del. 1992):

> A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction, Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings. . . . Ambiguity does not exist where the

---

[7] Rule 7056 of the Federal Rules of Bankruptcy Procedure applies Rule 56 of the Federal Rules of Civil Procedure in adversary proceedings.

> court can determine the meaning of a contract "without any other guide than a
> knowledge of the simple facts on which, from the nature of language in general, its
> meaning depends." . . . Courts will not torture contractual terms to impart ambiguity
> where ordinary meaning leaves no room for uncertainty. . . . The true test is not
> what the parties to the contract intended it to mean, but what a reasonable person
> in the position of the parties would have thought it meant.

*Id.* at 1196 (citations omitted).

> **B.  The Clear and Unambiguous Terms of the TCA Establish that Molekule is Not
> Entitled to Source Code of the Aura Air Platform as Excluded Know How.**

Because Molekule seeks specific performance of the TCA, Molekule's potential right to

relief is bounded by the clear and definite terms of the agreement. *Westwood Dev. Partners, LLC*

*v. Draper*, CIV.A. K10C-08018RBY, 2012 WL 2440144, at *2 (Del. Super. Ct. Mar. 29, 2012)

(action for specific performance seeks to hold party to terms of contract).

*The TCA is clear and unambiguous and confers no rights upon Molekule in or to the Aura*

*Air Platform source code*. The TCA provides for Molekule and ASA to "participate in a technology

collaboration to integrate the Molekule technology and the Aura technology and to engage in

certain joint development activities." TCA Whereas clause.  TCA § 2.01 is the core of the TCA,

providing for ASA to deliver documentation relating to its Intellectual Property created or

developed prior to the Effective Date of the TCA or after that date but independent of information

or materials provided or made available under the TCA.  TCA § 2.01(a). *Excluded Know-How is*

*excepted from this obligation. Id.* Molekule seeks ASA's source code for the Aura Air Platform.

However, the source code of the Aura Air Platform is Excluded Know-How and Molekule is not

entitled to it under the terms of the TCA.

Second, ASA was obligated to conduct the integration activities described in the SOW-1 to

integrate ASA technology and Molekule technology.  This includes, to the extent reasonably

requested, integrating with the Excluded Know-How in compliance with the R&D Law. TCA §

2.01(b). This is not a requirement to deliver source code or software for the Excluded Know-How.

TCA §2.04 specifies that the "deliverables" under the TCA are the Deliverables as specifically described in Section 4 of SOW-1. TCA § 2.04 continues that what must be provided pursuant to the TCA include sthe source code and documentation that relate to the SOW-1 Section 4 Deliverables. TCA § 2.04(i). ASA also was required to deliver the (undefined) tangible embodiments of the Background IP "in a form and manner reasonably requested by Molekule." TCA § 2.04(ii).

Molekule seeks to enforce the release provisions of TCA § 2.07(b), which provides for the release to Molekule of all Aura source code existing as of the date of the Escrow Agreement that relates to or is used in connection with Aura's Background IP. That delivery, requirement, however, is qualified with respect to Excluded Know-How, requiring release "solely to the extent permitted pursuant to the R&D Law." TCA § 2.07(b).[8]

The clear terms of the TCA include no provision for the delivery of the Aura Air Platform (constituting Excluded Know-How) to Molekule.

### C. The Clear and Unambiguous Terms of the TCA Establish that Molekule Does Not Have a License of the Aura Air Platform.

The TCA does not grant to Molekule a license of the Aura Air Platform (which, as Mr. Shnaiderman testifies, is ASA's Background IP). TCA § 4.01 provides that, "As between Aura and Molekule, each Party shall be the sole and exclusive owner of all right, title and interest in and to its own Background IP," and that "[a]ll rights not expressly granted by a Party herein are reserved by such Party." The Court's inquiry, accordingly, must turn to whether ASA "expressly granted" a software license.

