

**ORDERED in the Southern District of Florida on August 22, 2024.**

Erik P. Kimball
Chief United States Bankruptcy Judge

---

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

In re:                                              Case No. 23-18094-EPK

**MKUL, INC.**                                      Chapter 11
**f/k/a MOLEKULE GROUP, INC.,**                     (Jointly Administered)

      Debtor.
_____/

**MKUL, INC.,**
**f/k/a MOLEKULE GROUP, INC.,**

      Plaintiff,

v.                                                  Adv. Proc. No. 24-01004-EPK

**AURA SMART AIR, LTD.,**

      Defendant.
_____/

### ORDER DENYING CROSS MOTIONS FOR SUMMARY JUDGMENT
### AND LIMITING PRESENTATION FOR PURPOSES OF TRIAL

The Court has before it two motions for summary judgment, one filed by the plaintiff MKUL, Inc.[1] [ECF No. 100] and one filed by the defendant Aura Smart Air, Ltd. [ECF No. 145].  The two motions for summary judgment are mirror images of each other.  Molekule seeks summary judgment in its favor on all relief requested in the complaint [ECF No. 4].  While Aura's motion is labeled as one for partial summary judgment, it seeks judgment in favor of Aura on all counts of the complaint.  The Court has carefully reviewed these motions and the related briefs, statements of facts, documents, and declarations.  ECF Nos. 101, 129, 130, 137, 138, 144, 176, 177, and 178.

As discussed more fully below, Molekule met its burden on both counts of the complaint.  However, because the Court does not have sufficient data to rule on Aura's affirmative defense of illegality, the Court is unable to grant either motion for summary judgment.  In light of the Court's analysis of the relevant agreement between the parties and the Court's own prior orders in the chapter 11 case of Molekule, the only issue remaining for trial is Aura's affirmative defense of illegality.  The Court will limit presentation at trial to evidence and legal argument relevant to that defense.

## BACKGROUND

The parties' dispute centers around agreements they entered into in February 2023.  Among several contracts executed at that time, the parties focus on two — a Technology Collaboration Agreement (the "TCA") and a Merger Agreement.

Aura is an entity formed under the laws of Israel.  Molekule is a Florida corporation.  Both companies have been in the business of developing and marketing air filtration devices.

In late 2022, Molekule and Aura began negotiating a potential acquisition of Aura by Molekule by way of merger.  Aura would merge with a newly created Israeli entity, a

---

[1] In this order, the Court refers to the plaintiff MKUL, Inc. by its former name, Molekule.

subsidiary of Molekule. Aura would be the surviving entity in that merger, and would thereby become a subsidiary of Molekule. The parties memorialized that proposed transaction in the Merger Agreement.

At the same time, Molekule and Aura entered into other agreements including the TCA. Aura had developed software to permit its customers to access air filtration devices in the field by remote means, to obtain data from and control those devices, and to allow remote firmware updates. The parties refer to this as the Aura Air Platform ("AAP"). Molekule wanted to obtain the ability to use the AAP for remote access to its own customers' devices. In the TCA, the parties agreed to integrate their systems in a way to permit Molekule all of the benefits of the AAP, and to provide certain rights to Molekule should Aura fail to perform.

Aura commenced a voluntary bankruptcy in Israel in August 2023 and a trustee was appointed to manage its affairs. Molekule filed a voluntary chapter 11 petition in this Court in October 2023.

The parties differ on why the merger failed. But they agree that the Merger Agreement was terminated before Molekule filed its chapter 11 case.

## RELIEF SOUGHT IN THE COMPLAINT

In the complaint, Molekule requests relief in two counts.

In count I, Molekule seeks specific performance of Aura's obligations under the TCA. Citing section 2.04(ii) of the TCA, Molekule asks the Court to order Aura to deliver the "tangible embodiments" of Aura's Background IP. Background IP is a defined term which Molekule argues includes the AAP. Molekule argues that the phrase "tangible embodiments" refers to the software, related information, and the instructions needed to deploy and use the AAP. Citing section 2.01(a), Molekule asks the Court to order Aura to deliver all documentation for the Background IP, including the AAP. Citing section 2.04(i), Molekule asks the Court to order Aura to deliver all remaining Deliverables. Deliverables is a defined

term referring to work to be done in integrating the AAP with Molekule's technology.  Citing section 2.07, Molekule asks the Court to order Aura to place all source code for its Background IP, including the AAP, into a source code escrow with an escrow agent selected by Molekule. Finally, in count I Molekule asks the Court to award attorneys' fees and costs.

In count II, Molekule seeks injunctive relief aligned with the specific performance requested in count I.  Molekule asks the Court to enjoin Aura from deleting or modifying its Background IP, including the AAP, that is stored with third parties including an entity called Atlassian Corporation.  Molekule asks the Court to enjoin Aura from denying Molekule access to and the ability to transfer all source code and related documentation from any account in the name of Aura at Atlassian or elsewhere, so that it can be transferred into the source code escrow.  Molekule asks the Court to enjoin Aura from refusing to enter into the source code escrow agreement and from refusing to deposit the source code for the Background IP, including the AAP, as required under the TCA.  More generally, Molekule asks the Court to enjoin Aura from taking any action to deny Molekule access to the Background IP.  Molekule seeks an injunction requiring delivery of the tangible embodiments of the Background IP. Finally, in count II Molekule asks the Court to award attorneys' fees and costs.

## MOLEKULE BANKRUPTCY; ASSUMPTION OF TCA

Molekule filed a voluntary chapter 11 petition with this Court on October 3, 2023. Aura was listed on the initial creditors' matrix, and Aura was served with the Court's standard form notice of bankruptcy filing, including notice of the meeting of creditors and various deadlines.  Molekule also served first day motions and notices on Aura.  Aura received notice that it could seek to be included in the Master Service List where it would receive all documents filed in the case.   Shortly after filing the case, Molekule filed a plan of reorganization and related disclosure statement, and later filed an amended plan and disclosure statement.  The Court set an initial confirmation hearing on December 15, 2023.

Molekule served Aura with the plan, the disclosure statement, and this Court's order setting confirmation and establishing an objection deadline along with other deadlines.

On December 1, 2023, Molekule filed an assumption list that included the TCA as one of the contracts Molekule would assume in conjunction with confirmation of its plan. The assumption list identified Aura as the counterparty to the TCA. The assumption list did not reflect any defaults by Molekule that needed to be cured. No other contracts with Aura were included in the assumption list. Molekule served the assumption list on Aura. Under section 7.01(a) of the plan, all other contracts were to be rejected, including the Merger Agreement to the extent it remained executory.