---

[8] Although not at issue on this motion, TCA § 2.07(a), when considered in conjunction with the Merger Agreement and the obligations to secure IIA approval, provides for the escrow of source code with a proper escrow agent in compliance with the IIA and the Israeli R&D Law. (Recall that the IIA approval of the Merger was conditioned upon IIA approval of the source code escrow.)

Molekule claims that TCA § 4.05 grants it a software license, but Molekule distorts that section beyond recognition. It is true that section grants a license but not of the Aura Background IP (the Aura Air Platform). First, TCA § 4.05 does not grant a license "to" all of ASA's Background IP but, rather, grants a license to Molekule "under" ASA's Background IP. Second, that license *under* ASA's Background IP *confers the right to* "use, reproduce, distribute, publicly perform, publicly display, prepare derivative works based on, make, have made, provide, develop, offer to sell, sell, import, have imported, export, have exported, distribute, otherwise dispose of *or otherwise commercially exploit any Molekule products or services*." In other words, Molekule is free to commercially exploit any Molekule products or services fully without a care for whether doing so could infringe upon ASA's rights in ASA's Background IP. TCA § 4.05 does not grant any right to use ASA's Background IP/the Aura Air Platform; Molekule, accordingly, does not, have a license to use ASA's Background IP.

The case law illustrates that a license is a permission to do something relating to software and that it is the description of the rights (not the deployment of the word license) that is critical. *Compare Allscripts Healthcare, LLC v. Andor Health, LLC*, Civil Action No. 21-704, 2021 WL 7209357, at *1 (D. Del. Nov. 22, 2021) ("Allscripts's [sic] shall have a non-exclusive, perpetual, paid up and royalty free license to *__use__* this UI . . . .") (emphasis added); *Revolution Retail Systems, LLC v. Sentinel Tech., Inc.*, C.A. No. 10605–VCP, 2015 WL 6611601, at *14 (Del. Ch. Oct. 30, 2015) ("Revolution hereby grants to Tidel a non-exclusive, perpetual, irrevocable, sublicensable, transferrable and fully paid-up license to *__use__*, copy, display publically [sic], modify, create derivative works of, sell, and distribute the Licensed Software ... during the Term.") (emphasis added); *Block Fin. Corp. v. Inisoft Corp.*, C.A. No. 03C–04–010–CLS, 2009 WL 890981, at *9 (Del. Super. Apr. 2, 2009) ("Inisoft hereby grants Developer (Block) a non-exclusive, royalty free,

nontransferable license, for a period not to exceed seven days to __*use*__ internally the Software solely to commence development of software applications ("Applications"), which shall consist solely of the Software integrated with Developer's proprietary software and information ("Developer Materials").") (emphasis added). By contrast, TCA § 4.05 grants Molekule the authority to do a number of things that constitute commercial exploitation of any Molekule products or services. There is no grant to Molekule of *a license to use that software*.

The fact that Molekule has no license of the Aura Air Platform negates its argument that TCA § 2.04(b) entitles Molekule to an executable copy of the Aura Air Platform to install and run on a computer. Whatever Mr. Lester may believe contatitutes a tangible embodiment, *it is not reasonable for Molekule to demand delivery of software that it has no license to use*.

### D. Molekule May Not Enlist the Court in Ordering ASA to Violate the R& D Law.

It is a requirement of both Delaware law regarding specific performance and injunctions that the equities must favor Molekule in order for it to be entitled to relief. The equities are decidedly against Molekule. There is a strong inference from the facts that Molekule terminated the Merger Agreement with full knowledge (undisclosed to ASA) that it would file for bankruptcy and that this action is an effort to obtain the benefits of the Merger without paying the costs while pushing ASA itself into bankruptcy by failing to pay amounts owed to ASA while delaying the merger repeatedly.  It is suggestive that although represented by Freshfields Bruckhaus Deringer US LLP in connection with the Merger Agreement and the Ancillary Agreements, *see* Merger Agreement, Article 9.02, when Molekule requested that ASA sign the proposed Escrow Agreement it conveyed that request through bankruptcy counsel.[9]  *See* Declaration of Ryan Tyler

---

[9] ASA intends no criticism of counsel.

dated September 18, 2023, Exhibit I [ECF No. 100-1, page 73 of 109]. ASA has sought discovery on these subjects and it is telling that Molekule has sought a protective order rather than respond.