Aura filed proof of claim 28 in the amount of $12,838,977 alleging damages under the TCA, the Merger Agreement, and other agreements between it and Molekule. Molekule objected to Aura's claim and served the objection on Aura's counsel. Aura responded to Molekule's objection.

On January 8, 2024, at Molekule's request and with no objection from Aura, the District Court referred this litigation to this Court. The Court vacated the District Court's scheduling order, set a new scheduling conference, entered a new scheduling order setting this matter for pretrial hearing, and later continued the pretrial hearing to September 11, 2024.

The Court continued the confirmation hearing on the plan twice, first to January 8, 2024 and then to January 18 and 19, 2024, each time extending the deadline for objections, and the resulting orders were properly served on Aura. The Court held an evidentiary hearing on plan confirmation on January 18 and 19, 2024, and issued an oral ruling on January 22, 2024. Aura did not attend any part of the confirmation hearing.

On February 5, 2024, the Court entered an order confirming Molekule's chapter 11 plan [ECF No. 405; Case No. 23-18094]. In connection with confirmation of its plan, Molekule

assumed the TCA under 11 U.S.C. § 365.  To the extent the Merger Agreement remained an executory contract, it was rejected.  There is no dispute that the TCA was assumed and that the Merger Agreement was terminated and, to the extent it remained executory, was rejected. Aura had ample notice of all aspects of Molekule's plan confirmation, including Molekule's intention to assume the TCA and Molekule's intention to reject all contracts not specifically assumed, including relevant objection deadlines.  In connection with assumption of the TCA, consistent with the requirements of 11 U.S.C. § 365, Molekule did not indicate any monetary or non-monetary defaults by Molekule under that agreement [ECF No. 241; Case No. 23-18094].  Aura did not challenge any aspect of Molekule's assumption of the TCA, including the absence of defaults.  The Court's order confirming Molekule's plan and the assumption of the TCA was long ago final.  The parties are bound by that order, including the inherent finding that Molekule was not in default under the TCA at the time of assumption.

Molekule served discovery on Aura in the main bankruptcy case in connection with Molekule's objection to Aura's filed proof of claim.  Aura asked for an extension of time to respond and Molekule agreed.  However, Aura failed to respond to discovery by the agreed extended deadline.  Molekule sought sanctions against Aura and the Court held several hearings.  After multiple hearings, the Court awarded Molekule sanctions against Aura in the form of attorneys' fees and expenses as well as disallowing Aura's claim against the bankruptcy estate [ECF No. 486; Case No. 23-18094].  That order was not appealed and is final.  As a result, Aura holds no allowed claim in Molekule's chapter 11 case.

## ARGUMENTS OF THE PARTIES

The parties' disputes fall into three general categories.

First, Aura argues that, in spite of assumption of the TCA and termination and rejection of the Merger Agreement, the TCA and the Merger Agreement must be treated as a single, integrated agreement.  Aura argues that the TCA terminated along with the Merger

Agreement.  Aura argues that the result is that Molekule is not entitled to any relief requested in the complaint.  Molekule responds that *res judicata* prohibits Aura's argument because the TCA was assumed as a singular agreement and the Merger Agreement, to the extent relevant after its termination, was rejected.

Second, Aura argues that the text of the TCA does not support any of the relief requested by Molekule.  Among other things, Aura argues that it did not grant a license in the AAP to Molekule and so Molekule is not entitled to any data related to the AAP under the TCA, and that Aura did not agree to specific performance in the context of this dispute.

Third, Aura argues that Molekule is asking the Court to enforce an illegal contract.  Aura states that the relief requested in this adversary proceeding — in particular to give Molekule access to the source code for the AAP — is contrary to the law of Israel and would expose Aura to penalties including, potentially, incarceration of representatives of Aura.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a), made applicable to this matter by Federal Rule of Bankruptcy Procedure 7056, provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).  In considering a motion for summary judgment, the Court must construe all facts and draw all reasonable inferences in the light most favorable to the non-moving party. *Id.*

The moving party has the burden of establishing that there is an absence of any genuine issue of material fact. *Celotex*, 477 U.S. at 323.  Once the moving party meets that

burden, the burden shifts to the non-movant, who must present specific facts showing that there exists a genuine dispute of material fact. *Walker v. Darby*, 911 F.2d 1573, 1576 (11th Cir. 1990) (citation omitted).  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Id.* at 1577 (citing *Anderson*, 477 U.S. at 252).  The defendant bears the burden to adduce evidence supporting an affirmative defense.  *Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1552 (11 Cir. 1990).

At the summary judgment stage, the Court will not weigh the evidence or find facts; rather, the Court determines only whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003).

## ANALYSIS

### *Res Judicata* Effect of Order Assuming TCA

The Court first addresses Aura's argument that, in spite of assumption of the TCA and termination and rejection of the Merger Agreement, the TCA and the Merger Agreement must be treated as a single, integrated agreement.  When a chapter 11 debtor seeks to assume under 11 U.S.C. § 365 a contract that its counterparty believes is part of an integrated whole with other contracts, the counterparty may object to the debtor's proposed piecemeal assumption.  The debtor must assume an entire contract.  If several agreements are so intertwined as to make a whole, they must be assumed or rejected together.  *Braniff, Inc. v. GPA Group*, 118 B.R. 819, 844 (Bankr. M.D. Fla. 1990).  If the counterparty believes there are monetary or non-monetary defaults under the contract the debtor seeks to assume, the counterparty must present those defaults to the court so the court may determine if the debtor has an obligation to cure under section 365.