This is a case in which granting specific performance "would cause even greater harm than it would prevent," and for that reason, the Court should decline to grant specific performance. *Walton v. Beale*, 19749, 2006 WL 4763946, at *7 (Del. Ch. Jan. 30, 2006). This is so for several reasons.

Molekule requests that the Court order that ASA violate the R&D Law. As the Merger Agreement makes clear and Mr. Shnaiderman testifies, Molekule was aware of the R&D Law. Molekule was represented by Israeli counsel, Merger Agreement, Article 9.02, and there are numerous provisions in the Merger Agreement and in the TCA that pertained to compliance with the R&D Law. Notwithstanding Molekule's understanding of the law and its understanding that it would be required to sign an undertaking to comply with that law, *Molekule now seeks an order that would require ASA to violate that law and that would put ASA in peril of incurring criminal liabilities*.

Although Molekule profoundly misreads the TCA to argue that it is entitled to receive source code for the Excluded Know-How (the Aura Air Platform), were the Court to enter an order requiring ASA to perform as Molekule demands, the resulting order would violate the principle that the courts will not enforce an illegal agreement. "Being of the opinion that the contract proved in this case was illegal . . . the law will leave the parties as it finds them." *McMullen v. Hoffman*, 174 U.S. 639, 654, 670, 19 S.Ct. 839, 43 L.Ed. 1117 (1899) ("The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract. In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it, nor will they

enforce any alleged rights directly springing from such contract."). Delaware courts follow the same rule. *Della Corp. v. Diamond*, 58 Del. 465, 470 (Del. 1965) ("it is against the public policy of this State to permit its courts to enforce an illegal contract prohibited by law. Ordinarily, we think, when such is the fact, neither party has a remedy to any extent against the other."). When confronted with such a violation of public policy, "the courts typically will leave the parties where they find them." *Geronta Funding v. Brighthouse Life Ins. Co*., 284 A.3d 47, 61 (Del. 2022)

Although this issue arises most typically in cases of violations of state law, courts similarly refuse to order an act that would violate the law of another country. *United States v. Ross*, 302 F.2d 831, 834 (2d Cir. 1962) ("Of course no court should order the performance of an act in a foreign country when that act will violate the foreign country's laws."); *see also SEC v. Kirkland*, No. 6:06-cv-183-Orl-28KRS, 2007 WL 724886, at *2 (M.D. Fla. Feb. 28, 2007) (in connection with order directing U.S. citizen to repatriate assets, "[s]uch an order is effective against the defendant "'provided such act is not contrary to the law of the state in which it is to be performed.'") (*citing Ross*).

Molekule seeks relief from the consequence of its decision to terminate the Merger Agreement. The consequence of that decision was to deprive itself of anticipated benefits of the Merger. The Merger Agreement demonstrates the parties understanding and intent that terminating the Merger Agreement would result in all of the Transactions being abandoned. This is illustrated by the liquidated damages provision, which ASA invokes not because the provision is applicable but because Molekule plainly extracted that liquidated damages provision on the basis that terminating he Merger Agreement would deprive it of the benefits of all of the Transactions. This is reinforced by the fact that the Merger Agreement states that it and the Ancillary Agreements (including the TCA): "constitute the entire agreement with respect to the subject matter contained