Molekule argues that Aura did not raise these objections in opposition to Molekule's assumption of the TCA. After ample and repeated notice Aura did not object to Molekule's plan or the assumption and rejection of contracts in any way. The Court's order confirming the plan and approving assumption of the TCA and the rejection of the Merger Agreement is *res judicata* with regard to any argument Aura could have raised in opposition, including the integration and termination arguments it presents here. *See In re Cellnet Data Systems, Inc.*, 313 B.R. 604, 608-09 (Bankr. D. Del. 2004); *In re Diamond Mfg. Co.*, 164 B.R. 189, 197-202 (Bankr. S.D. Ga. 1994). The Court obviously had jurisdiction to enter the order confirming the plan and approving assumption of the TCA and the rejection of the Merger Agreement. The Court's order is a final order on the merits. Molekule and Aura are parties to the Court's determination to approve assumption of the TCA and rejection of the Merger Agreement. The causes of action are the same in that whether the TCA was an independent executory contract, whether Molekule was in default under the TCA, and whether the Merger Agreement, to the extent it remained executory, was subject to rejection are at issue in both matters. *See Jang v. United Techs. Corp.*, 206 F.3d 1147, 1149 (11th Cir. 2000). Both Aura's argument based on the alleged integration of the TCA and Merger Agreement and Aura's argument that the TCA terminated along with the Merger Agreement are impermissible collateral attacks on this Court's final order.[2]

Of course, to the extent the TCA specifically incorporates part or all of another agreement, the incorporated provisions are considered part of the TCA. For example, the TCA incorporates certain defined terms from the Merger Agreement. Those defined terms are thus a component of the assumed TCA. But this does not mean that the entire Merger

---

[2] In addition, the Court previously ruled in connection with Aura's motion to withdraw admissions [ECF No. 110] that the Court's order disallowing Aura's proof of claim is *res judicata* with regard to all potential arguments based on the Merger Agreement, among other matters. That is a second final order that Aura cannot now collaterally attack.

Agreement remains binding on Molekule. There is no dispute that the Merger Agreement was terminated and, to the extent it remained executory, was rejected.

Even if Aura was correct that the Court must consider the entire text of the Merger Agreement as part of the assumed TCA, the Merger Agreement does not say what Aura suggests. In particular, it is clear from the TCA that it survived failure of the merger, and there is nothing in the Merger Agreement to the contrary in spite of Aura's twisted interpretations of certain provisions in that agreement. Certain of Aura's related arguments are addressed below, in the Court's analysis of various contract terms.

**The Text of the TCA Supports Molekule's Claims**

The parties agree that the law of Delaware applies to interpretation and enforcement of the TCA, as stated in section 9.02. Consistent with Delaware law, section 9.04 requires that the TCA be "interpreted according to the plain meaning of its terms." Courts applying Delaware law construe contracts to give effect to the intent of the parties. *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1044 (Del. 2023). "Delaware adheres to the objective theory of contracts, *i.e.* a contract's construction should be that which would be understood by an objective, reasonable third party." *Id.* (quotation omitted). Courts read the contract as a whole and "enforce the plain meaning of clear and unambiguous language," endeavoring "to give each provision and term effect" and "not render any terms meaningless or illusory". *Id.* (quotation omitted). Specific provisions of the contract must be read in light of the entire contract. *Id.* (quotation omitted). "Language is ambiguous if it is susceptible to more than one reasonable interpretation." *Id.* (quotation omitted). "If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity." *Eagle Indus. v. DeVilbiss Health Care, Inc.*, 702 A.2d

1228, 1232 (Del. 1997).  The mere fact the parties disagree over interpretation does not, alone, render the contract ambiguous.  *Weinberg*, 294 A.3d at 1044.

The TCA takes the form of a master agreement.  From the second recital, section 2.02, and the overall structure of the contract, the clear intent is that there could be more than one statement of work entered into under the TCA.  This fact informs the Court's interpretation of certain provisions of the TCA.  The first statement of work, SOW-1, was executed along with the TCA.  No other SOWs were executed.

There are several defined terms in the TCA that are important to the parties' dispute here.

Background IP means "any Intellectual Property owned or licensed by a Party or its Affiliates, created or developed prior to the Effective Date or after that date but without access to any of the information or materials provided or made available under this Agreement."  Intellectual Property is very broadly defined and includes all types of software and systems.  The Effective Date is the date of the TCA.  Thus, Background IP includes all intellectual property in existence at the time the parties signed the TCA, plus intellectual property developed after that date that is not part of the integration project contemplated by the TCA.  The AAP existed at the time the parties entered into the TCA.  Indeed, its existence is the reason for the TCA, as Molekule sought to use the AAP for its own products and customers.  Applying simple logic to these provisions, Background IP includes the AAP.

Deliverables means "any and all work product or other results of the Services, in any form or medium and regardless of the state of completion, that is delivered and/or developed by Aura to or for Molekule or its Affiliates as further detailed in the relevant SOW or as set forth in the Integration Activities."  Deliverables are limited to work done after the execution of the TCA and consist of work to be performed under the TCA and its statements of work. The definition of Background IP specifically excludes intellectual property developed after

the date of the TCA that is part of the integration project. Thus, Deliverables are not Background IP.

Excluded Know-How means "Intellectual Property developed in connection with or which arises from any research and development efforts conducted under any of the IIA Approved Programs." IIA means the Israeli Innovation Authority. The IIA is an agency of the government of Israel whose mission is to invest in projects in Israel that foster innovation. The Israeli Encouragement of Research, Development and Technological Innovation in Industry Law, number 5744-1984, is defined in the TCA as the R&D Law. Among other things, the R&D Law restricts the ability to transfer know-how developed as a result of a grant from the IIA. The defined term Excluded Know-How does not include all intellectual property developed with a grant from the IIA and subject to the R&D Law. Excluded Know-How is limited to intellectual property developed under the two specified IIA Approved Programs, numbered 64715 and 67274.

Aura provided no evidence indicating that any of its Background IP, including the AAP, arose from research and development efforts under either of the two specified IIA Approved Programs. Aura did provide the declaration of Aviad Shnaiderman, former Chief Executive Officer and co-founder of Aura. In his declaration, Mr. Shnaiderman states that all of Aura's Background IP was funded with IIA grants. But nowhere in his declaration does Mr. Shnaiderman state that the AAP was funded as part of the IIA Approved Programs numbered 64715 or 67274. There is nothing in the text of the TCA or the evidence offered by Aura to support Aura's argument that the AAP or any component of it is Excluded Know-How as that term is defined in the TCA. Indeed, as will be discussed below, Aura specifically represented to Molekule that the AAP is not Excluded Know-How.[3]

---

[3] Many of Aura's arguments regarding the TCA appear to be desperate attempts to re-cast an agreement Aura apparently regrets entering into.

In section 2.01(a), Aura agrees to "deliver to Molekule documentation for the Aura Background IP (excluding the Excluded Know-How)".  This provision addresses delivery of documentation, which means data relating to software and systems but not the source code itself.  This might include instructions, troubleshooting materials, and the like.  Aura is not required under this provision to deliver documentation for Excluded Know-How.