herein and therein." Merger Agreement Art. 9.09. Even without this clear indication that the several agreements constitute one contract, the circumstances surrounding their execution and their subject matter would compel the conclusion that there is only one contract. *See Florida Chemical Co., LLC v. Flotek Indus, Inc.*, 262 A.3d 1066, 1081 (Del Ch. 2021) (applying substantially identical integration clause: "The Purchase Agreement and the Terpene Agreement are contemporaneous contracts and accordingly must be read together. As a matter of black letter law, "all writings that are part of the same transaction are interpreted together." *Restatement (Second) of Contracts* § 202(2). Delaware follows this principle and holds that, as a general rule, "contemporaneous contracts between the same parties concerning the same subject matter should be read together as one contract.") (citation omitted); *Comerica Bank v. Glob. Payments Direct*, 2014 WL 3567610, at *7 (Del. Ch. July 21, 2014) (applying "the rule that contemporaneous contracts between the same parties concerning the same subject matter should be read together as one contract.") (collecting authorities)").

What Molekule seeks is to fashion for itself a new contract by breaking apart the Merger Agreement and the TCA and then to reclaim anticipated benefits of the abandoned merger by seeking to convince the Court that the TCA imposes upon ASA obligations that cannot be found in the TCA or elsewhere. Molekule presumably would have found a willing partner (in its wholly-owned subsidiary) to allow Molekule to use the Aura Air Platform to control Molekule's devices. This did not come to pass, however, because Molekule elected to terminate the Merger agreement. There would be *no equity in requiring ASA to convey source code in violation of the law of Israel and to which Molekule has no right.*

Granting specific performance of the actual terms of the TCA will, moreover, confer little or no benefit upon Molekule. Such an order would grant Molekule a custom-built bridge to the Aura Air Platform that would not carry any "traffic." Because Molekule has no right to the use of

the Aura Air Platform, it must negotiate with ASA if it wished to have the use of the Aura Air Platform control the devices that Molekule sells. Similarly, the entry of an injunction requiring the delivery of the source code would run afoul to the law and the terms of the TCA.  Te

In sum, Molekule is not entitled to the relief sought in its Complaint in this action because ASA's source code relating to its Background IP (that is, the Aura Air Platform) is what the agreements between Molekule and ASA constitute Excluded Know-How to which Molekule has no rights. Although Molekule's pleading does not refer to any right to an executable copy of that same software, Molekule should be denied that relief as well because it has license to install and use that software.

The Court should grant summary judgment in ASA's favor because Molekule is not entitled to a judgment granting it specific enforcement of a contract that it cannot prove up by "clear and convincing evidence." *Estate of Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010) (specific performance standard). The same result is compelled on Molekule's count for injunctive relief because (1) ASA has every right to act freely with respect to its Background IP where Molekule has no rights in or to it, (2) Molekule has no right to source code that is Excluded Know-How and certainly not "the right to clone and transfer all source code and related documentation," (3) Molekule has no right to conveyance to it of source code that is Excluded Know-How, (4) Molekule has no right of access to source code that is Excluded Know How, and (5) Molekule has no right to "tangible embodiments" that are Excluded Know-How. Molekule is not entitled to ask the Court to craft a new contract for it.

**WHEREFORE**, this Court should grant ASA's motion for summary judgment in its entirety, and grant such other relief as this Court deems just and proper.

Dated: May 22, 2024                    **SANCHEZ FISCHER LEVINE, LLP**
                                       1200 Brickell Avenue, Ste. 750

Miami, Florida 33131
Telephone: (305) 925-9947

By: */s/ Michael P. De Simone*
Michael P. De Simone
Florida Bar No.: 199739
mdesimone@sfl-law.com
Veronica Rabinowitz, Esq.
Florida Bar No.: 99618
Email: vrabinowitz@sfl-law.com
Secondary email: eservice@sfl-law.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 22, 2024, I electronically filed the forgoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via electronic transmission of Notices of Electronic Filing generated by CM/ECF and/or via separate email.

By: */s/ Michael P. De Simone*
Michael P. De Simone