In section 2.01(b), Aura agrees to "conduct the integration activities as further described in SOW-1 to integrate the Aura technology with the Molekule technology (including, to the extent reasonably requested, integrating the Excluded Know-How with the Molekule technology in a manner permitted under, and in accordance with all restrictions of the R&D Law), in order to develop Molekule-Compliant Devices on the terms set forth here (the 'Integration Activities')."  This provision is directly at odds with Aura's argument that the entirety of the AAP is Excluded Know-How.  The goal of the Integration Activities under the TCA is to permit Molekule to use the AAP for Molekule's devices and customers.  The TCA makes it clear that the Integration Activities will include modifications to the software used by both parties to complete that integration.  If the AAP was in its entirety Excluded Know-How, section 2.01(b) would be inconsistent with the primary goal of the TCA is it would put in question the overall integration project.  Aura's interpretation makes no sense in light of the TCA taken as a whole.

Aura's argument actually goes further than this.  Aura argues that all of its Background IP is Excluded Know-How.  If this was the case, it would not be necessary for the TCA to use both terms, Background IP and Excluded Know-How, and the TCA would need to be structured very differently.  There is nothing in the TCA as it was executed to support this position.

In section 2.04, Aura agrees to "deliver to Molekule (i) all Deliverables provided for in the applicable SOW, together with related source code, documentation, test results, and

related Materials in accordance with the applicable schedule and otherwise as set forth in this Agreement, including the applicable SOW; and (ii) any tangible embodiments of the Background IP in a form and manner reasonably requested by Molekule." The Deliverables are defined as those things to be delivered as part of the integration project and spelled out in SOW-1. In this provision, the phrase "related source code" refers to source code in connection with those Deliverables. These aspects of section 2.04 are not in dispute.

The parties dispute the meaning of the requirement that Aura deliver "any tangible embodiments of the Background IP in a form and manner reasonably requested by Molekule." Molekule argues that the phrase "tangible embodiments" includes software, information, and instructions needed to deploy and use a software platform on a computer or on a cloud computing platform. Because the AAP is part of Aura's Background IP, Molekule interprets this provision to require Aura to deliver an executable copy of the AAP, including the machine-readable software and upload/download/operating instructions. Molekule states that this requires Aura to deliver a copy of the compiled source code for the AAP, meaning the source code that is actually installed on a computer or cloud platform. Molekule states that the tangible embodiments provision does not include uncompiled code, meaning the human-readable code needed to remedy possible future bugs or security breaches and to further develop the software. Molekule states that all source code for Aura's Background IP, including the AAP, both compiled and uncompiled, was to be placed in a source code escrow under section 2.07 of the TCA. Thus, according to Molekule, the distinction between the tangible embodiments provision in section 2.04 and the source code escrow in section 2.07, as they relate to source code, is that section 2.04 does not require delivery of the uncompiled code but section 2.07 does.

Aura's response to this argument is perplexing. Aura focuses on other provisions of the TCA, which Aura argues support the conclusion that Molekule obtained no license to the

AAP and so is not entitled to a copy of that platform in any regard. Aura argues that there is no physical item for the AAP.

As instructed by Delaware law, and by the TCA itself which requires the Court to consider the plain meaning of the contract's terms, the Court starts with the words of the contract. The TCA requires Aura to deliver any tangible embodiments of its Background IP without a limitation relating to Excluded Know-How. In construing the tangible embodiments provision, it is useful to consider the entirety of section 2.04. That provision is entitled "Deliverables." The Deliverables comprise the work to be done in connection with the integration project. For the integration project to have any value to Molekule, Molekule must have access not only to the data developed as a result of the integration project but also to Aura's Background IP, in particular the AAP, so that Molekule's customers may be able to access and control their devices. The plain meaning of the tangible embodiments provision in section 2.04 is that Aura must deliver any Background IP software, including the AAP, in usable form. This includes the compiled code for the AAP and the related data as outlined in the complaint.

Under Delaware law, the Court considers extrinsic evidence of a contract's terms only when the Court is unable to discern the intent of the parties from the text itself. The Court believes it is not necessary to consider extrinsic evidence to understand the "tangible embodiments" provision of section 2.04. But even if it was, Molekule's view would prevail. Molekule offers Mr. Lester's declaration which provides a concise explanation for what is covered by the term "tangible embodiments" in the context of the TCA. In response, Mr. Shnaiderman's declaration states only that Molekule's interpretation is incorrect without actually providing an alternative definition of the phrase "tangible embodiments" in this context. Mr. Shnaiderman's bald statement that Molekule obtained no license to the AAP

under the TCA is contrary to the clear terms of the TCA. Thus, even if the Court were to consider extrinsic evidence, Aura offered no actual contrary evidence.

Section 2.07 provides for a source code escrow. The parties agreed to execute a source code escrow agreement within 5 days after executing the TCA "with a third-party escrow agent determined by Molekule."

Contrary to Aura's argument, there is nothing in the TCA requiring Molekule to select an escrow agent in Israel. Section 2.07 gives Molekule complete discretion to select the escrow agent.

Section 2.07 provides, in relevant part: "Aura shall deposit into escrow all Aura source code existing as of the date of the Escrow Agreement that relates to or is used in connection with Aura's Background IP (the "Deposit Materials")". This provision could not be clearer. Aura is required to deposit in escrow all source code for its Background IP existing on the date of the Escrow Agreement, compiled and uncompiled, with no limitation relating to Excluded Know-How. Because the Escrow Agreement was to be executed less than a week after the TCA, that means all source code for Aura's then-existing software. As noted above, Background IP includes the AAP. Aura explicitly agreed to deposit in escrow all source code for the AAP.

Aura's argument that Molekule's right to escrow of Aura's software is limited to what Aura describes as the "bridge" — apparently a separable component effectuating the integration of the AAP with Molekule's products — does not comport with the text of section 2.07 or the TCA in general. The integration project, or the bridge as Aura calls it, is work to be done after execution of the TCA and implementation of the source code escrow. Section 2.07 requires Aura to deposit source code existing before any work would be done under the TCA or SOW-1. The "bridge" Aura posits could not have been contemplated as part of the source code escrow. In addition, as Molekule properly points out, section 2.07 is not limited

to delivery of the source code for the integration project, as Molekule is independently entitled to that under SOW-1.

As is typically the case, the source code escrow in the TCA is a device intended to protect the licensee, meaning Molekule, in case of a default by the licensor, meaning Aura. In the TCA, Molekule contracted for both a license to Aura's existing technology and services aimed at integrating Aura's existing technology with Molekule's technology and products. If the source code escrow had been designed to escrow only source code arising from the integration project, it would have provided no protection to Molekule at all.

Aura's obligation to deposit source code includes no limitation with regard to Excluded Know-How. Even if the Background IP included Excluded Know-How, Aura agreed to deposit it in escrow. The exclusion arises only if source code is to be released from escrow. Section 2.07 further provides that "the Escrow Agent shall release the Deposit Materials (but with respect to any Excluded Know-How, solely to the extent permitted pursuant to the R&D Law) to Molekule upon the occurrence of any of the following during the Term." Then section 2.07 lists several triggers for escrow release, including Aura filing a petition for bankruptcy. If Aura had made the source code deposit in escrow as it agreed, Molekule would now have rights to release of data from the escrow. Section 2.07 does not provide that any and all Background IP that might be subject to the R&D Law is excluded from release. Again, the defined term Excluded Know-How is narrowly tailored by reference to two specific IIA Approved Programs. Aura provided the Court with no evidence to support the conclusion that the AAP was developed under either of those specific programs. Thus, based on the evidence before the Court at summary judgment, under the terms of the TCA, Molekule is entitled to release of the source code for all of Aura's Background IP, including the AAP, without exclusion.

Section 3.01 provides for Molekule to pay a license fee of $250,000. This is in addition to the service fees under any SOW, and there are significant fees payable under SOW-1 for the integration project. That Molekule is required to pay a sizeable license fee is not consistent with Aura's argument that the only license granted to Molekule is a license to what Aura refers to as the bridge, meaning the product of the integration project for which Molekule agreed to pay separate fees.

In section 4.01, the parties confirm that they are the sole owner of their own Background IP. There is nothing remarkable about this provision. Aura repeatedly argues that Molekule's positions here are inconsistent with this ownership provision. They are not. Molekule is attempting to enforce its rights as the holder of a non-exclusive, perpetual license in Aura's intellectual property. Molekule does not argue that it would become the outright owner of the AAP or any other intellectual property held by Aura. Molekule simply means to obtain the benefit of its bargain in the TCA.

Section 4.02 provides as follows:

> In consideration of a fundamental element pursuant to which Molekule has agreed to enter into this Agreement, Aura represents that it is the sole and exclusive owner of Aura's Background IP and that, notwithstanding anything contrary contained herein, none of the technology set forth on SOW-1 constitutes Excluded Know-How and such technology has not been developed in connection with or arose from any research and development efforts conducted under the IIA Approved Programs. Aura further represents and warrants to Molekule that the restrictions and step-in rights that the IIA has under the IIA Approved Programs do not apply to any of the technology set forth on SOW-1.

This is titled as the Fundamental Representation.

The parties focus on the meaning of the phrase "technology set forth on SOW-1," which technology would be subject to Aura's representation that it is not Excluded Know-How. Molekule argues that the phrase "set forth on" refers to all technology referenced in SOW-1. Because the AAP is referenced multiple times in SOW-1, Molekule argues Aura represented

to Molekule that the AAP is not Excluded Know-How. Aura argues that its representation in section 4.02 applies only to the bridge, meaning the integration project contemplated in the TCA and SOW-1.

Molekule's interpretation of section 4.02 is consistent with the plain meaning of the text. Aura makes two representations in the first sentence of that section. The first representation is that Aura is the exclusive owner of Aura's Background IP. The second representation is that none of the technology set forth on SOW-1 is Excluded Know-How. The integration project, which Aura refers to as the bridge, is not Background IP. The AAP is part of Aura's Background IP. Thus, in a single sentence, Aura represents that it owns its Background IP and also that part of that Background IP, meaning the AAP which is central to the integration project and repeatedly referenced in SOW-1, is not Excluded Know-How.

In contrast, Aura posits that the Fundamental Representation, which Aura recognizes as a key component relied on by Molekule when entering into the TCA, is merely a representation that the integration project itself is not Excluded Know-How. But the Fundamental Representation applies only to technology that "has not been developed" in connection with the IIA Approved Programs. The use of the past tense cannot refer to the integration project because that work was to commence only after execution of the TCA.

Finally, the simplicity of the phrase "set forth on SOW-1" should not be overlooked. SOW-1 has no exhibit with a list of specific technology. It has only the text in the body of the SOW-1 itself. As Molekule properly points out, that text repeatedly references the AAP.

Reading the entirety of the TCA, and section 4.02 in particular, a reasonable person reviewing this contract would understand that Aura represented to Molekule that the AAP, the very software Molekule sought to integrate with its systems, was not Excluded Know-How that would make the integration project and the default provisions of the TCA subject

to regulatory restrictions.  It is not surprising that the TCA labels this as the Fundamental Representation.

In section 4.05, Aura grants a license to Molekule.  That provision states:

> Aura hereby grants Molekule a fully paid-up, worldwide, royalty-free, non-exclusive, non-terminable, perpetual, irrevocable, sublicensable (including through multiple tiers) and transferable license under all of Aura's Background IP and any other Intellectual Property owned or controlled by Aura at any time during the Term including the Aura Developed IP (but in each case excluding any Excluded Know-How solely to the extent restricted by the R&D Law), whether or not such intellectual Property is integrated in a Molekule-Compliant Device, to use, reproduce, distribute, publicly perform, publicly display, prepare derivative works based on, make, have made, provide, develop, offer to sell, sell, import, have imported, export, have exported, distribute, otherwise dispose of or otherwise commercially exploit any Molekule products or services.

This is a very broad grant of a license in all of Aura's Background IP, which includes the AAP.  It is a perpetual but non-exclusive license.  The tension between the parties here is not about ownership of Aura's Background IP.  Aura undisputedly owns all of its Background IP including the AAP, and retains the power to sell or license that intellectual property to others as permitted by applicable law and to continue to develop it.  But whoever owns Aura's Background IP, it will be subject to Molekule's license under the TCA.  Under section 5.04, Molekule's license survives termination of the TCA.

Aura states that the use of the word "under" in the license provision — "under all of Aura's Background IP" — is in contrast with the word "in" and thus limits the license granted to Molekule.  The Court sees no difference in these terms, particularly in light of the breadth of the license granted.

Aura argues that the last phrase of the license provision — "or otherwise commercially exploit any Molekule products or services" — is limiting language.  Aura says that this means every component of the license grant is limited so that Molekule has the use of Aura's technology only to the extent necessary to allow Molekule to exploit Molekule's own products

and services.  This interpretation is not supported by the text of section 4.05.  The phrase "or otherwise commercially exploit any Molekule products or services" is simply the last item in an expansive list of ways Molekule is permitted to use its license in all of Aura's Background IP, including the AAP.

The only limitation in the license granted to Molekule is that it does not include Excluded Know-How and solely to the extent such technology is restricted under the R&D Law.  Again, Excluded Know-How does not include any and all technology that might be subject to the R&D Law.  Excluded Know-How is limited to technology developed under two specified IIA Approved Programs.  Because Aura represented that the technology set forth on SOW-1 is not Excluded Know-How, and that technology includes the AAP, this means that the license in section 4.05 includes an unlimited perpetual but non-exclusive license to the AAP.

Section 5.01 of the TCA defines its term, meaning the length of the effectiveness of the agreement.  It states:  "This Agreement shall be effective from the Effective Date and terminate automatically at the earlier of (i) the date of the Closing, and (ii) the date at which no outstanding SOW remains in effect, unless earlier terminated in accordance with Section 5.042 or Section 5.03 (the "Term")."  The reference to section 5.042 appears to be a typo; it should read 5.02.

The Closing referenced in section 5.01 is the closing of the merger addressed in the Merger Agreement.  The TCA terminates on the earlier of two dates.  The first date is the date of the Closing, if and when that occurs.  If the merger was successful, Molekule would no longer need the integration services under the TCA as it would own and control Aura.  But the license granted in the TCA does not terminate when the TCA terminates.  The license stands whether or not the merger closed.  The second date is the date when no outstanding SOW remains in effect.  Because the Closing of the merger did not occur, and will never occur

because the Merger Agreement is now terminated and, to the extent executory, was rejected, the only date relevant to termination of the TCA is the date on which no existing SOW remains in effect. SOW-1 is the only SOW executed under the TCA. It has not terminated. Thus, the TCA remains in effect.

Aura argues that the TCA terminated when the Merger Agreement was terminated. They base this argument first on the language of section 5.01 of the TCA and second on provisions in the Merger Agreement.

There is no way to read the clear language of section 5.01 as providing that the TCA terminates if the Closing of the merger does not occur or the Merger Agreement is terminated. The text of the TCA does not support this argument.

Aura's argument based on the Merger Agreement fails for two reasons. First, while the TCA does incorporate certain defined terms from the Merger Agreement, the TCA does not incorporate any of the sections of the Merger Agreement cited by Aura. The TCA has been assumed and is thus binding on the parties. The Merger Agreement was terminated pre-bankruptcy and, to the extent it was still executory, was rejected. As explained above, Aura's arguments based on integration of the TCA and Merger Agreement constitute a collateral attack on this Court's order and cannot stand in the face of *res judicata*.

Second, even if Aura was not estopped from presenting these arguments here, the provisions of the Merger Agreement cited by Aura do not support its position. Section 2.01 of the Merger Agreement merely provides that after the merger Aura would be the surviving entity in its merger with Molekule's Israel subsidiary, which would leave Aura as a subsidiary of Molekule. Section 2.01 of the Merger Agreement says nothing about what happens with the TCA if the merger does not close. Aura argues that section 8.03(b) of the Merger Agreement provides that termination of the Merger Agreement results in "failure of the Transactions to be consummated" under the TCA and other documents executed in

connection therewith.  Aura interprets this as resulting in termination of the TCA.  Aura argues that section 8.03(b) of the Merger Agreement provides for a Termination Fee which is liquidated damages for all damage resulting from termination of the Merger Agreement and the TCA, among other agreements.  Even if the Termination Fee provision of section 8.03(b) applies to Molekule's termination of the Merger Agreement in this case, Aura did not pay the Termination Fee within 3 days of termination as required and so the liquidated damages component would not have been triggered. But more importantly, the Termination Fee provision under section 8.03(b) of the Merger Agreement applies only when the Merger Agreement is terminated under specified sections of the Merger Agreement not applicable to Molekule's actual termination of the Merger Agreement.  In other words, section 8.03(b) does not apply at all.

Section 9.06 of the TCA addresses the availability of equitable relief, among other things.  With regard to equitable relief, it states as follows:

> Aura acknowledges that any unauthorized disclosure or use of Molekule's Materials will cause irreparable harm and significant injury to the other Party, the full extent of which will be difficult to ascertain, for which damages are an inadequate remedy and for which there will be no other adequate remedy at law.   Each Party further acknowledges that the restrictions and other obligations under this Agreement are reasonable and necessary to protect Molekule's interests and rights in its Materials, the Molekule technology and the Molekule-Compliant Devices.  Accordingly, Aura agrees that Molekule, in addition to any other available remedies, shall have the right to an immediate injunction and other equitable relief to enforce such restrictions and other obligations, and to enjoin any breach or threatened breach of this Agreement, without the necessity of posting any bond or other security.

Aura argues that the first two sentences of this provision limit Molekule's ability to obtain equitable relief to instances involving Aura's violation of disclosure limitations or unauthorized use of Molekule's Materials.  Aura's view is not supported by the plain text. First, in the second sentence of this provision the parties acknowledge that, in addition to the referenced restrictions, "other obligations" under the TCA are reasonable and necessary to

protect Molekule's interests.  Second, the operative third sentence makes clear that injunctive and other equitable relief is available to enforce "such restrictions and other obligations" and also, specifically, "to enjoin any breach or threatened breach" of the TCA. Taking the text at its plain meaning, Aura agreed that Molekule is entitled to equitable relief in the face of any breach or threatened breach by Aura.  Aura agreed that Molekule is entitled to request the equitable relief at issue in this adversary proceeding.

The text of SOW-1 is illuminating in the context of the dispute here.  Aura argues that the TCA in general, and SOW-1 in particular, indicate the parties' agreement to create a separable bridge between their technologies.  Aura describes this as an independent component as though it can be inserted between Aura's and Molekule's systems and permit Molekule and its customers access to their devices in the field through Aura's AAP.  Like the TCA itself, SOW-1 does not support this view.  Instead, it is clear from the text that the work to be carried out under SOW-1 involves integrating the technology of the two parties in a way that will require changes to both of their systems.  For example, section 3.3 of SOW-1 recognizes the need for "software changes implemented within their respective areas."  In section 4.4 of SOW-1, Aura recognizes the need to modify its software including "any necessary updates to cloud APIS" and "any necessary updates to software and database systems."  This is contrary to Aura's position that Molekule obtained under the TCA only the rights to the so-called bridge and no right to any of Aura's existing technology.

Aura argues that the fact the TCA repeatedly carves out Excluded Know-How from Background IP indicates that there is significant Excluded Know-How.  But the TCA is a master agreement that contemplates multiple SOWs.  The TCA includes the repeated reference to Excluded Know-How to address the possibility of future SOWs involving technology financed with one of the two specified IIA Approved Programs.  The initial SOW, meaning SOW-1, was executed for the particular integration project.  The Fundamental

Representation is focused solely on SOW-1. Thus, the fact that the TCA repeatedly refers to Excluded Know-How does not mean that the AAP is Excluded Know-How. Indeed, Aura represented that it is not.

It is also not fatal that SOW-1 allows for the possibility that the integration project might involve integrating Excluded Know-How to the extent permitted under the R&D Law. The point of the integration project is to permit Molekule the benefit of the AAP for Molekule's devices and customers. If the AAP was itself Excluded Know-How, as Aura argues, then the entire purpose of SOW-1 would be nullified. But SOW-1 recognizes the possibility that other technology might be necessary to the project.

In summary, the text of the TCA and SOW-1 is consistent with Molekule's understanding of the parties' agreement. Aura's position is inconsistent with the written agreement.

## Molekule May Obtain Specific Performance of the TCA and Injunctive Relief

To obtain specific performance of the TCA, Molekule must show by clear and convincing evidence that (1) the TCA is valid and specifically enforceable, (2) Molekule, as the party seeking equitable relief, is ready, willing, and able to perform under the TCA, and (3) the balance of equities favor the requested specific performance. *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010).

The TCA is a valid, fully enforceable agreement that Molekule assumed under 11 U.S.C. § 365 by order of this Court. In the TCA, Aura agreed Molekule is entitled to specific performance of Aura's obligations. As confirmed in the assumption of the TCA, no performance is due from Molekule. Molekule is ready, willing, and able to perform under the TCA. Finally, Aura explicitly agreed to each of the obligations Molekule seeks to enforce, including the escrow of the source code for all of Aura's Background IP. At a minimum, Aura's bankruptcy triggered release to Molekule of the source code for Aura's Background

IP, including the AAP.  Because Aura represented that the AAP is not Excluded Know-How, there is no contractual impediment to release of the source code for the AAP to Molekule.

Aura argues that the equities disfavor Molekule as Molekule is attempting to cause Aura to violate Israeli law.  Even if Aura's illegality defense is valid and is supported by evidence not contradicted by the TCA, Aura would in effect be arguing that it knew from the start that it could not follow through on the promises it made in the TCA and Aura induced Molekule to enter into that agreement based on the false promise that it was enforceable. The equities certainly would not favor Aura.

To obtain the requested injunctive relief, Molekule must show that (1) Molekule succeeded on the merits of its specific performance claim, (2) Molekule will be irreparably harmed if the injunctions are not granted, and (3) any harm to Molekule outweighs potential harm to Aura.  *See N. River Ins. Co. v. Mine Safety Appliances Co.*, 105 A.3d 369, 379 n.47 (Del. 2014).    Molekule is entitled to specific performance as discussed above.  Without the requested injunctive relief Molekule will be unable to obtain the full benefit of the license Aura granted to Molekule under the TCA and money damages are no substitute for the unique intellectual property rights Aura granted to Molekule.  Aura will not be harmed by being required to comply with the terms of the agreement it executed.

**The Court is Unable to Rule on Aura's Illegality Defense at Summary Judgment**

Aura argues that the relief requested in this adversary proceeding — in particular to give Molekule access to the source code for the AAP — is contrary to the R&D Law and would expose Aura to civil and criminal penalties.  This affirmative defense is independent of Aura's arguments, addressed above, based on the terms of the TCA.  It is possible that the AAP was developed as a result of an IIA program other than the two IIA Approved Programs

encompassed by the term Excluded Know-How, thus exposing Aura to sanctions if Molekule is successful in this action.[4]

Under Fed. R. Civ. P. 8(c)(1), made applicable here by Fed. R. Bankr. P. 7008, illegality is an affirmative defense that must be specifically raised in the answer.  In its reply at ECF 178, Aura concedes that it did not raise the affirmative defense of illegality in its original answer.  Aura filed a separate motion to amend its answer by adding the affirmative defense, Molekule agreed to that request, and the Court granted Aura's motion.  ECF Nos. 179, 182, 184.  The parties agree that the affirmative defense of illegality was sufficiently briefed in connection with the cross motions for summary judgment before the Court and that the Court's ruling on these cross motions is binding and effective with respect to the amended answer. ECF No. 182.  The Court considers Aura's affirmative defense of illegality as presented in its amended answer and affirmative defenses.  ECF No. 184.  Aura bears the burden to adduce evidence supporting its affirmative defense. *See Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1552 (11 Cir. 1990).

Aura argues that if it is forced to release the source code for the AAP then Aura will be subject to civil and criminal sanctions under the R&D Law.  To rule on Aura's affirmative defense of illegality, the Court must consider both an issue of fact, whether the AAP was developed as a result of an IIA program and is thus subject to the R&D Law, and an issue of law, whether granting the relief requested in this action would necessarily result in sanctions against Aura.

---

[4] The Fundamental Representation and the TCA as a whole were designed to assure Molekule that the AAP is not subject to the R&D Law.  If Aura carefully structured the TCA to induce Molekule to enter into that agreement – narrowly defining the term Excluded Know-How to encompass only know-how developed under two specific IIA Approved Programs all the while knowing that the AAP was otherwise subject to the R&D Law – Aura may have fraudulently induced Molekule to enter into the TCA.  Nevertheless, the Court must consider whether the equitable relief requested in this adversary proceeding is illegal under the law of Israel.

Aura must show that the specific transaction in question, the escrow of the source code for the AAP and its release from that escrow, involves know-how developed under an IIA grant program. Aura did not provide the Court with an application by Aura for an IIA grant that encompassed development of the AAP, or a copy of an IIA approval relating to the same. Aura provided no documentation of any kind indicating that the AAP was developed as a result of an IIA program. Aura offered only Mr. Shnaiderman's declaration in which he states that Aura "developed the Aura Air Platform with the financial assistance of grants under the authority of the Israel Innovation Authority." Although such testimony, without corroboration, might not be adequate at trial, it could be sufficient at the summary judgment stage to satisfy the factual component of Aura's affirmative defense of illegality. Molekule did not present any evidence to the contrary, but it is typically impossible to present evidence to support the absence of a fact.

Assuming the AAP was developed as a result of an IIA program and is subject to the R&D Law, the Court must consider whether Aura would necessarily be subject to sanctions if the Court grants the relief requested by Molekule in this action. The parties did not provide the Court with sufficient data to make that determination. Among other things, it is unclear whether the source code escrow under the TCA is considered a restricted "transfer" under the R&D Law. Aura concedes that the granting of a non-exclusive license in know-how developed under an IIA program is not considered a transfer. But the parties did not cite any specific provision in the R&D Law, any regulations, any case law, any administrative ruling, or even a scholarly article addressing whether a source code escrow implemented solely to facilitate a non-exclusive license in know-how developed under an IIA program would subject Aura to penalties. Even if the source code escrow is a restricted transfer for purposes of the R&D Law, it is unclear whether Aura may avoid sanctions by paying to the IIA a "termination fee" consisting of repayment of a multiple of the original grant funding with interest. If this is

the case, the relief requested would not be illegal as it would not necessarily subject Aura to sanctions.

Molekule argues that Aura has already placed the source code for its Background IP, including the AAP, with an entity in the United States, and that Aura has the AAP operating in a cloud environment maintained in the United States. Molekule argues that the violation of the R&D Law, if there is any, already occurred, and the Court granting the requested equitable relief would not require Aura to take any further action in violation of the R&D Law. In his declaration, Mr. Shnaiderman flatly denies these factual allegations. In any case, it is unclear whether Aura placing its software with its own agent would constitute a restricted transfer under the R&D Law.

Aura points to the failed merger, and the requirement of IIA approval for that transaction, as indicating that IIA approval is also necessary for the source code escrow of the AAP. Assuming some of Aura's technology was developed as a result of an IIA grant, Molekule's acquisition of Aura would have been an indirect acquisition of the technology, thus implicating the R&D Law and requiring approval from the IIA. Under the TCA, Molekule obtained only a non-exclusive license in the AAP. Molekule will never become the absolute owner of the AAP with the ability to continue to develop that technology. Without citation to relevant Israeli law, Aura's argument by analogy to the failed merger is not persuasive.

Aura also states that section 4.10(m) of the Merger Agreement set a cap on sums that must be paid to the IIA for approval and argues that this limit applies to the source code escrow under the TCA. Even if this argument did not rely on impermissible extrinsic evidence, the cited text does not identify the technology for which sums might be payable to the IIA. There is nothing in section 4.10(m) of the Merger Agreement informing the Court

that any component of the Background IP as defined in the TCA would require payment to the IIA to facilitate a transfer, let along the specific transaction at issue here.

Nor does the IIA's footnote reference to a source code escrow in its approval letter for the merger have any impact on the Court's decision. In addition to the fact that the IIA approval letter is impermissible extrinsic evidence, there is nothing in that footnote to suggest that the referenced source code escrow has anything to do with the source code escrow required under the TCA.

During a hearing on April 24, 2024, at which the Court considered Aura's motion to extend time to designate expert witnesses among other matters [ECF Nos. 112 and 122; Case No. 23-18094], the Court stated that rather than present an expert on the law of Israel that United States counsel for Aura could associate with an Israeli attorney and that the foreign law issues could be presented through briefs and legal argument. Counsel for Aura suggested that the relevant law would be available in English translation. In light of this, the Court determined that an expert witness on Israeli law was not necessary and denied Aura's request for extension of time. [ECF No. 124; Case No. 23-18094].

Unfortunately, neither party provided the Court with a detailed analysis of the issues under the law of Israel. That the Court suggested expert witnesses were not required does not mean that the parties are relieved of the duty to cite with specificity applicable statutes, regulations, case law, and administrative rulings and to provide the Court with translations of the same in English. Other than a general description of the R&D Law and processes associated with it, and broad statements of its alleged impact on this case, Aura cites no specific provisions of the R&D Law that would prohibit the escrow and subsequent release of source code for the AAP solely to facilitate the non-exclusive license Aura granted to Molekule. Nor did Molekule provide a detailed analysis to the contrary. While the Court could certainly test any such argument with its own research, it should not be necessary for

the Court to do the job of the parties and make their legal arguments.[5]  Based on the presentations of the parties at the summary judgment stage, the Court is unable to rule on Aura's affirmative defense of illegality.

## CONCLUSION

Molekule presented sufficient evidence to meet its burden of proof on both counts of the complaint.  However, because the Court is unable at this time to rule on Aura's affirmative defense of illegality, and because the cross motions for summary judgment seek complete relief in favor of each movant, both cross motions must be denied.

In light of the Court's analysis of the TCA and the Court's own order approving assumption of the TCA, the only issue remaining for trial is Aura's affirmative defense of illegality.  The Court will limit presentation at trial to evidence and legal argument relevant to that defense.  At summary judgment, Aura offered only a bald statement in a declaration in support of its position that the AAP was developed as a result of an IIA grant and is thus subject to the R&D Law.  In light of this scant evidence, the Court believes the issue would benefit from a full hearing, including presentation of all relevant documentation and live testimony.  *United States v. Certain Real & Pers. Prop. Belonging to Hayes,* 943 F.2d 1292, 1297 (11th Cir. 1991) ("A trial court is permitted, in its discretion, to deny even a well-supported motion for summary judgment, if it believes the case would benefit from a full hearing."); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Kennedy v. Silas Mason Co.*, 334 U.S. 249 (1948)) (the Court has discretion to deny a motion for

---

[5] Fed. R. Civ. P. 44.1, made applicable here by Fed. R. Bankr. P. 9017, provides:
> A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing. In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law.

The Advisory Committee Notes to the rule make clear that, though the Court can conduct its own research, it is not obligated to do so.

summary judgment "in a case where there is reason to believe that the better course would be to proceed to a full trial."). The parties may present expert testimony on the law of Israel if they wish. The Court will require that all law relied on by the parties and all documentary evidence, if not originally presented in English, must be accompanied by a certified translation in English.

## ORDER

In light of the foregoing, the Court ORDERS and ADJUDGES as follows:

1.      The *Motion for Summary Judgment* [ECF No. 100] filed by plaintiff MKUL, Inc., f/k/a Molekule Group, Inc. is DENIED.

2.      The *Defendant Aura Smart Air, Ltd.'s Motion for Partial Summary Judgment* [ECF No. 145] is DENIED.

3.      At trial in this adversary proceeding, the parties may present evidence and argument solely with regard to Aura's affirmative defense of illegality. This may include expert testimony on the law of Israel as relevant to the affirmative defense. The parties must provide to the Court, to the extent not originally presented in English, along with the original, certified English translations of: (a) any and all Israeli law relied on by the parties, including without limitation statutory law, regulations, case law, and administrative rulings; and (b) all documentary evidence.

### ###

Copies furnished to:

Bradley S. Shraiberg, Esq.

*Bradley S. Shraiberg, Esq. shall serve a copy of this order on all appropriate parties and file a certificate of service with the Court.*